ACCEPTED
04-14-00641-CV
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
3/11/2015 1:37:12 PM
KEITH HOTTLE
CLERK

## NO. 04-14-00641-CV

---

## IN THE COURT OF APPEALS
## FOR THE FOURTH DISTRICT OF TEXAS
## AT SAN ANTONIO, TEXAS

---

**ROBERT MARX AND DEBBIE MARX,**

**Appellants,**

**V.**

**FDP, LP,**

**Appellee.**

---

**On Appeal From the 81st Judicial
District Court of Wilson County, Texas,
Trial Court Cause No. 12-03-0101-CVW**

---

## BRIEF OF APPELLEE FDP, LP

---

**GILBERT T. ADAMS, III**
gilbert@gta-law.com
**GILBERT ADAMS LAW OFFICES**
1855 Calder Avenue at Third
P. O. Drawer 3688
Beaumont, Texas   77704
Telephone:        (409) 835-3000
Telecopier:       (409) 832-6162

**VINCENT L. MARABLE III**
trippmarable@sbcglobal.net
**PAUL WEBB, P.C.**
221 N. Houston
Wharton, Texas   77488
Telephone:        (979) 532-5331
Telecopier:       (979) 532-2902

**ATTORNEYS FOR APPELLEE FDP, LP**

# TABLE OF CONTENTS

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

INDEX OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

STATEMENT OF THE CASE (Tex. R. App. P. 38.1(d)). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

STATEMENT REGARDING ORAL ARGUMENT. . . . . . . . . . . . . . . . . 18

RECORD AND PARTY REFERENCES. . . . . . . . . . . . . . . . . . . . . . . 19

APPENDIX. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

BRIEF OF APPELLEE FDP, LP. . . . . . . . . . . . . . . . . . . . . . . . . . 21

INTRODUCTION AND OVERVIEW. . . . . . . . . . . . . . . . . . . . . . . . 21

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    A.    The Farm And Ranch Contract. . . . . . . . . . . . . . . . . . . . 22

    B.    The Marxes Breach The Farm And Ranch Contract.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    C.    FDP Sues The Marxes. . . . . . . . . . . . . . . . . . . . . . . . . 26

    D.    FDP And The Marxes Settle. . . . . . . . . . . . . . . . . . . . . 27

    E.    The Marxes Breach The Mediated Settlement Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . 29

    F.    The Arbitrator Rules And His Rulings Are Confirmed. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

G.     The Trial Court Orders Specific Performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

     A.     Mediated Settlement Agreements.. . . . . . . . . . . . . . . . . . . . . . 36

     B.     Specific Performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

     C.     Contract Formation And Unenforceability. . . . . . . . . . . . . . . . 39

     D.     Consideration. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

     A.     The Mediated Settlement Agreement Was Enforceable And The Trial Court Did Not Err In Granting FDP's Motion For Final Summary Judgment (Responsive to Appellants' Brief, pp. 15-19). . . . . . . . . . . . . . . . . . . . . . . . 42

          I.     Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

          II.     The Marxes' Arguments Reflect A Lack Of Understanding Of Texas Law Governing Contract Modification. . . . . . . . . . . . . . . . 48

          III.     The Trial Court Did Not Abuse Its Discretion In Awarding Specific Performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

          IV.     The Marxes' Authorities Are Inapposite. . . . . . . . . . . . 58

3

B.    The Option That The Marxes Agreed To
In The Mediated Settlement Agreement
Was Supported By Consideration
(Responsive to Appellants' Brief, pp.
19-21). . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

C.    The Affirmative Defenses Alleged By
The Marxes Did Not Bar The Trial Court
From Granting Summary Judgment In
Favor Of FDP (Responsive to Appellants'
Brief, p. 22). . . . . . . . . . . . . . . . . . . . . . . 77

CONCLUSION AND PRAYER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

CERTIFICATE OF COMPLIANCE. . . . . . . . . . . . . . . . . . . . . . . . . . 85

APPENDIX

Final Judgment signed August 11, 2014
(2 CR 532-556) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . TAB "1"

Farm and Ranch Contract
(1 CR 16-31) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . TAB "2"

Mediated Settlement Agreement
(1 CR 182-188) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . TAB "3"

Order confirming Arbitration Award and
incorporating Arbitrator's Ruling
(2 CR 353-363) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . TAB "4"

# INDEX OF AUTHORITIES

**CASES:**

Advance Components, Inc. v. Goodstein, 608
SW.2d 737 (Tex. Civ. App.–Dallas 1980, writ
ref'd n.r.e.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 53, 54, 57, 60

Allen v. Am. Gen. Finance, Inc., 251 S.W.3d 676
(Tex. App.–San Antonio 2007, pet. granted,
judgment vacated pursuant to settlement). . . . . . . . . . . . . . . . . . . . . . . . 63

America's Favorite Chicken Co. v. Samaras, 929
S.W.2d 617 (Tex. App.–San Antonio 1996, writ
denied). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 45

Ayala v. Soto, No. 04-12-00860-CV, 2014 WL
1614281 (Tex. App.–San Antonio April 23,
2014, pet. filed) (mem. op.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

BACM 2001-1 San Felipe Road Ltd. Partnership
v. Trafalgar Holdings I, Ltd., 218 S.W.3d 137
(Tex. App.–Houston [14th Dist.] 2007, pet. denied). . . . . . . . . . . . . . . . . 48

Birdwell v. Birdwell, 819 S.W.2d 223 (Tex. App.–
Fort Worth 1991, writ denied). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64, 71

Blaffer & Farish v. Gulf Pipe Line Co., 218 S.W.
89 (Tex. Civ. App.–Galveston 1919, no writ). . . . . . . . . . . . . . . . . . . . 67, 68

Bridgeman v. Jefferson Amusement Co., 207
S.W.2d 138 (Tex. Civ. App.–Beaumont 1948,
writ ref'd n.r.e.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66, 67

Brison v. Continental Oil Co., 48 S.W.2d 442
(Tex. Civ. App.–Fort Worth 1932, writ ref'd). . . . . . . . . . . . . . . . . . . . . . 71

Brooks v. Excellence Mortg., Ltd., __ S.W.3d __,
No. 04-13-00106, 2014 WL 2434583 (Tex. App.–
San Antonio May 30, 2014, no pet.). . . . . . . . . . . . . . . . . . . . . . . . . . 80

Brownlee v. Brownlee, 665 S.W.2d 111 (Tex.
1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78, 79

Brownwood Ross Co. v. Maverick Cnty., 936
S.W.2d 42 (Tex. App.–San Antonio 1996, writ
denied). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Bryant v. Cady, 445 S.W.3d 815 (Tex. App.–
Texarkana 2014, no pet.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Chambers County v. TSP Dev., Ltd., 63 S.W.3d 835
(Tex. App.–Houston [14th Dist.] 2001, pet. denied). . . . . . . . . . . . 74, 75, 76

Corsicana Petroleum Co. v. Owens, 222 S.W.
154 (Tex. 1920).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

Culbertson v. Brodsky, 788 S.W.2d 156 (Tex.
App.–Fort Worth 1990, writ denied). . . . . . . . . . . . . . . . . . . . . . . . . . . 73

Doncaster v. Hernaiz, 161 S.W.3d 594 (Tex. App.–San Antonio 2005, no pet.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Eastman Gas Company, L.L.C. v. Goodrich Petroleum Company, L.L.C., __ S.W.3d __, No. 06-13-00128-CV, 2015 WL 170234 (Tex. App.–Texarkana Jan. 14, 2015, no pet. h.). . . . . . . . . . . . . . . . . . . . . . . 40

Echols v. Bloom, 485 S.W.2d 798 (Tex. Civ. App.–Houston [14th Dist.] 1972, writ ref'd n.r.e.). . . . . . . . . . . . . . . . . . 65, 66

Enserch Corp. v. Rebich, 925 S.W.2d 75 (Tex. App.–Tyler 1996, writ dism'd). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Estate of Griffin v. Sumner, 604 S.W.2d 221 (Tex. Civ. App.–San Antonio 1980, writ ref'd n.r.e.). . . . . . . . . . . . . . . . . . . . . . . 50

Fortner v. Fannin Bank in Windom, 634 S.W.2d 74 (Tex. App.–Austin 1982, no writ). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

Foster v. Lessing, 346 S.W.2d 939 (Tex. Civ. App.–Waco 1961, writ ref'd n.r.e.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Garrod Investments, Inc. v. Schlegel, 139 S.W.3d 759 (Tex. App.–Corpus Christi 2004, no pet.). . . . . . . . . . . . . . . . . . . . 58, 60

General Metal Fabricating Corporation Corp. v. Stergiou, 438 S.W.3d 737 (Tex. App.–Houston [1st Dist.] 2014, no pet.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 46

Great Western Oil Co. v. Carpenter, 95 S.W. 57
(Tex. Civ. App. 1906, writ ref'd).. . . . . . . . . . . . . . . . . . . . . . . . . . . 71, 72

Hammonds v. Cramer Financial Group, Inc., No.
04-96-00548-CV, 1997 WL 184734 (Tex. App.–
San Antonio April 16, 1997, no writ) (not
designated for publication). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

Hastings v. Pichinson, 370 S.W.2d 1 (Tex. Civ.
App.–San Antonio 1963, no writ). . . . . . . . . . . . . . . . . . . . . . . . . . 26

Hernandez v. Telles, 663 S.W.2d 91 (Tex. App.–
El Paso 1983, no writ).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Horner v. Bourland, 724 F.2d 1142 (5th Cir. 1984). . . . . . . . . . . . 55, 56, 57

Hott v. Pearcy/Christon, Inc., 663 S.W.2d 851
(Tex. App.–Dallas 1983, writ ref'd n.r.e.).. . . . . . . . . . . . . . . . . . . . . 73

Incore Construction, Inc. v. Incore, Inc., No.
04-08-00785-CV, 2009 WL 4827071 (Tex.
App.–San Antonio Dec. 16, 2009, pet. denied)
(mem. op.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

In re Blankenship, 392 S.W.3d 249 (Tex. App.–
San Antonio 2012, no pet.).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 78

In re Estate of Valdez, 406 S.W.3d 228 (Tex.
App.–San Antonio 2013, pet. denied). . . . . . . . . . . . . . . . . . . . . . . 78

J.M. Davidson, Inc. v. Webster, 128 S.W.3d 223
(Tex. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Jim Maddox Properties, LLC v. WEM Equity
Capital Investments, Ltd., 446 S.W.3d 126
(Tex. App.–Houston [1st Dist.] 2014, no pet.). . . . . . . . . . . . . . . . . . . . 80

Johnson v. Farrow, 594 S.W.2d 655 (Mo. App.
1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

Kress v. Soules, 261 S.W.2d 703 (Tex. 1953). . . . . . . . . . . . . . . . . . . . 38

Lee v. Lee, 275 S.W.2d 574 (Tex. Civ. App.–
Texarkana 1955, writ dism'd). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

Lower Colorado River Authority v. Naumann, 638
S.W.2d 195 (Tex. App.–Houston [1st Dist.] 1982,
writ ref'd n.r.e.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Lunsford Consulting Group, Inc. v. Crescent Real
Estate Funding VIII, L.P., 77 S.W.3d 473 (Tex.
App.–Houston [1st Dist.] 2002, no pet.). . . . . . . . . . . . . . . . . . . . . . . 79

Martin v. Martin, 326 S.W.3d 741 (Tex. App.–
Texarkana 2010, pet. denied). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Martin v. Martin, Martin & Richards, Inc., 12 S.W.3d
120 (Tex. App.–Fort Worth 1999, no pet.).. . . . . . . . . . . . . . . . . . . . . 71

Mayhew & Isbell Lumber Co. v. Valley Wells Truck Growers' Ass'n, 216 S.W. 225 (Tex. Civ. App.– San Antonio 1919, no writ). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

McCalla v. Baker's Campground, Inc., 416 S.W.3d 416 (Tex. 2013).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 46

Mitchell v. Lawson, 444 S.W.2d 192 (Tex. Civ. App.–San Antonio 1969, no writ). . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

National Oil & Pipe Line Co. v. Teel, 68 S.W. 979 (Tex. 1902). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

Nolan v. Hunter, No. 04-13-00072-CV, 2013 WL 5431050 (Tex. App.–San Antonio Sept. 25, 2013, no pet.) (mem. op.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Nolana Development Ass'n v. Corsi, 682 S.W.2d 246 (Tex. 1984).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Pace Corporation v. Jackson, 284 S.W.2d 340 (Tex. 1955). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68, 69

Paciwest, Inc. v. Warner Alan Properties, LLC, 266 S.W.3d 559 (Tex. App.–Fort Worth 2008, pet. denied).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 52

Pickard v. LJH Enterprises, No. 01-07-01105-CV,
2010 WL 1493105 (Tex. App.–Houston [1st Dist.]
April 15, 2010, no pet.) (mem. op.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Potcinske v. McDonald Property Investments,
Ltd., 245 S.W.3d 526 (Tex. App.–Houston
[1st Dist.] 2007, no pet.). . . . . . . . . . . . . . . . . . . . . . . . . 52, 58, 59, 60

Prairie Producing Co. v. Martens, 705 S.W.2d 257
(Tex. App.–Texarkana 1986, writ ref'd n.r.e.). . . . . . . . . . . . . . . . . . . . 64, 71

Reeves v. Lago Vista, Inc., 497 S.W.2d 950 (Tex.
Civ. App.–Austin 1973, writ ref'd n.r.e.). . . . . . . . . . . . . . . . . . . . . . . . . 64

Reserve Petroleum Co. v. Hodge, 213 S.W.2d
456 (Tex. 1948). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Rickey v. Houston Health Club, 863 S.W.2d 148
(Tex. App.–Texarkana 1993), writ denied n.r.e.,
888 S.W.2d 812 (Tex. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

Rother v. Rother, No. 04-13-00899-CV, 2014 WL
4922898 (Tex. App.–San Antonio Oct. 1, 2014,
no pet.) (mem. op.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Rus-Ann Dev., Inc. v. ECGC, Inc., 222 S.W.3d 921
(Tex. App.–Tyler 2007, no pet.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Saenz v. Martinez, No. 04-07-00339-CV, 2008 WL
4809217 (Tex. App.–San Antonio Nov. 5, 2008,
no pet.) (mem. op.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 43, 63, 71

Saturn Capital Corp. v. Dorsey, No. 01-04-00626-CV,
2006 WL 1767602 (Tex. App.–Houston [1st Dist.]
2006, pet. denied). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Schlumberger Technology Corporation v. Swanson,
959 S.W.2d 171 (Tex. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Scott v. Sebree, 986 S.W.2d 364 (Tex. App.–
Austin 1999, pet. denied). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 49

Sifuentes v. Carrillo, 982 S.W.2d 500 (Tex.
App.–San Antonio 1998, pet. denied). . . . . . . . . . . . . . . . . . . . . . 45

Smith v. Thorne, No. 01-01-01241-CV, 2003 WL
21357297 (Tex. App.–Houston [1st Dist.] June
12, 2003, no pet.) (mem. op.). . . . . . . . . . . . . . . . . . . . . . . . . . 58, 59

Stafford v. S. Vanity Magazine, Inc., 231 S.W.3d
530 (Tex. App.–Dallas 2007, pet. denied). . . . . . . . . . . . . . . . . 38, 39

Wilson v. Beaty, 211 S.W. 524 (Tex. Civ. App.–
San Antonio 1919, writ ref'd). . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Wise v. Luke Development, LLC, No.
04-12-00477-CV, 2013 WL 4483381
(Tex. App.–San Antonio Aug. 21, 2013,
no pet.) (mem. op.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80, 81

Woodside v. Woodside, 154 S.W.3d 688 (Tex.
App.–El Paso 2004, no pet.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

Wright v. Sydow, 173 S.W.3d 534 (Tex. App.–
Houston [14th Dist.] 2004, pet. denied). . . . . . . . . . . . . . . . . . . . . . . 38

**RULES AND STATUTES:**

Tex. Civ. Prac. & Rem. Code Ann. § 154.002. . . . . . . . . . . . . . . . . . . . . . 38

Tex. Civ. Prac. & Rem. Code Ann. § 154.003. . . . . . . . . . . . . . . . . . . . . . 38

Tex. Civ. Prac. & Rem. Code Section 154.071(a). . . . . . . . . . . . . . . . . . . 37

Tex. Gov't Code §§ 2007.001–.045. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

Tex. R. App. P. 9.4(i)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

Tex. R. App. P. 9.4(i)(2)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

Tex. R. App. P. 38.1(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Tex. R. App. P. 38.1(i). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

Tex. R. App. P. 38.2(a)(1)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**OTHER SOURCES:**

Joseph Perillo and Helen Bender, 2 Corbin on
Contracts (rev. ed. 1995) Section 5.12. . . . . . . . . . . . . . . . . . . . . . . . 64

Restatement (Second) of Contracts, Section
80 (1981), comment a. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

## STATEMENT OF THE CASE
## (Tex. R. App. P. 38.1(d))


The Appellants' Brief contains a section entitled "Statement of the Case" on pages 1-2. This section of Appellants' Brief does not comply with the requirements of Texas Rule of Appellate Procedure 38.1(d). For such reason, Appellee FDP, LP includes this Statement of the Case that complies with Tex. R. App. P. 38.1(d).

| | |
|---|---|
| **NATURE OF THE CASE:** | This is a contractual dispute arising from a Farm and Ranch Contract executed by Appellants Robert and Debbie Marx, as Sellers and Appellee FDP, LP as Buyer, pursuant to which the Marxes agreed to sell to FDP, LP a 500 acre tract for $1,875,000.00 ($3,750.00 per acre) and to grant to FDP, LP a right of first refusal and option to purchase a 21 acre tract. (1 CR 16-30; Tab "2" to Appendix) |
| **COURSE OF PROCEEDINGS:** | FDP, LP filed suit against the Marxes and their attorney on March 12, 2012, requesting specific performance and seeking actual and exemplary damages. (1 CR 1-32) On August 27, 2013, FDP, LP and the Marxes entered into a Mediated Settlement Agreement that contained the following terms:<br><br>a) FDP, LP agreed to purchase from the Marxes 421 acres for $5,000.00 per acre; |

b) the Marxes retained a Homestead for no longer than 8 years;

c) the parties were to mutually agree on the Homestead, not to exceed 100 acres;

d) if the parties could not agree on what constituted the Homestead, the issue would be submitted to arbitration;

e) FDP, LP was granted an exclusive option to purchase the Homestead; and

f) all claims and causes of action between the parties, except for the undertakings in the Mediated Settlement Agreement were mutually released. (1 CR 182-188; Tab "3" to Appendix)

The Mediated Settlement Agreement was filed on September 3, 2013. (1 CR 182) On September 16, 2013, the Marxes objected to the Mediated Settlement Agreement. (1 CR 191-202)

**TRIAL COURT'S DISPOSITION OF THE CASE:**

On October 23, 2013, the trial court ordered the parties back to mediation. (2 CR 322) The mediation was not successful. (2 CR 323) On November 14, 2013, the trial court ordered the parties to arbitrate the issue of designation of the 100 acre Homestead.

(2 CR 323) The arbitrator made his ruling on such issue by letter dated April 14, 2014. (2 CR 355-363; Tab "4" to Appendix) The trial court confirmed the arbitration award on May 12, 2014. (2 CR 353-363; Tab "4" to Appendix) On August 11, 2014, the trial court signed a Final Judgment in favor of FDP, LP awarding specific performance and attorneys' fees. (2 CR 532-556; Tab "1" to Appendix)

## STATEMENT REGARDING ORAL ARGUMENT

The final judgment in this case orders specific enforcement of a Farm and Ranch Contract that was modified by a Mediated Settlement Agreement and clarified by an arbitration ruling. (2 CR 532-556; Tab "1" to Appendix) The standard of appellate review that governs the enforceability of the trial court's rulings and the challenges made on appeal by the Marxes are well-established. Appellee FDP, LP does not believe that oral argument will assist the Court in disposing of the issues in this appeal. However, should this Court decide that oral argument would be beneficial to resolution of this case, counsel for FDP, LP will gladly participate in such oral argument.

## RECORD AND PARTY REFERENCES

Appellee FDP, LP is referred to in the Brief of Appellee as "FDP."

Appellants Robert and Debbie Marx are referred to in the Brief of Appellee collectively as the "Marxes."

The original clerk's record is two volumes and was filed in the Court of Appeals on October 9, 2014.  References in the Brief of Appellee to the two volume original clerk's record are shown as ("____ CR ____") with the volume and page number of the clerk's record in parentheses.

There is no reporter's record.

# APPENDIX

Final Judgment signed August 11, 2014
(2 CR 532-556) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . TAB "1"


Farm and Ranch Contract
(1 CR 16-31) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . TAB "2"


Mediated Settlement Agreement
(1 CR 182-188) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . TAB "3"


Order confirming Arbitration Award and
incorporating Arbitrator's Ruling
(2 CR 353-363) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . TAB "4"

TO THE HONORABLE FOURTH COURT OF APPEALS:

Appellee FDP, LP ("FDP") files this its Brief of Appellee requesting that this Court affirm the final judgment in favor of FDP which ordered specific performance of an agreement to sell to FDP real property owned by the Marxes.

## INTRODUCTION AND OVERVIEW

The principal issue in this appeal is the propriety of the trial court's final judgment awarding specific performance in favor of FDP for the sale of real property located in Wilson County, Texas, which sale is documented in a January 27, 2012, Farm and Ranch Contract, that was modified by an August 27, 2013, Mediated Settlement Agreement and clarified by a May 12, 2014, arbitration award. (2 CR 532-556; 1 CR 16-31; 1 CR 182-188; 2 CR 353-363; Tabs "1" - "4" to Appendix)

The January 27, 2012, Farm and Ranch Contract obligated FDP to pay to the Marxes a purchase price of $1,875,000.00 (500 acres at $3,750.00 per acre), consisting of $300,000.00 cash and a promissory note for $1,575,000.00, payable in monthly installments of $12,048.64 for 180 months, at 4.5% interest. (1 CR 16, 17, 25) The August 27, 2013, Mediated Settlement Agreement increased the purchase price payable by FDP to

$5000.00 per acre for 421 acres. (1 CR 182-183) The final judgment ordering specific performance obligates FDP to pay to the Marxes a purchase price of $2,086,675.00, consisting of $300,000.00 cash and a promissory note for $1,786,675.00, payable in monthly installments of $13,667.94 for 180 months at 4.5% interest. (2 CR 533, 542-546)

The Marxes have repeatedly frustrated FDP's attempts to close on the sale of the real property, which has included multiple firings and hirings of new lawyers. The trial court did not abuse its discretion in ordering the equitable remedy of specific performance and requiring the Marxes to convey to FDP the real property that the Marxes agreed to sell.

## STATEMENT OF FACTS

Appellee FDP is dissatisfied with the Marxes' Statement of Facts, pages 2-14 of Appellants' Brief. For such reason, FDP presents this Statement of Facts. See Tex. R. App. P. 38.2(a)(1)(B).

## A.   The Farm And Ranch Contract

On January 27, 2012, Appellants Robert Marx and Debbie Marx, as Sellers, and Appellee FDP, as Buyer, executed a Farm and Ranch Contract. (1 CR 16-31; Tab "2" to Appendix) The Marxes agreed to sell to FDP real property located in Wilson County described as follows: "Approximately 500

acres to be surveyed out of a tract of land containing 521.79 acres further described in exhibit 'A.'" (1 CR 16, ¶ 2(A))  The Farm and Ranch Contract further described the real property as the "Marx Ranch, Lavernia, Tx." (1 CR 16, ¶ 2(A))  The Exhibit "A" to the Farm and Ranch Contract contains field notes for a 326.047 acre tract and a 186.152 acre tract. (1 CR 27-30) The Marxes agreed to furnish a new survey to FDP. (1 CR 17, ¶ 6(C)(3)) FDP owned land on both sides of the Marx Ranch, the property the subject of the January 27, 2012, Farm and Ranch Contract. (2 CR 448, ¶ 7)

The "Sales Price" provision of the Farm and Ranch Contract reads as follows:

3. **SALES PRICE:**
A. Cash portion of Sales Price
payable by Buyer at closing.. . . . . . . . . . . $  300,000.00
B. Sum of all financing described
below (excluding any loan
funding fee or mortgage insurance
premium). . . . . . . . . . . . . . . . . . . . . . . . . $1,575,000.00
C. Sales Price (Sum of A and B). . . . . . . . . . $1,875,000.00
D. The Sales Price [X] will [ ] will not be
adjusted based on the survey required
by Paragraph 6C.  If the Sales Price is
adjusted, the Sales Price will be calculated
on the basis of $3,750.00 per acre.  If the
Sales Price is adjusted by more than 10%,
either party may terminate this contract by
providing written notice to the other party
within 14 days after the terminating party
receives the survey.  If neither party terminates

this contract or if the variance is 10% or less, the adjustment will be made to the amount in [ ] 3A   [ ] 3B   [ ] proportionately to 3A and 3B.

(1 CR 16, ¶ 3)

The Farm and Ranch Contract stated that the financed portion of the purchase price would be "Seller Financing," based on a promissory note from FDP to the Marxes of $1,575,000.00, secured by vendor's and deed of trust liens.  (1 CR 17, ¶ 4(C))  The Seller Financing Addendum to the Farm and Ranch Contract states that this promissory note will have an interest rate of 4.5% and will be payable to the Marxes in monthly installments of $12,048.64 beginning 30 days after the date of the promissory note and continuing thereafter for 180 months.  (1 CR 25, ¶ (C)(2))

The Farm and Ranch Contract contains the following "Special Provisions":

Buyer is a licensed real estate agent.  Buyer and Seller agree to the following details to be worked out before closing:  1.  Seller will survey out approximately 21 acres which will not [be] convey[ed] with this sale.  2.  Seller will sign a first right of refusal and option agreement for the 21 acres which will allow buyer to purchase the property in the future.  3.  Seller will retain an easement for access to the 21 acres.  4.  Seller agrees to fence the 21 acres within 120 days after closing.

(1 CR 20, ¶ 11)

The Farm and Ranch Contract provides that FDP shall deposit

$10,000.00 earnest money upon execution of the contract. (1 CR 17, ¶ 5) The Farm and Ranch Contract further provides that FDP shall pay to the Marxes a $100.00 Option Fee within two days after the effective date of the contract, which granted to FDP the unrestricted right to terminate the contract within 15 days. (1 CR 23, ¶ 23) FDP paid the $10,000.00 earnest money and $100.00 Option Fee by checks dated January 26, 2012. (1 CR 31)

On page 3 of Appellants' Brief, the Marxes claim that "the contract was prepared by appellee." The Marxes cite to page 163 of the clerk's record. (1 CR 163) Page 163 of the clerk's record is a letter from the Marxes' lawyer, Diego A. Lopez, that was attached to Diego Lopez's motion for summary judgment. (1 CR 116-172) That letter was never adopted by the Marxes in connection with their various motions and objections. Diego Lopez is not a party to this appeal or to the final judgment and his motion for summary judgment (that was never ruled on) is not at issue in this appeal.

## B. The Marxes Breach The Farm And Ranch Contract

After the Marxes executed the Farm and Ranch Contract, they contacted a new attorney, Diego A. Lopez, that led to the Marxes refusing to close on the contract and sell the real property to FDP. (2 CR 447-448) On Page 4 of the Appellants' Brief, they assert the following:

> Recognizing that the contract failed to describe the tract of land to be sold that complied with the statute of frauds, appellants repudiated the contract prior to the closing date.

This statement is <u>not</u> supported by any citation to the record and there is nothing in the record that supports the above statement. In their August 4, 2014, response to FDP's request for specific performance, the Marxes judicially admitted that there was no legitimate statute of frauds defense in this case, stating as follows: "The defect which exist[ed] prior to the mediation/arbitration, that is, the lack of a valid description of the land to be sold, has now been resolved ..." (2 CR 490) The Marxes do not assert a statute of frauds argument on appeal. Texas has long recognized that where a contract or deed initially fails to contain a legal description that satisfies the statute of frauds, the parties may by their subsequent conduct or agreement provide a legal description that complies with the statute of frauds. <u>See Reserve Petroleum Co. v. Hodge</u>, 213 S.W.2d 456, 457-459 (Tex. 1948); <u>Foster v. Lessing</u>, 346 S.W.2d 939, 942-43 (Tex. Civ. App.–Waco 1961, writ ref'd n.r.e.); <u>Hastings v. Pichinson</u>, 370 S.W.2d 1, 4 (Tex. Civ. App.–San Antonio 1963, no writ).

## C.    FDP Sues The Marxes

On March 12, 2012, FDP sued the Marxes and their attorney, Diego A.

Lopez. (1 CR 1-33) FDP sued the Marxes for specific performance and damages. (1 CR 9-11) FDP also sued the Marxes for fraud and sought to recover exemplary damages. (1 CR 11-12, 13) Debbie Marx answered on April 5, 2012. (1 CR 33-34). She was represented by Diego Lopez. (1 CR 33) He was disqualified from representing the Marxes on June 21, 2012. (1 CR 96)

FDP filed its First Amended Original Petition on May 31, 2012. (1 CR 57-90) Robert Marx evaded service of process, requiring an order for substituted service on him. (1 CR 91-95, 97) Robert Marx filed his original answer on August 8, 2012. (1 CR 98) He was represented by attorney Manuel Pelaez-Prada. (1 CR 99) Debbie Marx filed a second original answer on September 6, 2012. (1 CR 101-102) She was also represented by Pelaez-Prada. (1 CR 102)

On May 7, 2013, the Marxes moved to substitute new counsel. (1 CR 176-177) On May 8, 2013, the trial court signed an agreed order that substituted attorneys Gilbert Vara, Jr. and Gerald D. McFarlen as attorneys of record for the Marxes. (1 CR 178-179)

## D. FDP And The Marxes Settle

The parties mediated on May 22, 2013, and August 27, 2013. (1 CR

180-181) Effective August 27, 2013, the parties executed a Mediated Settlement Agreement. (1 CR 182-188; Tab "3" to Appendix) The Mediated Settlement Agreement was filed with the district clerk on September 3, 2013. (1 CR 182) It is signed by the Marxes and their attorneys. (1 CR 185, 187) The parties agreed to execute and file an agreed order dismissing all claims with prejudice and agreed that, except for the undertakings in the Mediated Settlement Agreement, all claims that were asserted or could be asserted by the parties against each other were mutually released. (1 CR 182, ¶ 3; 1 CR 183, ¶ 5)

Paragraph 4 of the Mediated Settlement Agreement provided as follows:

4.      The parties agree as follows:

a.      Plaintiffs purchase 421 more or less acres from Defendants for $5,000.00 per acre. Closing per existing EMK – October 1, 2013.

b.      Defendants retain his "homestead property" for period of no longer than 8 years after Closing.

c.      Homestead Property will be determined by the parties, based on home and fenced areas sufficient to maintain existing horse/cattle operation, but not to exceed 100 acres. If the parties cannot agree on what constitutes Homestead Property, the mediator will act as arbitrator and make the determination. Defendants' use of the Homestead Property will not unreasonably restrict Plaintiffs' use of the property being purchased.

> d. Plaintiffs shall have the exclusive option to purchase the Homestead Property, at the above stated price, for a period of 120 days from the earlier of:
>
> (i) written notice from the Defendant,
>
> (ii) the death of the last surviving Defendant,
>
> (iii) or the expiration of 8 years from closing.

(1 CR 182-183)

On page 6 of the Appellants' Brief, they assert that "the mediated settlement agreement also failed to meet the requirement of the statute of frauds in that it failed to provide a description of the land to be sold by appellants to appellee." As previously discussed by FDP on page 26 herein, the Marxes judicially admitted that there was no legitimate statute of frauds defense in this case (2 CR 490) and they do not assert a statute of frauds argument on appeal.

## E. The Marxes Breach The Mediated Settlement Agreement

On September 12, 2013, the Marxes proceeded to change lawyers again. (1 CR 189-190) The Marxes sought to discharge Gilbert Vara, Jr. and to substitute attorney Kirk Dockery for him. Id. There was no order signed authorizing the substitution of counsel for the Marxes until October 4, 2013. (2 CR 292)

On the morning of September 16, 2013, FDP filed its "Motion to Enforce Mediated Settlement Agreement." (1 CR 203-228) Despite the fact that the trial court had signed no order that allowed for substitution of counsel, the Marxes' new lawyer filed "Defendants' Objections to Mediated Settlement Agreement" in the late afternoon on September 16, 2013. (1 CR 191-202) On September 30, 2013, FDP filed its Second Amended Original Petition specifically pleading the execution of the Mediated Settlement Agreement. (1 CR 230-271)

On October 1, 2013, the Marxes gave notice of hearing for their motion for substitution for their most recent change of attorneys. (2 CR 291) On October 4, 2013, the trial court signed an order allowing attorney Kirk Dockery to substitute for attorneys Gilbert Vara, Jr. and Gerald D. McFarlen, who were discharged. (2 CR 292) The Marxes claim on page 8 of the Appellants' Brief that they filed on October 14, 2013, a Supplemental Answer which "asserted sixteen affirmative defenses." This Supplemental Answer (2 CR 293-297) is the subject of the Marxes' Third Point of Error, Appellants' Brief, p. 22, which complains that the trial court erred in rendering final judgment in favor of FDP because FDP did not file a no-evidence motion for summary judgment on these affirmative defenses. As FDP explains on pages 77-81 herein, a

plaintiff moving for summary judgment is under no duty to negate affirmative defenses.

On October 23, 2013, the trial court ordered the parties back to mediation. (2 CR 322) On page 9 of the Appellants' Brief, the Marxes contend that "upon hearing of the defects in the [Mediated Settlement Agreement], the trial court stopped the hearing and ordered the parties to return to mediation to attempt to resolve those issues." There is nothing in the record to support this contention made by Appellants and they cite only to 2 CR 322, which is the trial court's October 23, 2013, handwritten order which states simply that "the Court Orders the parties back to mediation pursuant to the terms of the Settlement Agreement on November 14, 2013, beginning at 9:00 a.m." Paragraph 8 of the Mediated Settlement Agreement provides that the parties agree to further mediation if disputes arise with regard to interpretation and/or performance of the agreement, including the form of the documents to be executed. (1 CR 183)

The Marxes also argue on page 9 of their brief, citing only to the October 23, 2013, order (2 CR 322), that "the trial court failed and refused to acknowledge that appellants' consent to the MSA had been revoked." As FDP explains on page 37 herein, the withdrawal or revocation of consent to

a settlement agreement does not prevent enforcement of the settlement agreement by the trial court.

On November 14, 2013, the trial court ordered the parties to proceed with arbitration with respect to the designation of the "Homestead Property" as described in Paragraph 4(c) of the Mediated Settlement Agreement. (2 CR 323) On page 10 of the Appellants' Brief, the Marxes claim they "objected to arbitration." The Marxes filed no written objection to arbitration in the trial court and have made no argument in the trial court or on appeal that they could not be compelled to arbitrate under Paragraph 4(c) of the Mediated Settlement Agreement.

## F.    The Arbitrator Rules And His Rulings Are Confirmed

The arbitrator issued his ruling on April 14, 2014, making findings for the 100 acre tract to be retained by the Marxes (subject to the purchase option granted to FDP) and the 417.335 acres to be sold by the Marxes to FDP. (2 CR 355-356; Tab "4" to Appendix) The arbitrator's ruling included a map and metes and bounds descriptions of the 100 acre and 417.335 acre tracts. (2 CR 357-362) On May 8, 2014, FDP filed its "Motion and Application To Confirm Arbitration Award." (2 CR 324-349) The Marxes objected to "items 3 and 4" of the arbitrator's ruling. (2 CR 351) Item 3 of the ruling stated that

all other terms and conditions of the Mediated Settlement Agreement remain the same, except the closing date which will be at the earliest possible date. (2 CR 355)  Item 4 assessed costs of the arbitration.  (2 CR 356)

On May 12, 2014, the trial court signed an order confirming the arbitration award.  (2 CR 353-363; Tab "4" to Appendix)  The trial court confirmed the arbitrator's metes and bounds legal descriptions and awarded arbitrator's fees, surveyor's fees, attorneys' fees and expenses to FDP of $1,800.00, $11,539.43, $17,202.50 and $486.00.  (2 CR 353-354)  The Marxes did not move to vacate the arbitration award and have made no appellate challenge to the arbitrator's award or to the order confirming the arbitrator's award.  The Marxes, on page 11 of the Appellants' Brief, again complain of the trial court's action with respect to confirmation of the arbitration ruling because they had revoked their consent to the settlement. They have not challenged on appeal the May 12, 2014, order on this or any other ground and Texas law permits enforcement of a settlement agreement even where consent to settlement has been withdrawn or revoked.  See Brief of Appellee, p. 37, herein.

**G.    The Trial Court Orders Specific Performance**

On July 9, 2014, FDP moved for a final summary judgment for specific

performance (2 CR 364-475), which the trial court granted by order and final judgment signed on August 11, 2014. (2 CR 532-556; Tab "1" to Appendix) As part of its summary judgment proof, FDP presented affidavits from the managing member of the general and limited partners of FDP (Larry Friesenhahn) and an Executive Vice President of Security State Bank, who testified as follows:

a) FDP was willing to close the sale on an Owner Finance basis or on a Cash to Seller basis (2 CR 447, ¶ 4),

b) FDP had a certificate of deposit in the amount of $434,014.50 with Sun Trust Bank (2 CR 448, ¶ 5),

c) Security State Bank had lines of credit in the amount of $1,737,000.00 available for immediate advance to Larry Friesenhahn for personal or business uses, including FDP (2 CR 449, ¶ 3),

d) Security State Bank was interested in financing the purchase price of 501 acres for $5000.00 per acre (2 CR 449, ¶ 4).

The affidavit from the FDP principal, Mr. Friesenhahn, stated that FDP was "ready, able and willing to purchase the subject property and close and perform the Mediated Settlement Agreement." (2 CR 447, ¶ 4)

The Marxes' summary judgment response did not include any evidence or argument in support of their affirmative defenses. (2 CR 486-516) The Marxes asserted the following arguments in opposition to FDP's request for

specific performance:

a)  there was an ambiguity between the Farm and Ranch Contract and the Mediated Settlement Agreement (2 CR 487-494);

b)  the option agreement was invalid because of lack of consideration (2 CR 494-495);

c)  FDP, LP lacked standing to prosecute the suit (2 CR 495-497); and

d)  FDP, LP failed to act through its general partner (2 CR 497-498).

On page 13 of the Appellants' Brief, the Marxes complain that FDP "did not file a no-evidence motion for summary judgment regarding the issues of the many affirmative defenses asserted [by] appellants in their most recent pleadings." As FDP explains in responding to the Marxes' Third Point of Error, a plaintiff moving for summary judgment is not under any obligation to negate affirmative defenses." See Brief of Appellee, pp. 77-81, herein.

The Marxes complain on page 13 of their Appellants' Brief of the supplement to FDP's motion for summary judgment that was filed on August 5, 2014. (2 CR 517-531) The supplement addressed arguments made by the Marxes that FDP lacked standing and that FDP failed to act through its general partner. (2 CR 519-520) The Marxes have not asserted these arguments on appeal or raised any appellate error with respect to FDP's

August 5, 2014, filing.

The trial court signed a final judgment in favor of FDP on August 11, 2014. (2 CR 532-556; Tab "1" to Appendix) The January 27, 2012, Farm and Ranch Contract obligated FDP to pay to the Marxes a purchase price of $1,875,000.00 (500 acres at $3,750.00 per acre), consisting of $300,000.00 cash and a promissory note for $1,575,000.00, payable in monthly installments of $12,048.64 for 180 months, at 4.5% interest. (1 CR 16, 17, 25) The August 27, 2013, Mediated Settlement Agreement increased the purchase price payable by FDP to $5000.00 per acre for 421 acres. (1 CR 182-183) The final judgment ordering specific performance obligates FDP to pay to the Marxes a purchase price of $2,086,675.00, consisting of $300,000.00 cash and a promissory note for $1,786,675.00, payable in monthly installments of $13,667.94 for 180 months at 4.5% interest. (2 CR 553, 542-546)

## STANDARD OF REVIEW

### A. Mediated Settlement Agreements

The trial court, in granting FDP's motion for summary judgment, enforced the Mediated Settlement Agreement entered into by FDP and the Marxes and awarded the remedy of specific performance. (2 CR 532-556;

Tab "1" to Appendix)  In <u>Saenz v. Martinez</u>, No. 04-07-00339-CV, 2008 WL 4809217 at * 4 (Tex. App.–San Antonio Nov. 5, 2008, no pet.) (mem. op.), this Court discussed the enforcement of a written settlement agreement where one party withdraws its consent before judgment and held in that case the "subsequent withdrawal of consent to the agreement, though undisputed, does not raise a fact issue negating the enforceability of the agreement and precluding summary judgment."

> A written settlement agreement may be enforced even if one party withdraws its consent before judgment is rendered on the agreement.  <u>Mantas v. Fifth Ct. of App.</u>, 925 S.W.2d 656, 658 (Tex. 1996) (orig. proceeding) (per curiam) (citing <u>Padilla v. LaFrance</u>, 907 S.W.2d 454, 461 (Tex. 1995)).  Where consent is lacking, a trial court may not render an agreed judgment on the settlement agreement, but the party seeking enforcement may properly pursue a separate breach of contract claim. <u>Mantas</u>, 925 S.W.2d at 658.  This mode of enforcement is based on rule 11 of the Texas Rules of Civil Procedure, the requisites of which are necessary for entry of any judgment enforcing a settlement agreement.  <u>Padilla</u>, 907 S.W.2d at 460 (citing <u>Kennedy v. Hyde</u>, 682 S.W.2d 525, 528 (Tex. 1984)).

<u>Id</u>. at * 3.  <u>See</u> <u>also</u> Tex. Civ. Prac. & Rem. Code Section 154.071(a) ("If the parties reach a settlement and execute a written agreement disposing of the dispute, the agreement is enforceable in the same manner as any other written contract.").

Texas law strongly favors and encourages voluntary settlement and

orderly dispute resolution.  Wright v. Sydow, 173 S.W.3d 534, 551 (Tex. App.–Houston [14th Dist.] 2004, pet. denied), citing Schlumberger Technology Corporation v. Swanson, 959 S.W.2d 171, 178 (Tex. 1997).  The El Paso Court of Appeals has stated that "[t]he law has always favored the resolution of controversies through compromise and settlement rather than through litigation and it has always been the policy of the law to uphold and enforce such contracts if they are fairly made and are not in contravention of some law or public policy." Hernandez v. Telles, 663 S.W.2d 91, 93 (Tex. App.–El Paso 1983, no writ).

This strong public policy in favor of voluntary settlements is reflected in Section 154.002 of the Civil Practice and Remedies Code.  Further, it is the responsibility of all trial and appellate courts and their court administrators to carry out the policy under Section 154.002.  Tex. Civ. Prac. & Rem. Code Ann. Section 154.003.

## B.    Specific Performance

Specific performance is an equitable remedy that may be awarded at the trial court's discretion upon a showing of breach of contract.  Kress v. Soules, 261 S.W.2d 703, 704 (Tex. 1953); Stafford v. S. Vanity Magazine, Inc., 231 S.W.3d 530, 535 (Tex. App.–Dallas 2007, pet. denied).  Specific

performance is not a separate cause of action, but rather it is an equitable remedy used as a substitute for monetary damages when such damages would not be adequate.  Stafford, 231 S.W.3d at 535; Scott v. Sebree, 986 S.W.2d 364, 368 (Tex. App.–Austin 1999, pet. denied).  "Because of the unique nature of real property, breach of a contract to sell real property may generally be enforced by specific performance."  Pickard v. LJH Enterprises, No. 01-07-01105-CV, 2010 WL 1493105 at * 3 (Tex. App.–Houston [1st Dist.] April 15, 2010, no pet.) (mem. op.), citing Rus-Ann Dev., Inc. v. ECGC, Inc., 222 S.W.3d 921, 927 (Tex. App.–Tyler 2007, no pet.) and Scott v. Sebree, 986 S.W.2d at 369-70.

## C.    Contract Formation And Unenforceability

The principal argument made by the Marxes in their First Point of Error is that the trial court erred in rendering final judgment in favor of FDP and ordering specific performance because there is no enforceable agreement in this case because there was "no meeting of the minds" between FDP and the Marxes as to material and essential terms.  See Appellants' Brief, pp. 15-19.  As explained in more detail on pages 43-48 herein, the Marxes did not make a "no meeting of the minds" argument in their summary judgment response.  (2 CR 486-516)  The only argument made by the Marxes was their assertion

that the parties' agreement could not be specifically enforced because there was an ambiguity with respect to the financing provisions in the Farm and Ranch Contract created by the increased purchase price agreed to in the Mediated Settlement Agreement.  (2 CR 487-494)

"The enforceability of a settlement agreement is a question of law." Eastman Gas Company, L.L.C. v. Goodrich Petroleum Company, L.L.C., __ S.W.3d __, No. 06-13-00128-CV, 2015 WL 170234 at * 3 (Tex. App.–Texarkana Jan. 14, 2015, no pet. h.), citing McCalla v. Baker's Campground, Inc., 416 S.W.3d 416, 418 (Tex. 2013) and Martin v. Martin, 326 S.W.3d 741, 746 (Tex. App.–Texarkana 2010, pet. denied).  The issue of whether a settlement agreement fails for lack of essential terms is a question of law.  See General Metal Fabricating Corporation Corp. v. Stergiou, 438 S.W.3d 737, 744 (Tex. App.–Houston [1st Dist.] 2014, no pet.) (collecting cases).  Whether an agreement fails for indefiniteness is a question of law.  Stergiou, 438 S.W.3d at 752, citing to America's Favorite Chicken Co. v. Samaras, 929 S.W.2d 617, 622 (Tex. App.–San Antonio 1996, writ denied).

## D.    Consideration

The Marxes' Second Point of Error argues that the option to purchase

the Homestead Property granted to FDP by the Marxes is not supported by consideration.  See Appellants' Brief, pp. 19-21.  This Court has stated that what constitutes consideration is a question of law, Brownwood Ross Co. v. Maverick Cnty., 936 S.W.2d 42, 45 (Tex. App.–San Antonio 1996, writ denied), and that the existence of a written contract presumes consideration for its execution.  Doncaster v. Hernaiz, 161 S.W.3d 594, 603 (Tex. App.–San Antonio 2005, no pet.).

## SUMMARY OF THE ARGUMENT

The Mediated Settlement Agreement, which modified the Farm and Ranch Contract, is an enforceable contract and does not fail for lack of mutual assent, indefiniteness or failure of a meeting of the minds.  The "no meeting of the minds" argument made by the Marxes in their First Point of Error on pages 15-19 of their Appellants' Brief was not made in the trial court.  The trial court properly exercised its discretion in enforcing the Mediated Settlement Agreement and awarding the equitable remedy of specific performance.  The trial court was authorized under Texas law to enforce the Mediated Settlement Agreement even where the Marxes withdrew their consent to the settlement.

In the Marxes' Second Point of Error, Appellants' Brief, pp. 19-21, they argue that the option to purchase the Homestead Property is not supported

by any consideration. This argument fails as a matter of law. Where a contract that includes an option is supported by a sufficient consideration, the option is valid and enforceable, even if there is no independent or specific consideration for the option and even if there is no independent or specific consideration recited for the option.

The Marxes' Third Point of Error, Appellants' Brief, p. 22, claims that they asserted various affirmative defenses and that FDP failed to move for summary judgment on such affirmative defenses. The Marxes' Third Point of Error is inadequately briefed and therefore waived. Further, their argument is flatly contrary to Texas law. FDP had no obligation to move for summary judgment on the Marxes' affirmative defenses. The Marxes had the obligation to present evidence to support their defenses and failed to present any such evidence.

## ARGUMENT

### A. The Mediated Settlement Agreement Was Enforceable And The Trial Court Did Not Err In Granting FDP's Motion For Final Summary Judgment (Responsive to Appellants' Brief, pp. 15-19)

#### I. Introduction

The Marxes initially argue that they withdrew their consent to the Mediated Settlement Agreement. See Appellants' Brief, pp. 15-16. The

withdrawal of consent to settlement by the Marxes did not prohibit the trial court from enforcing the settlement for the reasons stated by this Court in Saenz v. Martinez, 2008 WL 4809217 at * 3-4, quoted on page 37 of this Brief.

The Marxes next argue that the Mediated Settlement Agreement is unenforceable or invalid because of lack of mutual assent, indefiniteness or no meeting of the minds. See Appellants' Brief, pp. 18-19 ("Because the terms of the Seller Financing Addendum to the Farm and Ranch Contract were not amended by the mediated settlement agreement, there has been no meeting of the minds between appellants and appellee as to those material and essential terms. The mediated settlement agreement is therefore not a complete contract and is rendered unenforceable.").

The Marxes, on pages 15-16 of the Appellants' Brief, cite to their October 14, 2013, "Supplemental Answer" (2 CR 293-297) for this "no meeting of the minds" argument. But, the Marxes did not make this argument in their summary judgment response. (2 CR 486-516) Instead, the Marxes argued that there was an ambiguity with respect to the financing provisions created by the Mediated Settlement Agreement. (2 CR 487-494) At page 3 of their summary judgment response, the Marxes asserted that there was a

"contradiction" between the new sales price in the Mediated Settlement Agreement and owner financing provisions of the Farm and Ranch Contract. (2 CR 488) On pages 5 and 6 of their summary judgment response, they further discuss the "contradiction," stating that paragraph 4a of the Mediated Settlement Agreement "creates the patent ambiguity." (2 CR 490) They continue on page 6 of their summary judgment response discussing "the patent ambiguity" (2 CR 491), on page 7 "this ambiguity" and "patent ambiguity" (2 CR 492), and on page 8 "the obvious ambiguity" and "patent ambiguity." (2 CR 493)

The Marxes' Appellants' Brief repeats these arguments of contractual ambiguity in the Statement of Facts, even though the Marxes do not make the ambiguity argument in their First Point of Error.

> The mediated settlement agreement also created an ambiguity between it and the Farm and Ranch Contract.

■ ■ ■

> [T]he mediated settlement agreement created an ambiguity as to the manner in which the sale price was to be paid and the terms of any seller-financing.

■ ■ ■

> Appellants objected to arbitration because they recognized that a settlement pursuant to the MSA was unlikely due to the ambiguities therein ...

<u>See</u> Appellants' Brief, pp. 6-7, 9, 10.

There is a difference under Texas law between contractual ambiguity and contractual indefiniteness. <u>See</u> <u>Sifuentes v. Carrillo</u>, 982 S.W.2d 500, 504 (Tex. App.–San Antonio 1998, pet. denied), <u>citing</u> <u>America's Favorite Chicken Co. v. Samaras</u>, 929 S.W.2d at 628 ("There is a significant legal difference between ambiguity and indefiniteness."). A contract containing an ambiguity is not unenforceable. Ambiguity results when the intention of the parties is expressed in language susceptible of more than one meaning. <u>J.M. Davidson, Inc. v. Webster</u>, 128 S.W.3d 223, 229 (Tex. 2003). Interpreting an ambiguous contract is a factual issue. <u>Id</u>. In contrast, an agreement that is indefinite because it fails to contain all material and essential terms is unenforceable. <u>See</u> <u>America's Favorite Chicken Co. v. Samaras</u>, 929 S.W.2d at 622. In the trial court, the Marxes argued ambiguity, not indefiniteness. (2 CR 487-494) This Court cannot reverse a summary judgment based on an argument made on appeal that the Marxes did not make in their summary judgment response. <u>See</u> <u>In re Blakenship</u>, 392 S.W.3d 249, 255 (Tex. App.–San Antonio, 2012, no pet.).

Under Texas law, a modified contract creates a new contract that includes the new, modified provisions and the unchanged old provisions.

Even if there was a contradiction or ambiguity with respect to the financing terms of the Farm and Ranch Contract caused by the increased purchase price of the Mediated Settlement Agreement, the parties' agreement was still enforceable and FDP was entitled to purchase the property for $2,086,675.00 and the trial court had the right to order specific performance that was not in strict compliance with the parties' agreement.

Any conflict between the financing terms in the Farm and Ranch Contract and the language in the Mediated Settlement Agreement creates, at best, a contractual ambiguity rather than contractual indefiniteness. Ambiguous and unambiguous contracts are both enforceable under Texas law. A contract with an ambiguity is not unenforceable because of indefiniteness. A contract is not indefinite if the contract terms are reasonably certain to the extent they provide a basis for determining the existence of a breach and for giving an appropriate remedy. McCalla v. Baker's Campground, Inc., 416 S.W.3d at 418 ("If a court was trying to enforce the settlement agreement, it could find all the terms necessary for its enforcement."); Stergiou, 438 S.W.3d at 751. The Marxes do not and cannot contend that the Mediated Settlement Agreement is not reasonably certain or indefinite with respect to the obligation of FDP to pay $2,086,675.00 in return

for the 421 acres and the option on the Homestead Property.

The Marxes and FDP executed written agreements that contained essential terms; the Marxes just want out of the agreements and the bargains that were struck. The Marxes make no argument that they were harmed or injured by the trial court's final judgment which ordered that they were to receive $1,619.30 more per month from FDP under the Mediated Settlement Agreement which modified the Farm and Ranch Contract. They simply contend, erroneously, that the Mediated Settlement Agreement is unenforceable. There is nothing "indefinite" about the agreements that preclude enforcement.

At most, the Marxes' arguments implicate the doctrine of ambiguity, which is an argument that they made in their summary judgment response (2 CR 487-494), but have abandoned on appeal. See Appellants' Brief, pp. 15-19. An executed contract that contains an ambiguity is not unenforceable because of the ambiguity. The Marxes do not make the ambiguity argument on appeal because they seek to invalidate the agreements in their entirety based on indefiniteness. Under no circumstances do they want any enforcement of the agreements. The Marxes' "no meeting of the minds" argument fails under Texas law. As this is the only argument made on appeal

– which they did not make in the trial court – the overruling of this argument requires the affirmance of the trial court's final judgment.

## II. The Marxes' Arguments Reflect A Lack Of Understanding Of Texas Law Governing Contract Modification

"Modification of a contract is some change in an original agreement which introduces a new or different element into the details of the contract but leaves its general purpose and effect undisturbed." See Enserch Corp. v. Rebich, 925 S.W.2d 75, 83 (Tex. App.–Tyler 1996, writ dism'd). In BACM 2001-1 San Felipe Road Ltd. Partnership v. Trafalgar Holdings I, Ltd., 218 S.W.3d 137, 145-146 (Tex. App.–Houston [14th Dist.] 2007, pet. denied), the Court of Appeals explained as follows:

> But, a modification to a contract need not restate all the essential terms of the original agreement. A modification alters only those terms of the original agreement to which it refers, leaving intact those unmentioned portions of the original agreement that are not inconsistent with the modification. See Boudreaux Civic Ass'n v. Cox, 882 S.W.2d 543, 547-48 (Tex. App.–Houston [1st Dist.] 1994, no writ) ("A modification to a contract creates a new contract that includes the new, modified provisions and the unchanged old provisions.") (emphasis added).

Under Texas law, conflicts between the provisions of an original contract and a modification do not make the modified agreement "unenforceable." There are specific rules for such situations. In Saturn Capital Corp. v. Dorsey, No. 01-04-00626-CV, 2006 WL 1767602 at * 4 (Tex. App.–Houston [1st Dist.]

48

2006, pet. denied), the Court of Appeals discussed the issue as follows:

> That is, when the second contract does not state whether or to what extent it supersedes the parties' first contract, and when some provision of the two contracts conflicts, the conflicting provision of the later contract prevails. In re Palm Harbor Homes, Inc., 129 S.W.3d at 643; Courage Co., L.L.C. v. Chemshare Corp., 93 S.W.3d 323, 333 (Tex. App.–Houston [14th Dist.] 2002, no pet.). The remainder of the earlier contract not in conflict with the later one may still be enforced. Courage Co., L.L.C., 93 S.W.3d at 333. These rules also apply when, as here, one of the contracts is a promissory note.

The Marxes cite no authority, Texas or otherwise, which holds that a court may find an agreement underlineenforceable because, in modifying the agreement, a conflict with the language of the original contract resulted. At most, that would create an ambiguity, which argument the Marxes do not make on appeal. See Appellants' Brief, pp. 15-19. The real issues in this case are contract interpretation and contract enforcement, not contract formation. The "no meeting of the minds" arguments made by the Marxes do not apply to the written, executed agreements in this case.

### III. The Trial Court Did Not Abuse Its Discretion In Awarding Specific Performance

Specific performance is more readily available as a remedy for the sale of real estate than for the sale of personal property. See Scott v. Sebree, 986 S.W.2d at 369-370. Damages are generally believed to be inadequate in

connection with real property.  Id. at 370.  Specific performance is commonly granted where a valid contract to purchase real property is breached by the seller.  Id.; see also Estate of Griffin v. Sumner, 604 S.W.2d 221, 225 (Tex. Civ. App.–San Antonio 1980, writ ref'd n.r.e.).

The trial court ordered specific performance of the sale of the real property by the Marxes to FDP because the Marxes breached the Mediated Settlement Agreement.  (2 CR 532-556)  The Marxes do not argue on appeal that they did not breach the Mediated Settlement Agreement.  Their sole argument is the alleged "unenforceability" of the agreement because of "indefiniteness."

To the extent that the Marxes believe that the final judgment awarding specific performance is not in compliance with or consistent with the parties' agreement, they have not made such argument on appeal.  They argue only unenforceability based on no meeting of the minds.  Texas law affords discretion to the trial court in ordering the remedy of specific performance, even if the award of specific performance is not in strict compliance with the underlying agreement.

In Estate of Griffin v. Sumner, 604 S.W.2d at 225, this Court discussed its earlier decision in Wilson v. Beaty as follows:

In <u>Wilson v. Beaty</u>, 211 S.W. 524 (Tex. Civ. App.–San Antonio 1919, writ ref'd), a case involving specific performance of a contract for the sale of land, this court said:

> Where a contract is in writing, is certain in its terms, is fair and just in its provisions and capable of being enforced with fairness to both parties, it is a matter for enforcement in a court of equity ...
>
> Absolute and positive certainty as to the terms of the contract is not required, but there must be reasonable certainty as to the subject-matter, the stipulations, the purposes, and the circumstances under which the contract was made ...
>
> The contract is certain and definite in its terms if it leaves no reasonable doubt as to what the parties intended and no reasonable doubt of the specific thing equity is called upon to have performed.

211 S.W. at 526-527.

In <u>Paciwest, Inc. v. Warner Alan Properties, LLC</u>, 266 S.W.3d 559, 570 (Tex. App.–Fort Worth 2008, pet. denied), the award of specific performance was not in literal compliance with the parties' agreement, because the buyer could not obtain financing and chose to pay the full purchase price in cash. The Court of Appeals held that the award of specific performance was proper in such circumstances and noted that the analysis of materiality of financing terms for purposes of contract enforcement is different from the analysis for purposes of contract formation.

Further, even if the writings between the parties are not sufficient to show an agreement by Paciwest to an all-cash transaction, provisions in an earnest money contract that provide for termination of a contract if the buyer is unable to obtain financing are solely for the benefit of the buyer and may be waived by the buyer. See R. Conrad Moore & Assocs., Inc. v. Lerma, 946 S.W.2d 90, 94-95 (Tex. App.–El Paso 1997, writ denied); Renouf v. Martini, 577 S.W.2d 803, 803-04 (Tex. Civ. App.–Houston [14th Dist.] 1979, no writ). Thus, even a buyer who has not strictly complied with the financing terms in an earnest money contract, but who is nevertheless able to meet its obligations to close a transaction, may enforce specific performance against a seller who thereafter refuses to close the transaction on the ground that the buyer did not obtain the financing on the express terms provided for in the contract. See Advance Components, Inc. v. Goodstein, 608 S.W.2d 737, 739-40 (Tex. Civ. App.–Dallas 1980, writ ref'd n.r.e.); cf. Potcinske v. McDonald Prop. Invs., 245 S.W.3d 526, 530-31 (Tex. App.–Houston [1st Dist.] 2007, no pet.) (distinguishing Advance Components and holding that analysis of materiality of financing provisions for purposes of contract enforcement differs from analysis for purposes of contract formation).[1]

Id. at 570.

In Advance Components, Inc. v. Goodstein, 608 SW.2d 737 (Tex. Civ. App.–Dallas 1980, writ ref'd n.r.e.), cited in the Paciwest decision, Advance Components leased from Goodstein real property with an option to purchase. Id. at 738. The purchase option contained a financing provision that required Advance Components to assume the unpaid principal balance on a

---

[1]Potcinske is a case relied upon by the Marxes. See Appellants' Brief, p. 17. FDP discusses the Potcinske decision on pages 58-60 herein.

$165,000.00 promissory note.  Id.  Advance Components was unable to assume the note, and instead, arranged for third-party financing for the entire purchase price.  Id. at 739.  Goodstein refused to close and the trial court denied Advance Components's request for specific performance.  Id.  In reversing the trial court's denial of specific performance, the Dallas Court of Appeals first explained as follows:

> In the early case of Farris v. Bennett's Executors, 26 Tex. 568 (1863), our Supreme Court stated:
>
> > (I)t is the general rule, that, to entitle a party to specific performance, he must show that he has been in no default in not having performed the agreement, and that he has taken all proper steps towards the performance, on his part; yet, on the other hand, though there has not been a strict legal compliance with the terms of the contract, yet, if the noncompliance does not go to the essence of the contract, relief will be granted.  Id. at 572.
>
> The rule of the Farris case has been followed by our Supreme Court for many years.  Linch v. Paris Lumber & Grain Elevator Co., 80 Tex. 23, 15 S.W. 208 (1891); McMillan v. Smith, 363 S.W.2d 437 (Tex. 1962).  In the present case there has not been a strict compliance with the terms of the contract by the plaintiff in that plaintiff arranged to pay off the outstanding note rather than to assume it.

Id. at 739.

The Court of Appeals then explained that the departure from the contract will not prevent specific enforcement if it is not a material breach and

identified the factors for determining if there was a material breach. Id. at 739-740. After analyzing these factors, the Court concluded as follows:

> Of the circumstances listed in this section, only the first three are applicable under the facts and arguments in this case. Applying those three "influential circumstances," we hold that plaintiff's breach was not so material as to defeat its action for specific performance. Under a decree of specific performance, defendant will receive the substantial benefit which he could have reasonably anticipated, the agreed price of his equity and complete protection against his liability on the outstanding note, and may be compensated by plaintiff for any damages he suffers as a result of its minor breach.

Id. at 740. In the present case, the Marxes will similarly receive the substantial benefits they could have reasonably anticipated from the agreements they executed.

The Dallas Court of Appeals rejected Goodstein's argument that specific performance was improper because there had not been literal compliance with the agreement.

> Defendant argues that enforcing the contract without the exact financing provisions specified therein will result in adverse tax consequences to him and will deprive him of his rights as a lienholder of the property. If that is so, he may be compensated in damages for those consequences of plaintiff's breach. With the exception of literal compliance with the financing provisions, plaintiff has fully performed under the contract. It attempted to comply, but was unable to do so without obtaining a guaranty by third persons. It then tendered the full purchase price in cash. On these facts, refusal of a decree of specific performance effectuates an unjust penalty or forfeiture and therefore, the

54

> judgment of the trial court is reversed, and since no motion for summary judgment was filed by plaintiff, the case is remanded for further proceedings. If defendant pleads and proves any damages because of plaintiff's breach, the trial court may enter a decree of specific performance that is conditioned on payment to defendant of reasonable compensation in money. Farris v. Bennett's Executors, supra, at 575; see Restatement of the Law of Contracts, s 375(3).

Id. The Marxes have never claimed they have been damaged by the specific performance ordered by the trial court. (2 CR 486-516)

In Horner v. Bourland, 724 F.2d 1142, 1143-1144 (5th Cir. 1984) (applying Texas law), Horner entered into a contract to purchase a mobile home park from the Bourlands. The purchase price was $570,700.00 that was to be paid by refinancing a loan and deed of trust in favor of FHA in the amount of $455,700.00 and a promissory note in the amount of $115,000 from Horner, secured by a second deed of trust. Id. at 1144. The FHA loan could not be refinanced and the FHA would not permit a second lien. Id.

Horner agreed to pay the entire amount in cash. Id. The Bourlands would not agree. The federal district court denied Horner's request for specific performance, finding that "the parties had entered into the contract under the mutually mistaken belief that the Bourlands' FHA loan could be recast, ... that because enforcement of the contract as written was impossible, its enforcement would require the court to rewrite the contract for the parties,

55

... Horner's proposed escrow instructions materially altered the terms of the contract and constituted counter offers; and that Horner made no written cash offer for the property." Id.

The Fifth Circuit Court of Appeals reversed, first discussing the standard of discretion for granting specific performance.

> The parties correctly point out that in general, a decree for specific performance is not a matter of right, but is a matter resting in the court's judicial discretion. See, e.g., Kress v. Soules, 152 Tex. 595, 261 S.W.2d 703, 704 (1953); Nash v. Conatser, 410 S.W.2d 512, 519 (Tex. Civ. App.–Dallas 1966, no writ). Nonetheless, in the proper circumstances the standard set forth by the Texas Supreme Court in Bennett v. Copeland, 149 Tex. 474, 235 S.W.2d 605 (1951), is applicable:
>
>> "Mere hardship is not sufficient ground for denial of the right to specific performance of a contract otherwise subject to enforcement. ... Especially where it was fairly and voluntarily assumed as part of a contract. ... In this respect a contract for the sale of land will be enforced as a matter of right, regardless of its wisdom or folly, if fairly and understandingly made. ... [C]ourts cannot arbitrarily refuse specific performance of a contract, because they deem it unwise, or because subsequent events disclose that it will result in a loss to defendant; but to justify the refusal of this relief it must appear that the defendant had been misled and overreached to such an extent that the contract is unconscionable."
>
> 235 S.W.2d at 609 (quoting Annot., 65 A.L.R. 1st 75); accord Kress v. Soules, supra (determination must be according to facts of individual case; grant of specific performance must not operate inequitably on defendant). In a case involving a contract for the

sale of real estate that is otherwise subject to enforcement and where justification on the ground of inequity is lacking, it is an abuse of the trial court's discretion to refuse specific performance.

Id. at 1144-1145.

The Court of Appeals then discussed several Texas cases, including the Advance Components decision, finding them dispositive of the request for specific performance. The Fifth Circuit affirmed that specific performance does not require strict compliance with the agreement. Id. at 1146-1147.

> Advance Components is consistent, moreover, with other Texas cases finding that a cash offer in lieu of contractually specified financing provisions constitutes substantial compliance with the contract. In Renouf v. Martini, 577 S.W.2d 803 (Tex. Civ. App.–Houston 1979, no writ), the court granted specific performance of a contract for the sale of real estate where the buyer was unable to secure the financing pursuant to the terms provided for in the contract and instead arranged full cash financing. Accord Smith v. Nash, 571 S.W.2d 372 (Tex. Civ. App.–Texarkana 1978, no writ).

> We think that these cases are dispositive of the instant appeal. Applying the Advance Components analysis to the case before us, we think it is clear that no inequity would result from a grant of specific performance. A cash payment would bestow upon the Bourlands substantially the equivalent benefit – the assumption, in either the legal or common usage of the term, of the FHA loan coupled with a return of equity – for which they contracted. Moreover, any adverse tax consequences incurred by the defendants as a result of a cash payment may be compensated, upon the payment of which the decree should be conditioned. See Advance Components, supra.

Id. at 1146.

This is not a contractual indefiniteness or "no meeting of the minds" case. At best, the Marxes claim there is a contradiction or ambiguity with respect to the owner-financing provisions of the Farm and Ranch Contract caused by the increased price of the Mediated Settlement Agreement. Assuming that this Court were to find that the Marxes have preserved the ambiguity argument on appeal and reverse on such basis, FDP would still be afforded the opportunity to purchase under the executed documents based on payment of all cash by FDP or third-party financing resulting in all cash being paid to the Marxes by FDP and its lender.

**IV.    The Marxes' Authorities Are Inapposite**

The Marxes rely on three cases in support of their argument that there was no mutual assent or no meeting of the minds between FDP and the Marxes. The three cases are cited on page 17 of Appellants' Brief: Smith v. Thorne, No. 01-01-01241-CV, 2003 WL 21357297 (Tex. App.–Houston [1st Dist.] June 12, 2003, no pet.) (mem. op.), Potcinske v. McDonald Property Investments, Ltd., 245 S.W.3d 526 (Tex. App.–Houston [1st Dist.] 2007, no pet.), and Garrod Investments, Inc. v. Schlegel, 139 S.W.3d 759 (Tex. App.–Corpus Christi 2004, no pet.). None of those cases are factually similar to the facts in this appeal.

Smith is a contract formation case. In Smith, the Court of Appeals explained that the parties used an inapplicable earnest-money-contract form and never agreed upon a method of financing or on the issue of financing.

> In this case, there was evidence that Smith's selection of an inapplicable earnest-money-contract form created confusion and misunderstanding between the parties. Smith's explanation that the "all-cash" option referred only to the fact that Smith would receive the full amount of the sales price at closing was intended to reassure appellees regarding questionable provisions in the form used. The trial testimony clearly established that the sale of the property was to be neither "all-cash" nor "owner-financed." Therefore, there is both legally and factually sufficient evidence to support the trial court's finding of fact number three.

> Regarding findings of fact numbers one and six, the contract, on its face, appears to show two different methods of payment: paragraph 3.B indicates that a note is involved and is described within the contract, and paragraph 4.A indicates that the transaction will be an "all cash" sale. In addition, Smith and Corbin both testified that Smith was aware of appellees' attempts to secure third-party financing and spoke with the mortgage company on at least two occasions. This evidence is legally and factually sufficient to support the trial court's findings that the parties never agreed upon a method of financing (number one) and that there was no meeting of the minds on the issue of financing (number six). We therefore uphold the court's conclusion of law that the parties did not reach agreement on a material term of the contract.

2003 WL 21357297 at * 3.

Potcinske is an "offer/counter-offer" case where there was never a signed contract and the buyer admitted that there was no meeting of the

minds regarding financing. 245 S.W.3d at 530. Relevant to this appeal, there is an important discussion in <u>Potcinske</u> of the decision in <u>Advance Components, Inc. v. Goldstein</u> and the fact that different considerations come into play when determining the materiality of a finance provision in the context of contract enforcement versus contract formation. <u>Id</u>. at 531. ("The court in <u>Advance Components</u> determined whether the buyer's failure to perform agreed upon financing terms was a material breach of an already formed contract. Here, we must determine whether a financing term is a material term in the context of contract formation. We agree with McDonald Property that different considerations come into play when determining the materiality of a finance provision in each context.")

Garrod Investments is actually a statute of frauds case where the parties never <u>signed</u> an agreement enforceable under the statute because of offers and unaccepted counter-offers. 139 S.W.3d at 765.

> Any material change in a proposed contract constitutes a counteroffer, which must be accepted by the other party for a contract to exist. ... Where "negotiations" are in writing, as in this case, the question of whether an offer was unconditionally accepted is primarily a question of law for the court. ... Based on the Schlegels' summary judgment evidence and Garrod's appellate brief, we conclude that on November 17, Garrod materially altered Myrna Schlegel's offer and thus made a counteroffer.

The Schlegels' evidence shows that they never signed the standard form contract after changes were made to it. We conclude that the document therefore has the same status as if Myrna Schlegel had never signed it. ... As a matter of law, the standard form contract does not satisfy the Statute of Frauds and cannot be enforced.

Id.

None of these contract formation cases support the Marxes' argument that the Mediated Settlement Agreement is unenforceable because of the failure of a meeting of the minds. The Farm and Ranch Contract is a fully integrated, executed written agreement containing all material and essential terms. The Mediated Settlement Agreement is a valid, binding and enforceable written agreement. Any ambiguity or contradiction between the terms of the Farm and Ranch Contract and the Mediated Settlement Agreement does not result in contractual indefiniteness or unenforceability. Any complaints that the Marxes could have with the award of specific enforcement are contract enforcement and interpretation issues that they have not raised on appeal. The Marxes' First Point of Error must be overruled.

**B.  The Option That The Marxes Agreed To In The Mediated Settlement Agreement Was Supported By Consideration (Responsive to Appellants' Brief, pp. 19-21)**

The principal argument made by the Marxes in their Second Point of

Error is that the option for the Homestead Property is unenforceable because it is not supported by any consideration. As explained below, the option is supported by consideration and is valid and enforceable.

Multiple Texas cases have cited this Court for the principles that what constitutes consideration is a question of law and the existence of a written contract presumes consideration for its execution.

> What constitutes consideration is a question of law, <u>Brownwood Ross Co. v. Maverick Cnty.</u>, 936 S.W.2d 42, 45 (Tex. App.–San Antonio 1996, writ denied), and the existence of a written contract presumes consideration for its execution. <u>Doncaster v. Hernaiz</u>, 161 S.W.3d 594, 603 (Tex. App.–San Antonio 2005, no pet.).

<u>See</u> <u>Bryant v. Cady</u>, 445 S.W.3d 815, 819 (Tex. App.–Texarkana 2014, no pet.); <u>Ayala v. Soto</u>, No. 04-12-00860-CV, 2014 WL 1614281 at * 4 (Tex. App.–San Antonio April 23, 2014, pet. filed) (mem. op.); <u>see</u> <u>also</u> <u>Nolana Development Ass'n v. Corsi</u>, 682 S.W.2d 246, 250 (Tex. 1984) (consideration presumed even if not apparent).

The Marxes do not dispute that they agreed in the Mediated Settlement Agreement to grant FDP an option to purchase the Homestead Property. (1 CR 182-183) The Marxes do not contend that the exhibits attached to the trial court's final judgment awarding specific performance fail to accurately document the terms of the option they agreed to. (2 CR 456) <u>See</u> Appellants'

Brief, pp. 19-20 (discussing Warranty Deed with Vendor's Lien attached as Exhibit "A" to final judgment that contains option terms).

The Farm and Ranch Contract was undisputedly supported by consideration and FDP deposited the earnest money required by that contract. (1 CR 16, 17, 31) The consideration recited in the Farm and Ranch Contract and further reflected by the Mediated Settlement Agreement constitute sufficient consideration for the option as a matter of law. There is no requirement under Texas law for any independent consideration for the option.

Numerous Texas courts, including this one, treatises and commentators consistently state that a single consideration is sufficient to support multiple promises bargained for in an agreement and that consideration for the principal agreement is sufficient to support other promises that are subsidiary or collateral to the principal agreement. See Mitchell v. Lawson, 444 S.W.2d 192, 196 (Tex. Civ. App.–San Antonio 1969, no writ); Saenz v. Martinez, 2008 WL 4809217 at * 4; Allen v. Am. Gen. Finance, Inc., 251 S.W.3d 676, 688 (Tex. App.–San Antonio 2007, pet. granted, judgment vacated pursuant to settlement); Incore Construction, Inc. v. Incore, Inc., No. 04-08-00785-CV, 2009 WL 4827071 at * 3 (Tex. App.–San Antonio Dec. 16, 2009, pet. denied)

(mem. op.); Birdwell v. Birdwell, 819 S.W.2d 223, 228 (Tex. App.–Fort Worth 1991, writ denied); Reeves v. Lago Vista, Inc., 497 S.W.2d 950, 954 (Tex. Civ. App.–Austin 1973, writ ref'd n.r.e.); Rickey v. Houston Health Club, 863 S.W.2d 148, 150 (Tex. App.–Texarkana 1993), writ denied n.r.e., 888 S.W.2d 812 (Tex. 1994); Fortner v. Fannin Bank in Windom, 634 S.W.2d 74, 77 (Tex. App.–Austin 1982, no writ); Lee v. Lee, 275 S.W.2d 574, 576 (Tex. Civ. App.–Texarkana 1955, writ dism'd); Prairie Producing Co. v. Martens, 705 S.W.2d 257, 260 (Tex. App.–Texarkana 1986, writ ref'd n.r.e.).

The Corbin treatise addresses this issue as follows:

> A single and undivided consideration may be bargained for and given as the agreed equivalent of one promise or of two promises or of many promises. The consideration is not rendered invalid by the fact that it is exchanged for more than one promise. If it could support each of the promises taken separately it is consideration for all of them ... Where an option is part of a larger contract, the consideration for the contract is also consideration for the option.

Joseph Perillo and Helen Bender, 2 Corbin on Contracts (rev. ed. 1995) Section 5.12, pp. 56-57, 59. (emphasis supplied)

Comment a to the Restatement (Second) of Contracts, Section 80 (1981), states as follows:

> [T]wo or more promises may be binding even though made for the price of one. A single performance or return promise may thus furnish consideration for any number of promises.

These principles apply to option contracts.

In Echols v. Bloom, 485 S.W.2d 798, 800 (Tex. Civ. App.–Houston [14th Dist.] 1972, writ ref'd n.r.e.), the Fourteenth Court of Appeals expressly held that there was consideration for an option in a real estate contract even where there was no express recital of consideration for the option.

> It is axiomatic that to be valid and enforceable a contract establishing an option must be supported by consideration. 13 Tex. Jur. 2d Contracts Sec. 38 (1960). Often the consideration is, as here, a sum of money to be regarded as a parcel of the total purchase price in the event the option-holder elects to buy. If an option is contained in a contract which itself is supported by a sufficient consideration, no independent consideration for the option itself need appear. Colligan v. Smith, 366 S.W.2d 816 (Tex. Civ. App.–Fort Worth 1963, writ ref'd n.r.e.).

Id.

In Lower Colorado River Authority v. Naumann, 638 S.W.2d 195, 196-197 (Tex. App.–Houston [1st Dist.] 1982, writ ref'd n.r.e.), the Naumanns executed a deed to the LCRA conveying eight acres of surface estate and an option for the LCRA to acquire a perpetual easement over a 100 foot wide strip of land. The deed recited consideration of $8,000.00, which was paid by the LCRA. Id. There was no separate recital of consideration for the option. The trial court found that the option was not supported by consideration. Id. at 196. Citing to Echols v. Bloom, the Court of Appeals held that the trial

court erred in finding that there was no consideration for the option.  <u>Id</u>. at 199.

The decision in <u>Echols v. Bloom</u> has been cited by the Missouri Court of Appeals to support its holding that there was consideration for an option contained in a real estate installment contract.  In <u>Johnson v. Farrow</u>, 594 S.W.2d 655, 657 (Mo. App. 1980), the Court stated as follows:

> Defendants' second point is that there was no consideration for the option contract.  In support of this contention defendants cite cases involving separate option contracts.  <u>See</u> for instance <u>Mohawk Real Estate Sales, Inc. v. Crecelius</u>, 424 S.W.2d 86 (Mo. App. 1968).  Here the option was a part of the entire real estate installment contract.  The considerations flowing between the parties were part of the entire contract.  These mutual considerations served to support the entire contract between the parties including the option provision.  <u>Echols v. Bloom</u>, 485 S.W.2d 798 (2, 3) (Tex. Civ. App. 1972); <u>1 Corbin on Contracts</u> Sec. 125.  This is particularly apparent from the language of the paragraph granting the option which states it is "in consideration of the promises stated herein."  There was no lack of consideration.

In <u>Bridgeman v. Jefferson Amusement Co.</u>, 207 S.W.2d 138, 140 (Tex. Civ. App.–Beaumont 1948, writ ref'd n.r.e.), Jefferson Amusement entered into a lease with a 10 year primary term with an option to extend the lease for five additional years.  There was no specific consideration recited for the option.  <u>Id</u>.  Bridgeman argued on appeal that the option to extend the lease was not supported by any consideration.  The Court of Appeals rejected this

argument, stating as follows:

> Plaintiff has assigned 9 Points of Error for reversal. Points 1, 2 and 4 are founded upon the proposition that the option to extend or renew the lease was not supported by any consideration. Plaintiff seemingly argues that the lease was divisible, expressing two distinct agreements, namely, the demise for 10 years and the option, and further, that whatever consideration may be expressed in the lease was intended to be a consideration for only the 10 year demise.
>
> Points 1, 2 and 4 are overruled. The option was supported by a valuable consideration. It presumably constituted an inducement to Defendant to enter into the contract evidenced by the lease and as we construe the lease, Defendant's covenants, rental and otherwise, were intended by the parties to be a consideration not only for the 10 year demise but also for the option. ... Our conclusion is in accord with that reached by other courts of this state in resolving similar questions of construction, arising under various kinds of agreements containing options. Blaffer & Farish v. Gulf Pipe Line Co., Tex. Civ. App., 218 S.W. 89; Griffin v. Bell, Tex. Civ. App., 202 S.W. 1034; Mayhew & Isbell Lumber Co. v. Valley Wells Truck Growers' Ass'n, Tex. Civ. App., 216 S.W. 225, at page 232; Texarkana Pipe Works v. Caddo Oil & Ref. Co., Tex. Civ. App., 228 S.W. 586; Jones v. Gibbs, 133 Tex. 627, 130 S.W.2d 265, at page 268.

Id. at 142-143.

In Blaffer & Farish v. Gulf Pipe Line Co., 218 S.W. 89, 90 (Tex. Civ. App.–Galveston 1919, no writ), cited above in Bridgeman, plaintiffs entered into a contract whereby they agreed to sell to the defendant up to 1,000 barrels of oil per day, with an option for the defendant to purchase additional quantities in excess of the 1,000 barrels. The plaintiffs argued that the option

provision was not supported by consideration. The Court of Appeals rejected this argument, stating as follows:

> We are of opinion that the contracts between the parties constitute entire contracts, and that the considerations recited support, not only the sale of the 1,000 barrels of oil by each of the plaintiffs, but as well the right of defendant to demand the placing of the excess oil in the settling tank to which defendant had attached its pipe line, and the right of defendant to run said excess oil into its pipe line, and thereafter, at the time of or prior to any settlement and payment for oil theretofore received, to purchase the same by paying therefor the price stipulated in the contract. <u>Where in a contract supported by a sufficient consideration an option is given to one of the parties, the option is valid and enforceable, though there is no independent or specific consideration for the option</u>.

Id. at 91-92. (emphasis supplied)

In <u>Corsicana Petroleum Co. v. Owens</u>, 222 S.W. 154, 154-55 (Tex. 1920), the Owenses entered into a mineral lease whereby Corsicana Petroleum paid the Owenses $28.20, agreeing to drill a well within one year or to pay delay rentals of $28.20 quarterly if no well was drilled. The agreement also contained an option in favor of Corsicana Petroleum. Id. at 154-155. The Supreme Court found that the agreement was enforceable and that the option was supported by the above-recited consideration. Id. at 155.

The above decision and the decision in <u>Blaffer & Farish v. Gulf Pipe Line Co.</u> were later cited by the Supreme Court in <u>Pace Corporation v.</u>

<u>Jackson</u>, 284 S.W.2d 340, 343 (Tex. 1955), a case which involved a settlement agreement between three shareholders that contained an option granted to one of the shareholders to have the company supply him with discounted cigarettes for resale. The option was described as follows:

> 4. Paragraph E, the heart of the controversy, reads as follows: "As a part of the consideration for this transaction, Pace Corporation agrees to supply Allan Jackson for any business he may become interested in outside of Bexar County, with cigarettes on a cash basis, at cost, for a period not to exceed two years after Pace Corporation has paid its indebtedness to Allan Jackson, such cost being defined as invoice price less normal trade and cash discount, if any."

<u>Id</u>. at 343.

The Supreme Court found that Paragraph E of the settlement agreement, quoted above, was "an option contract, supported by a valuable consideration."

> Our construction of the contract is that for a valuable consideration Pace Corporation obligated itself by paragraph E to supply Jackson, at cost, with all the cigarettes he chose to order at any time on reasonable notice, and from time to time, for his cigarette business in Kerr and Bandera Counties for a period of seven years.
>
> In asserting that the contract is lacking in mutuality petitioners have reference to mutuality of obligation, and assume that paragraph E is a separate and divisible contract. Paragraph E is not a separate and divisible contract. It is a part of the entire integrated contract between the parties, and the consideration for Pace Corporation's promise to supply Jackson with cigarettes

was the sale and transfer of Jackson's stock in the corporation at the price stipulated and the relinquishment of his rights incident to the ownership thereof. Blaffer & Farish v. Gulf Pipe Line Co., Tex. Civ. App., 218 S.W. 89, no writ history. Consideration for the promise having been [otherwise] paid or furnished, the contract is unilateral and mutuality of obligation is unnecessary to its validity. Corbin on Contracts, Vol. 1, secs. 21 and 152; 12 Am.Jur. 509-513, Contracts, secs. 13 and 14; 46 Am.Jur. 254, Sales, sec. 63. This elementary rule is recognized in Corsicana Petroleum Co. v. Owens, 110 Tex. 568, 222 S.W. 154, and in Johnson v. Breckenridge-Stephens Title Co., Tex. Com. App., 257 S.W. 223, 225. In so far as the provisions of paragraph E are concerned the contract is not a bilateral executory contract for the sale of cigarettes for future delivery but is an option contract, supported by a valuable consideration.

Id. at 344.

In Mayhew & Isbell Lumber Co. v. Valley Wells Truck Growers' Ass'n, 216 S.W. 225, 226-227 (Tex. Civ. App.–San Antonio 1919, no writ), Valley Wells and its members entered into an agreement with Mayhew to purchase 60,000 onion crates (30,000 that were to be deliverable immediately). The agreement required a payment of $4,500.00 on the purchase price, which was paid. Id. Mayhew provided the initial 30,000 crates, but subsequently and untimely provided only 12,000 additional crates causing Valley Wells to suffer losses due to damaged and ruined corps. Id. at 227. Mayhew argued that there was no consideration to supply the additional crates, the second 30,000. This Court rejected the argument, concluding that the initial payment of

$4,500.00 was part of the consideration for the additional crates.  Id. at 231-232.  This Court concluded there was valid consideration for the additional crates even if it adopted a construction of the agreement that there was only an option contract for the second 30,000 crates.  Id. at 231-232.

The Mediated Settlement Agreement recites that the parties agreed to dismiss and release all claims asserted between them with the exception of the undertakings reflected in the Mediated Settlement Agreement.  (1 CR 182-183,  ¶¶ 3 and 5)  The relinquishment of a legal right is sufficient consideration to support a contract.  See Brison v. Continental Oil Co., 48 S.W.2d 442, 444 (Tex. Civ. App.–Fort Worth 1932, writ ref'd); Martin v. Martin, Martin & Richards, Inc., 12 S.W.3d 120, 125 (Tex. App.–Fort Worth 1999, no pet.); Birdwell, 819 S.W.2d at 228; Saenz v. Martinez, 2008 WL 4809217 at * 4; Prairie Producing Co. v. Martens, 705 S.W.2d at 260.

Texas courts recognize that the settlement of disputed claims can constitute legally sufficient consideration for an option.  In Great Western Oil Co. v. Carpenter, 95 S.W. 57, 58 (Tex. Civ. App. 1906, writ ref'd), the Carpenters entered into mineral leases for 400 acres of land in Jefferson County and 145 acres in Hardin County on January 28, 1901.  On July 20, 1901, the parties entered into a new contract which extended the term of the

mineral leases and released back to the Carpenters 25 acres of the 145 acre lease. Id. at 58-59. The Court of Appeals found that this release and compromise was adequate legal consideration for an option.

> We conclude that the lease contracts of January 28, 1901, were valid contracts and were in full force, binding the land embraced therein, on July 20, 1901, when the second contract was executed. The release of the 25 acres of land out of the tract of 145 acres furnished a valuable consideration for the option contained in the last contract, which option would have continued until and unless forfeited, by its terms, for failure on the part of appellant to begin work in 9 months and finish a well on each of the two tracts in 15 months from the date of the contract. Until these contingencies occurred, the land was bound by the option contained in this contract. This contract imposed no express obligation on appellant to do any work, as a consideration of the option, but the release of the 25 acres from the former leases was sufficient consideration to support it. A release of both tracts of land from this option was a sufficient consideration for the contract to convey the 2.82 acres of land and the payment of the $1,000 sued for herein. This conclusion finds further support, if need be, in the principle that agreements made in good faith in compromise of doubtful claims, are to be enforced notwithstanding the claim asserted on the one side is denied on the other, and may appear to be invalid or unenforceable. 1 Pars. on Contracts, 438.

Id. at 61.

The cases cited by the Marxes do not support the no consideration arguments they make in their Second Point of Error. The Texas Supreme Court in National Oil & Pipe Line Co. v. Teel, 68 S.W. 979, 980 (Tex. 1902), simply stated that a promise to give an option is valid if supported by an

independent consideration and that if a sum of money is paid for the option, the promisee may enforce the contract. That decision is not contrary to the cases cited above by FDP which hold that if the option is contained in a contract which itself is supported by consideration, no independent consideration for the option itself need appear.

In Hott v. Pearcy/Christon, Inc., 663 S.W.2d 851, 853 (Tex. App.–Dallas 1983, writ ref'd n.r.e.), the seller rejected the agreement before the buyer paid the earnest money, a factual situation that is different from this case on appeal.

The decision in Culbertson v. Brodsky, 788 S.W.2d 156, 157 (Tex. App.–Fort Worth 1990, writ denied), also involved a factual situation different from this appeal. In Culbertson, the contract permitted the buyer to deliver an earnest money check to the title company that the title company could not deposit for sixty days. The Court of Appeals explained as follows:

> Brodsky's check for $5,000 was not consideration for the option because the title company was forbidden to cash the check until the expiration of the option. During the option period, the check would have to be returned to Brodsky upon his demand despite any objections by Culbertson. We reject Brodsky's argument that by delivering the check to the title company, he had to forbear the use of the $5,000 it represented. Because the title company could not cash the check, that sum remained on deposit to Brodsky's account and since the check had to be returned to Brodsky on demand, he was free to put the money to any other

73

use. Brodsky contends that he had to maintain the $5,000 on account, however, Brodsky was not required to deposit funds to cover the check until he decided to exercise the option.

Id. at 157.

The Farm and Ranch Contract in this case expressly and unambiguously provides that FDP shall deposit $10,000.00 as earnest money with the title company. (1 CR 17, ¶ 5) The Marxes judicially admit that FDP made payment and that it was deposited with the title company. See Marxes' Summary Judgment Response, p. 3 (2 CR 488) ("Plaintiff [F]DP, LP, deposited a check for earnest money with the title company described in the contract, but said earnest money will be refunded to said Plaintiff entirely.").

On page 21 of the Appellants' Brief, the Marxes cite to the decision in Chambers County v. TSP Dev., Ltd., 63 S.W.3d 835, 838 (Tex. App.–Houston [14th Dist.] 2001, pet. denied), for the proposition that "the primary test for determining whether an agreement is a valid option contract is whether the contract imposes a mandatory obligation upon the seller to accept a sum stipulated as liquidated damages in lieu of the purchaser's further liability." After citing to the Chambers County decision for this proposition, the Marxes state in the next paragraph of their Brief that "no such fee is described in either the MSA, the Final Judgment, or in the warranty deed prescribed by the

Final Judgment" and that "the option agreement itself lacks all the essential terms of a real estate contract." All that Chambers County stands for is that a real estate contract which provides that the seller's only contractual remedy is retention of the earnest money is considered an option under Texas law, rather than a contract for sale that conveys equitable title. Id. at 838. There is nothing in the opinion that speaks to essential terms required for the option or enforceability.

The decision in Chambers County has absolutely nothing to do with any of the issues in this case or the agreements that were executed by FDP and the Marxes. Chambers County addressed the standing of an owner to sue under the Private Real Property Rights Preservation Act, Tex. Gov't Code §§ 2007.001–.045. The Act permits owners of real property to file a lawsuit against a political subdivision to determine whether a constitutional taking has occurred. Chambers County, 63 S.W.3d at 837-838. The Act defines an owner as a person with legal or equitable title to affected private real property at the time a taking occurs. Id. at 838.

At the time that TSP Dev. sued, it had a contract to purchase property in the relevant area. Id. The issue that the Court of Appeals addressed in Chambers County was whether or not the contract for sale was an

enforceable real estate contract that granted legal or equitable title to TSP or whether it was an option contract. The distinction was important because an option contract does not pass title at the time that it is formed. Id. at 838.

The Court of Appeals found that the contract was an option contract which did not confer standing on TSP under the Act. The Court of Appeals concluded as follows: "As discussed above, the act provides standing only for 'owners' of property possessing 'legal or equitable title.' ... Although TSP may have certain rights in the property not possessed by the public at large, e.g., an option to buy on particular terms, such claimed rights are not sufficient to give it equitable title. ... The TSP/USX agreement was an option contract; hence, TSP did not have standing to attack the ordinance under the Private Real Property Rights Preservation Act." Id. at 840. The Chambers County decision cited by the Marxes on page 20 of their Appellants' Brief does not support their argument that the option provision that the Marxes agreed to in the Mediated Settlement Agreement is unenforceable under Texas law because it fails to contain essential terms.

The Marxes' Second Point of Error must be overruled.

**C.     The Affirmative Defenses Alleged By The Marxes Did Not Bar The Trial Court From Granting Summary Judgment In Favor Of FDP (Responsive to Appellants' Brief, p. 22)**

In their Third Point of Error, Appellants' Brief, p. 22, the Marxes make a five sentence argument claiming that (1) their Supplemental Answer filed on October 14, 2013, contained "no less than sixteen affirmative defenses," (2) FDP did not file a no-evidence motion for summary judgment and (3) the trial court erred in granting final judgment in favor of FDP because the final judgment "failed to dispose of each and every one of appellants' affirmative defenses."

First, the Marxes cite no authority to support the arguments made above in their Third Point of Error.  This Court should overrule the Marxes' Third Point of Error for inadequate briefing.  See Tex. R. App. P. 38.1(i).

> "The Texas Rules of Appellate Procedure require adequate briefing."  ERI Consulting Eng'rs, Inc. v. Swinnea, 318 S.W.3d 867, 880 (Tex. 2010); see TEX. R. APP. P. 38.1.  Specifically, Rule 38.1(i) requires that an appellant's brief contain clear and concise arguments, "with appropriate citations to authorities and to the record."  TEX. R. APP. P. 38.1(i); In re Blankenship, 392 S.W.3d at 259.  Failure to satisfy this requirement waives the issue on appeal.  See In re Blankenship, 392 S.W.3d at 259; Dove v. Graham, 358 S.W.3d 681, 685 (Tex. App.–San Antonio 2011, pet. denied).
>
> ... Because Valdez's brief on this issue does not contain any clear and concise argument with appropriate citation to the record and authorities, we conclude that this issue was inadequately

briefed and thus waived.  See TEX. R. APP. P. 38.1(i); In re Blankenship, 392 S.W.3d at 259.

In re Estate of Valdez, 406 S.W.3d 228, 235 (Tex. App.–San Antonio 2013, pet. denied); see also In re Blankenship, 392 S.W.3d at 259 (concluding that an issue was inadequately briefed and presented nothing for appellate review when the appellant cited no cases or other authority in her brief); Rother v. Rother, No. 04-13-00899-CV, 2014 WL 4922898 at * 3 (Tex. App.–San Antonio Oct. 1, 2014, no pet.) (mem. op.); Nolan v. Hunter, No. 04-13-00072-CV, 2013 WL 5431050 at * 9 (Tex. App.–San Antonio Sept. 25, 2013, no pet.) (mem. op.).

Second, the Marxes' arguments are flatly contrary to long-established Texas summary judgment practice.  The Marxes presented no evidence to support any of their claimed affirmative defenses.  (2 CR 486-516)  The defendant's pleading of an affirmative defense will not prevent the rendition of summary judgment for the plaintiff where the plaintiff has conclusively established each element of its cause of action as a matter of law.  See Brownlee v. Brownlee, 665 S.W.2d 111, 112 (Tex. 1984).  Once the plaintiff has conclusively proven its entitlement to summary judgment, the burden shifts to the defendant to produce evidence to raise an issue of fact on its affirmative defenses sufficient to defeat summary judgment.  Id.  Under Texas

law, a plaintiff is not required to move for summary judgment on the defendant's affirmative defenses and has no obligation to negate the defendant's affirmative defenses.  Id.  See also Woodside v. Woodside, 154 S.W.3d 688, 691 (Tex. App.–El Paso 2004, no pet.) ("A plaintiff, when moving for summary judgment, is not under any obligation to negate affirmative defenses.").[2]

In Lunsford Consulting Group, Inc. v. Crescent Real Estate Funding VIII, L.P., 77 S.W.3d 473, 475-476, 477 (Tex. App.–Houston [1st Dist.] 2002, no pet.), the First Court of Appeals explained as follows:

> To defeat summary judgment by raising an affirmative defense, the nonmovant must do more than just plead the affirmative defense.  American Petrofina, Inc. v. Allen, 887 S.W.2d 829, 830 (Tex. 1994).  The nonmovant must present summary judgment evidence that raises that defense.  Brownlee v. Brownlee, 665 S.W.2d 111, 112 (Tex.1984).  If the nonmovant does not raise a fact issue on each element, there is no defense.

■ ■ ■

> Because Kiser was relying on an affirmative defense to defeat summary judgment, he had to produce summary judgment evidence that raised a fact issue on each element of the affirmative defense.  See Brownlee, 665 S.W.2d at 112.  Because

---

[2] In their summary judgment response, the Marxes acknowledge this authority, citing to the decision in Brownlee v. Brownlee (2 CR 486):  "A defendant relying upon an affirmative defense must then come forward with evidence raising a fact issue on each element of its affirmative defense in order to avoid the summary judgment.  Brownlee v. Brownlee, 665 S.W.2d 111, 112 (Tex. 1984)."

he did not, the trial court properly rendered summary judgment in favor of Crescent.

See also Jim Maddox Properties, LLC v. WEM Equity Capital Investments, Ltd., 446 S.W.3d 126, 131-132, 133-134 (Tex. App.–Houston [1ˢᵗ Dist.] 2014, no pet.); Brooks v. Excellence Mortg., Ltd., __ S.W.3d __, No. 04-13-00106, 2014 WL 2434583 at * 4 (Tex. App.–San Antonio May 30, 2014, no pet.); Hammonds v. Cramer Financial Group, Inc., No. 04-96-00548-CV, 1997 WL 184734 at * 2 (Tex. App.–San Antonio April 16, 1997, no writ) (not designated for publication).

This Court's opinion in Wise v. Luke Development, LLC, No. 04-12-00477-CV, 2013 WL 4483381 at * 2 and * 4 (Tex. App.–San Antonio Aug. 21, 2013, no pet.) (mem. op.), expressly addressed and rejected the arguments made by the Marxes and is dispositive of their Third Point of Error.

> When the plaintiff moves for traditional summary judgment, it must conclusively prove its entitlement to summary judgment on each element of its cause of action as a matter of law. See TEX. R. CIV. P. 166a(c). If the plaintiff does so, the burden then shifts to the defendant to produce evidence creating a genuine issue of material fact as to the challenged element or elements in order to defeat the summary judgment. See Walker v. Harris, 924 S.W.2d 375, 377 (Tex. 1996). The defendant's mere pleading of an affirmative defense does not prevent the rendition of summary judgment for a plaintiff who has conclusively established each element of its cause of action as a matter of law. Brownlee v. Brownlee, 665 S.W.2d 111, 112 (Tex. 1984).

■ ■ ■

Wise and Hubbard next argue the summary judgment was improper because Luke Development "failed to demonstrate the lack of [a] genuine issue of material fact" concerning their affirmative defenses.  However, to avoid summary judgment, the burden was on Wise and Hubbard to produce evidence raising a fact issue on each element of their affirmative defenses.  See <u>A.J. Morris, M.D., P.A. v. De Lage Landen Fin. Serv., Inc.</u>, 2009 WL 161065, at * 12 (Tex. App.–Fort Worth 2009, no pet.) (rejecting the argument that summary judgment was improper when the plaintiff did not move for summary judgment on the defendant's affirmative defenses); <u>Tesoro Petroleum Corp. v. Nabors Drilling USA, Inc.</u>, 106 S.W.3d 118, 124 (Tex. App.–Houston [1st Dist.] 2002, pet. denied) (noting that a plaintiff moving for summary judgment has no obligation to negate the defendant's affirmative defenses).  Wise and Hubbard do not argue they produced evidence raising a fact issue on each of the elements of their affirmative defenses.

The Marxes' Third Point of Error is unmeritorious and must be overruled.

## CONCLUSION AND PRAYER

The final judgment and award of specific performance in favor of FDP, LP must be affirmed.

The Marxes have not asserted in any of their three Points of Error that there is an ambiguity with respect to the financing provisions of the Farm and Ranch Contract that was created by the Mediated Settlement Agreement. They made this argument in the trial court and in their Statement of Facts, but

have argued on appeal only that the agreements that they executed are unenforceable because of contractual indefiniteness or failure to agree to all material and essential terms. If this Court finds that the ambiguity argument has merit, has been preserved for appeal, and requires reversal of the final judgment, this Court should make clear in its opinion and judgment that on remand FDP shall have the opportunity to conclude the transaction by payment of $2,086,675.00 cash by FDP or by the obtaining of third-party financing for all or part of the $2,086,675.00, resulting in FDP and FDP's lender paying a cash purchase price of $2,086,675.00.

Respectfully submitted,

**PAUL WEBB, P.C.**

 /s/   Vincent L. Marable III
**VINCENT L. MARABLE III**
trippmarable@sbcglobal.net
State Bar No. 12961600

221 N. Houston
Wharton, Texas   77488
Telephone:        (979) 532-5331
Telecopier:        (979) 532-2902

**GILBERT ADAMS LAW OFFICES**


**GILBERT T. ADAMS, III**
gilbert@gta-law.com
State Bar No. 00790201

1855 Calder Avenue at Third
P. O. Drawer 3688
Beaumont, Texas   77704
Telephone:         (409) 835-3000
Telecopier:        (409) 832-6162


**ATTORNEYS FOR APPELLEE FDP, LP**

# CERTIFICATE OF SERVICE

I certify that on March 11, 2015, a true and correct copy of the above and foregoing Brief Of Appellee FDP, LP was forwarded to all counsel of record by the Electronic Filing Service Provider, if registered; a true and correct copy of this document was forwarded to all counsel of record not registered with an Electronic Filing Service Provider by certified mail return receipt requested, addressed as follows:

Kirk Dockery
kirkdockery@gmail.com
Scott R. Donaho
srdonaho@floresville.net
The Law Offices of Donaho & Dockery, P.C.
P. O. Box 459
Floresville, Texas   78114


[ Counsel for Appellants Robert Marx and Debbie Marx ]


 /s/   Vincent L. Marable III
**VINCENT L. MARABLE III**

# CERTIFICATE OF COMPLIANCE

This brief complies with the length limitations of Tex. R. App. P. 9.4(i)(2)(B) because this brief consists of 14,522 words, excluding the parts of the brief exempted by Tex. R. App. P. 9.4(i)(1).

_/s/   Vincent L. Marable III_
**VINCENT L. MARABLE III**

# APPENDIX

Final Judgment signed August 11, 2014
(2 CR 532-556) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . TAB "1"


Farm and Ranch Contract
(1 CR 16-31) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . TAB "2"


Mediated Settlement Agreement
(1 CR 182-188) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . TAB "3"


Order confirming Arbitration Award and
incorporating Arbitrator's Ruling
(2 CR 353-363) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . TAB "4"

| | | |
|---|---|---|
| FDP, LP and LARRY FRIESENHAHN | § | IN THE DISTRICT COURT OF |
| | § | |
| .V. | § | WILSON COUNTY, TEXAS |
| | § | |
| ROBERT MARX, DEBBIE MARX | § | |
| and DIEGO LOPEZ | § | 81ST JUDICIAL DISTRICT |

## FINAL JUDGMENT

Came on for consideration Plaintiff FDP, LP's Motion For Final Summary Judgment For Specific Performance And Other Relief and the Court having considered the motion, any response, the pleadings in the case and having taken judicial notice of this Court's May 12, 2014, Order Granting Plaintiffs' Motion And Application To Confirm Arbitration Award And Confirmation Of Arbitration Award has determined that Plaintiff FDP, LP is entitled to specific performance and the other relief reflected in this Final Judgment.

It is ORDERED, ADJUDGED and DECREED that Plaintiff FDP, LP's Motion For Final Summary Judgment For Specific Performance And Other Relief is granted.

It is ORDERED, ADJUDGED and DECREED that FDP, LP is entitled to specific performance of the Farm and Ranch Contract between Robert Marx and Debbie Marx and FDP, LP dated January 27, 2012, as modified by the parties' August 27, 2013, Mediated Settlement Agreement and further clarified by the April 14, 2014, arbitration letter ruling of Thomas J. Smith and confirmed by this Court's May 12, 2014, Order Granting Plaintiffs' Motion And Application To Confirm Arbitration Award And Confirmation Of Arbitration Award.

It is ORDERED, ADJUDGED and DECREED that a closing of transaction as described above shall occur on or before Sept 5, 2014, at Bedgood Title Co. 300 E Airline Rd, Victoria, Tx [location]. At or prior to the closing, the Sellers, Robert Marx and Debbie Marx, shall, upon receipt of the cash funds and the executed documents described in the next paragraph, execute

1

136|392-416



532

the Warranty Deed With Vendor's Lien in the form attached to this Final Judgment as Exhibit "A." This order is enforceable by contempt.

It is **ORDERED, ADJUDGED and DECREED** that at or before the closing, Plaintiff FDP, LP will tender cash funds of $300,000.00 and will execute the Real Estate Lien Note and Deed of Trust in favor of Robert Marx and Debbie Marx in the amount of $1,786,675.00 and in the form attached to this Final Judgment as Exhibits "B" and "C."

It is **ORDERED, ADJUDGED and DECREED** that at or before the closing the parties shall execute all other and necessary, typical and traditional documents required to close the transaction.

It is **ORDERED, ADJUDGED and DECREED** that Plaintiff FDP, LP have judgment against Defendants Robert Marx and Debbie Marx jointly and severally for $17,688.50 and post-judgment interest on that amount until the sum is paid by Defendants to Plaintiff.

In its May 12, 2014, Order Granting Plaintiffs' Motion And Application To Confirm Arbitration Award And Confirmation Of Arbitration Award, this Court made rulings as to Robert Marx's and Debbie Marx's joint and several liability for the cost of the Arbitrator's fee ($1,800.00) and the surveyor's fee ($11,539.43). To the extent that these fees remain outstanding and unsatisfied, those rulings are reaffirmed and are deemed to be part of this Final Judgment.

In connection with the closing of this transaction described above, counsel for Plaintiff FDP shall, prior to the closing, provide notice to the Title Company closing the transaction (with a copy to counsel for Defendants) advising the Title Company whether Defendants have paid to Plaintiff FDP, LP the attorneys' fees and expenses in the amount of $17,688.50, paid to the surveyor the surveyor's fees in the amount of $11,539.43 and paid to the arbitrator the arbitrator's fees of $1,800.00. The Title Company closing the sale shall deduct from the cash payment made by FDP, LP any unpaid amounts described above and shall disburse payment to

2

533

the proper recipient.

The Farm and Ranch Contract states that the Seller (Defendants) shall furnish a Title Policy at seller's expense. If, at closing, the Defendants have not furnished and paid for such Title Policy and FDP, LP has paid to obtain such Title Policy, the Title Company is directed to disburse to FDP, LP such amounts paid for the Title Policy from the cash payment to be made by FDP, LP.

Plaintiff FDP, LP is entitled to recover additional reasonable and necessary attorneys' fees of $2,800.00. Judgment is hereby rendered against Defendants Robert Marx and Debbie Marx. The Title Company closing the sale shall deduct from the cash payment made by FDP, LP any unpaid amounts described above and shall disburse payment to the proper recipient.

The Court conditionally awards appellate attorneys' fees to Plaintiff FDP, LP as follows:

$15,000.00 for the Court of Appeals.

$4,500.00 in the event that FDP, LP responds to a petition for review.

$9,000.00 if briefing on the merits is ordered by the Texas Supreme Court.

All other claims for relief asserted by any party to this case are denied.

This is a final and appealable judgment.

Costs of court, including any mediator's fees associated with any mediations, are taxed against Defendants Robert Marx and Debbie Marx.

SIGNED on this Date: *August 11*, 2014

DISTRICT JUDGE PRESIDING

Filed 11 Day of August 2014
11:30 A M
Deborah Bryan
Clerk District Court Wilson County, Texas
By _____ Deputy

3

534

**APPROVED AS TO FORM:**

GILBERT T. ADAMS, III
gilbert@gta-law.com
State Bar No. 00790201

**GILBERT ADAMS LAW OFFICE**
1855 Calder Avenue at Third
P. O. Drawer 3688
Beaumont, Texas   77704
Telephone:      (409) 835-3000
Telecopier:     (409) 832-6162

**ATTORNEY FOR PLAINTIFFS**

4

535

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

## WARRANTY DEED WITH VENDOR'S LIEN

**Date:** _____, 2014

**Grantor:** ROBERT MARX AND DEBBIE MARX

**Grantor's Mailing Address:**

> ROBERT MARX
> DEBBIE MARX
> 620 Marx Lane
> La Vernia, TX 78121
> Wilson County

**Grantee:** FDP, LP, a Texas Limited Partnership

**Grantee's Mailing Address:**

> FDP, LP.
> 1204 Zanderton
> Jourdanton, TX 78026
> Atascosa County

**Consideration:** TEN AND NO/100ths DOLLARS ($10.00) and other good and valuable consideration and the further consideration of a note of even date executed by Grantee and payable to the order of Grantor in the principal amount of ONE MILLION SEVEN HUNDRED EIGHTY-SIX THOUSAND SIX HUNDRED SEVENTY-FIVE AND NO/100 DOLLARS ($1,786,675.00). The note is secured by a first and superior vendor's lien and superior title retained in this deed and by a first-lien deed of trust of even date from Grantee to KIRK DOCKERY, TRUSTEE.

**Property (including any improvements):**

> 417.335 acre (Surface area - Grid Area: 417.201 acres) tract of land situated in the G. C & S.F.R.R Survey, Section 5, Abstract No. 442, the Benjamin White Survey, Abstract No. 431; and the J.N. Stone Survey, Abstract No. 516 in Wilson County, Texas, containing a portion of Tracts 1, 2 and 3 described in instrument to Mrs. Clara Jaksik Marx, Sr., recorded in Volume 420, Page 209 of the Wilson County Deed Records, containing a small portion of that certain 5.000 acre tract described in instrument to Robert R. Marx recorded in Volume 673, Page 799 of the Wilson County Official Public Records; containing a portion of that certain 326.047 acre tract described in instrument to Robert R. Marx recorded in Volume



536

732, Page 377 of the Wilson County Official Public Records; and being more particularly described by metes and bounds on the attached Exhibit "A."

**Reservations from and Exceptions to Conveyance and Warranty:**

Easements, rights-of-way, and prescriptive rights, whether of record or not; all presently recorded instruments, other than liens and conveyances, that affect the property; taxes for the current year, the payment of which Grantee assumes.

Grantor, for the Consideration and subject to the Reservations from Conveyance and the Exceptions to Conveyance and Warranty, grants, sells, and conveys to Grantee the Property, together with all and singular the rights and appurtenances thereto in any way belonging, to have and to hold it to Grantee and Grantee's heirs, successors, and assigns forever. Grantor binds Grantor and Grantor's heirs and successors to warrant and forever defend all and singular the Property to Grantee and Grantee's heirs, successors, and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof, except as to the Reservations from Conveyance and the Exceptions to Conveyance and Warranty.

The vendor's lien against and superior title to the Property are retained until each note described is fully paid according to its terms, at which time this deed will become absolute.

**Option:**

Grantor hereby grants to Grantee the exclusive option to purchase the Homestead Property, described on the attached Exhibit "B," for the price of $500,000.00, for a period of 120 days from the earlier of:

(i)     written notice from the Grantor;

(ii)    the death of the last surviving Grantor;

(iii)   or the expiration of eight (8) years from the effective date of this Warranty Deed With Vendor's Lien.

When the context requires, singular nouns and pronouns include the plural.

ROBERT MARX

DEBBIE MARX

Acknowledgments

STATE OF TEXAS §

COUNTY OF _____ §

This instrument was acknowledged before me on _____, 2014, by ROBERT MARX.

_____
Notary Public, State of Texas

STATE OF TEXAS §

COUNTY OF _____ §

This instrument was acknowledged before me on _____, 2014, by DEBBIE MARX.

_____
Notary Public, State of Texas

PREPARED IN THE OFFICE OF:
Paul Webb, PC
221 N. Houston Street
Wharton, Texas 77488

AFTER RECORDING RETURN TO:
_____
_____

WARRANTY DEED WITH VENDOR'S LIEN

538

**JONES & CARTER, Inc.**
ENGINEERS · PLANNERS · SURVEYORS

1000 Central Parkway N., Suite 100
San Antonio, Texas 78232-5050

TEL 210-494-5511
FAX 210-494-5519

AUSTIN                DALLAS
HOUSTON               DENHAM
SAN ANTONIO           ROSENBERG
COLLEGE STATION       THE WOODLANDS

Texas Board of Professional Engineers Registration No. F-439

**METES AND BOUNDS
DESCRIPTION OF A
417.365 ACRE TRACT OF LAND**

A Metes and Bounds description of a 417.385 acre (Surface area – Grid Area: 447,201 acres) tract of land situated in the G.C. & S.F. RR Survey, Section 5, Abstract No.442; the Benjamin White Survey, Abstract No.431; and the J.N. Stone Survey, Abstract No.516; in Wilson County, Texas; containing a portion of Tracts 1, 2 and 3 described in instrument to Mrs. Clara Jakelk Marx, Sr. recorded in Volume 429, Page 209 of the Wilson County Deed Records; containing a small portion of that certain 5.000 acre tract described in instrument to Robert R. Marx recorded in Volume 679, Page 769 of the Wilson County Official Public Records; containing a portion of that certain 326.047 acre tract described in instrument to Robert R. Marx recorded in Volume 732, Page 377 of the Wilson County Official Public Records; and being more particularly described as follows:

BEGINNING at a 2-inch iron pipe found marking the northern-most corner of said 326.047 acre tract, and marking the western-most corner of that certain 8.0 acre tract described in instrument to Raymond L. Budge recorded in Volume 785, Page 711 of the Wilson County Official Public Records; and marking the eastern-most common corner of Tracts 4 and 5 of Ruble Ranch Subdivision, plat of which is recorded in Volume 1, Page 78 of the Wilson County Plat Records; and marking the northeastern-most corner of Marx Lane (60-feet wide private lane, Volume 521, Page 637 of the Wilson County Deed Records); said BEGINNING point having Texas State Plane Grid Coordinates:
North 13,651,249.69 feet, East 2,289,408.88 feet;

THENCE, along the boundary of said 8.0 acre tract the following two (2) courses and distances:

1. South 76°29'06" East, 248.79 feet to a 1/2-inch iron rod found for corner;

2. North 14°32'14" East, 1045.67 feet to a 1/2-inch iron rod found for corner in the southwesterly boundary of Lot 88 of Rosewood Subdivision, Unit 2, plat of which is recorded in Volume 9, Page 22 of the Wilson County Plat Records;

THENCE, South 76°11'36" East, 6551.79 feet along the southwesterly boundary of said Rosewood Subdivision, Unit 2 and Rosewood Subdivision, Unit 3 (Volume 9, Page 60, Wilson County Plat Records), and Rosewood Subdivision, Unit 8 (Volume 9, Page 70, Wilson County Plat Records) to a 1-inch iron pipe found marking the northern-most corner of that certain 832.072 acre tract described in instrument to Yates-Semmes Land and Cattle Co. recorded in Volume 710, Page 572 of the Wilson County Official Public Records;

THENCE, South 69°32'02" West, along the northwesterly boundary of said 832.072 acre tract, at 2089.30 feet passing a 1/2-inch iron rod found marking the eastern-most corner of the aforementioned 326.047 acre tract, continuing for a total distance of 6044.69 feet to a 1-inch iron pipe found marking the western-most corner of said 832.072 acre tract and northern-most corner of the remainder of that certain 600.003 acre tract described in instrument to Norma L. Jakelk recorded in Volume 698, Page 265 of the Wilson County Official Public Records;

THENCE, South 59°33'42" West, 2854.48 feet along the northwesterly boundary of said 600.003 acre tract to a tract to a rock found near a fence post situated in the southeasterly boundary of Woodlands Subdivision, plat of which is recorded in Volume 11, Page 31 of the Wilson County Plat Records;

EXHIBIT
"A"
Page 1 of 3

1-23-2014

**JONES & CARTER, Inc.**
ENGINEERS· PLANNERS· SURVEYORS
Texas Board of Professional Engineers Registration No. F-439

THENCE, along the easterly boundary of aforementioned Ruble Ranch Subdivision, the following three (3) courses and distances:

1. North 14°11'50" East, along the easterly boundary of said Woodlands Subdivision, at 50.80 feet passing the centerline of Woodlands Drive (70 feet wide), continuing for a total distance of 332.87 feet to a 1/2-inch iron rod found marking the northeast corner of said Woodlands Subdivision and the southeast corner of Copper Creek Estates, Unit 2, plat of which is recorded in Volume 10, Page 93 of the Wilson County Plat Records;

2. North 13°57'45" East, along the easterly boundary of said Copper Creek Estates, Unit 2 and along the easterly boundary of an "unplatted area" owned by Paul Cleveland (Vol. 1444, Pg. 362, WCOPR) per plat of Copper Creek Estates, Unit 3 recorded in Volume 10, Page 160 of the Wilson County Plat Records, at 884.5 feet passing the centerline of Copper Creek Drive (70 feet wide), continuing for a total distance of 1804.94 feet to a 2-inch pipe found marking the eastern-most common corner of Tracts 6 and 7 of aforesaid Ruble Ranch Subdivision;

3. North 14°10'03" East, 1457.91 feet along the easterly boundary of an unplatted strip of land (approximately 15 feet wide, Paul Cleveland, et ux, Volume 1597, Page 108, WCOPR) adjoining the easterly boundary of Bridge Water Ranch Subdivision, plat of which is recorded in Volume 11, Page 14 of the Wilson County Plat Records, and along the easterly boundary of that certain 18.979 acre "Tract Two" described in instrument to Lawrence Eriesenhahn, et ux, recorded in Volume 1623, Page 359 of the Wilson County Official Public Records, to a point for corner;

THENCE, along the boundary of a proposed 100.000 acre remainder tract, the following seven (7) courses and distances:

1. South 75°49'57" East, 70.00 feet to a point for corner;

2. South 14°10'03" West, 1457.79 feet to a point for corner;

3. South 13°57'45" West, 1804.95 feet to a point for corner;

4. South 14°11'50" West, 162.33 feet to a point for corner;

5. North 58°33'42" East, 2206.14 feet to a point for corner;

6. North 07°46'31" West, 4201.67 feet to a point for corner;

7. North 75°29'26" West, 80.00 feet to a 1/2-inch iron rod found marking the eastern-most corner of "Tract 1" described in instrument to Douglas D. Watson, et ux, recorded in Volume 1672, Page 266 of the Wilson County Official Public Records, and marking the southern-most corner of the aforementioned Marx Lane tract;

THENCE, North 14°16'49" East, 29.97 feet along the easterly end of said Marx Lane tract to a 1-inch iron pipe found marking an angle point, same being the northern-most corner of the aforesaid 5.000 acre tract;

EXHIBIT
"A"
Page 2 of 3

1-23-2014

540

**JONES & CARTER**,INC.
ENGINEERS · PLANNERS · SURVEYORS
Texas Board of Professional Engineers Registration No. F-439

THENCE, North 16°17'19" East, 50.08 feet along the easterly end of said Marx Lane tract to the POINT OF BEGINNING, containing 417.335 acres of land in Wilson County, Texas as shown on drawing filed under Job No. 50762-008-00 in the office of Jones & Carter, Inc., San Antonio, Texas.

Note: All bearings and distances referenced herein are Texas State Plane Coordinate System grid, South Central Zone (NAD83) as established by Global Positioning System (GPS). The grid to surface scale factor is: 1.000101.

JONES & CARTER, INC.



Michael A. Romans
Registered Professional Land Surveyor #4857

Signature Date: _1-23-2014_



EXHIBIT
"A"
Page 3 of 3

541

# REAL ESTATE LIEN NOTE

**Date:** _____, 2014

**Borrower:** FDP, LP, a Texas Limited Partnership

**Borrower's Mailing Address:**

> FDP, LP
> 1204 Zanderton
> Jourdanton, TX 78026
> Wilson County

**Lender:** ROBERT MARX AND DEBBIE MARX, husband and wife

**Place for Payment:**

> 620 Marx Lane
> La Vernia, Wilson County, Texas 78121, or any other place that Lender may
> designate in writing.

**Principal Amount:** ONE MILLION SEVEN HUNDRED EIGHTY-SIX THOUSAND SIX
HUNDRED SEVENTY-FIVE AND NO/100 ($1,786,675.00) DOLLARS

**Annual Interest Rate:** 4.5%

**Maturity Date:** 180 months from date of Note

**Annual Interest Rate on Matured, Unpaid Amounts:** The maximum lawful rate of interest per
annum.

**Terms of Payment (principal and interest):**

Principal and interest are payable in 180 monthly installments of THIRTEEN THOUSAND SIX
HUNDRED SIXTY-SEVEN AND 94/100 ($13,667.94) DOLLARS or more each. From each of
these installments the accrued interest on the unpaid principal will be deducted first, and the
remainder will be applied to payment of principal. The first installment is payable on or before
_____, 2014, and the others are payable regularly on or before the 30th day of each
succeeding month until the principal and interest have been paid.

**Security for Payment:** This note is secured by a vendor's lien and superior title retained in a
deed from ROBERT MARX AND DEBBIE MARX, husband and wife to Borrower of even date and
by a deed of trust of even date from FDP, LP to KIRK DOCKERY, TRUSTEE, both of which cover
the following real property:

417.335 acre (Surface area - Grid Area: 417.201 acres) tract of land situated in the G. C & S.F.R.R
Survey, Section 5, Abstract No. 442, the Benjamin White Survey, Abstract No. 431; and the J.N.
Stone Survey, Abstract No. 516 in Wilson County, Texas, containing a portion of Tracts 1, 2 and 3
described in instrument to Mrs. Clara Jaksik Marx, Sr., recorded in Volume 420, Page 209 of the
Wilson County Deed Records, containing a small portion of that certain 5.000 acre tract described
in instrument to Robert R. Marx recorded in Volume 673, Page 799 of the Wilson County Official


EXHIBIT
B

542

Public Records; containing a portion of that certain 326.047 acre tract described in instrument to Robert R. Marx recorded in Volume 732, Page 377 of the Wilson County Official Public Records; and being more particularly described by metes and bounds on the attached Exhibit "A."

**Other Security for Payment:**     None

Borrower promises to pay to the order of Lender the Principal Amount plus interest at the Annual Interest Rate. This note is payable at the Place for Payment and according to the Terms of Payment. All unpaid amounts are due by the Maturity Date. After maturity, Borrower promises to pay any unpaid principal balance plus interest at the Annual Interest Rate on Matured, Unpaid Amounts.

If Borrower defaults in the payment of this note or in the performance of any obligation in any instrument securing or collateral to this note, Lender may declare the unpaid principal balance, earned interest, and any other amounts owed on the note immediately due. Notwithstanding any other provision of this note, in the event of a default, before exercising any of Lender's remedies under this note or any deed of trust or warranty deed with vendor's lien securing it, Lender will first give Borrower written notice of default and Borrower will have ten days after notice is given in which to cure the default. If the default is not cured ten days after notice, Borrower and each surety, endorser, and guarantor waive all demand for payment, presentation for payment, notice of intention to accelerate maturity, notice of acceleration of maturity, protest, and notice of protest, to the extent permitted by law.

Borrower also promises to pay reasonable attorney's fees and court and other costs if this note is placed in the hands of an attorney to collect or enforce the note. These expenses will bear interest from the date of advance at the Annual Interest Rate on Matured, Unpaid Amounts. Borrower will pay Lender these expenses and interest on demand at the Place for Payment. These expenses and interest will become part of the debt evidenced by the note and will be secured by any security for payment.

**Prepayment:**  Borrower may prepay this note in any amount at any time before the Maturity Date without penalty or premium.

**Application of Prepayment:**     Prepayments will be applied to installments on the last maturing principal, and interest on that prepaid principal will immediately cease to accrue.

Interest on the debt evidenced by this note will not exceed the maximum rate or amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the Principal Amount or, if the Principal Amount has been paid, refunded. On any acceleration or required or permitted prepayment, any excess interest will be canceled automatically as of the acceleration or prepayment or, if the excess interest has already been paid, credited on the Principal Amount or, if the Principal Amount has been paid, refunded. This provision overrides any conflicting provisions in this note and all other instruments concerning the debt.

Each Borrower is responsible for all obligations represented by this note.

When the context requires, singular nouns and pronouns include the plural.

A default exists under this note if (1) (a) Borrower or (b) any other person liable on any part of this note or who grants a lien or security interest on property as security for any part of this note (an "Other Obligated Party") fails to timely pay or perform any obligation or covenant in any written

543

agreement between Lender and Borrower or any Other Obligated Party; (2) any warranty, covenant, or representation in this note or in any other written agreement between Lender and Borrower or any Other Obligated Party is materially false when made; (3) a receiver is appointed for Borrower, any Other Obligated Party, or any property on which a lien or security interest is created as security (the "Collateral Security") for any part of this note; (4) any Collateral Security is assigned for the benefit of creditors; (5) a bankruptcy or insolvency proceeding is commenced by Borrower, a partnership of which Borrower is a general partner, or an Other Obligated Party; (6) (a) a bankruptcy or insolvency proceeding is commenced against Borrower, a partnership of which Borrower is a general partner, or an Other Obligated Party and (b) the proceeding continues without dismissal for sixty days, the party against whom the proceeding is commenced admits the material allegations of the petition against it, or an order for relief is entered; (7) any of the following parties is dissolved, begins to wind up its affairs, is authorized to dissolve or wind up its affairs by its governing body or persons, or any event occurs or condition exists that permits the dissolution or winding up of the affairs of any of the following parties: Borrower, a partnership of which Borrower is a general partner, or an Other Obligated Party; and (8) any Collateral Security is impaired by loss, theft, damage, levy and execution, issuance of an official writ or order of seizure, or destruction, unless it is promptly replaced with collateral security of like kind and quality or restored to its former condition.

If any provision of this note conflicts with any provision of a loan agreement, deed of trust, or security agreement of the same transaction between Lender and Borrower, the provisions of the deed of trust will govern to the extent of the conflict.

This note will be construed under the laws of the state of Texas, without regard to choice-of-law rules of any jurisdiction.

FDP, LP

BY: _____

_____, General Partner

544

**JC** **JONES & CARTER**, Inc.
ENGINEERS · PLANNERS · SURVEYORS

1050 Central Parkway N., Suite 100
San Antonio, Texas 78232-5050

Tel. 210 494 5511
FAX 210 494 5519

AUSTIN
HOUSTON
SAN ANTONIO
COLLEGE STATION

DALLAS
BRENHAM
ROSENBERG
THE WOODLANDS

*Texas Board of Professional Engineers Registration No. F-439*

METES AND BOUNDS
DESCRIPTION OF A
100.000 ACRE TRACT OF LAND

A Metes and Bounds description of a 100.000 acre (Surface area – Grid Area: 99.989 acres) tract of land situated in the Benjamin White Survey, Abstract No.431 and the J.N. Stone Survey, Abstract No.519, in Wilson County, Texas; containing a portion of Tracts 1 and 2 described in Instrument to Mrs. Clara Jakak Marx, Sr. recorded in Volume 459, Page 209 of the Wilson County Deed Records; containing a portion of that certain 6.000 acre tract described in Instrument to Robert R. Marx recorded in Volume 673, Page 769 of the Wilson County Official Public Records; containing a portion of that certain 328.047 acre tract described in Instrument to Robert R. Marx recorded in Volume 782, Page 377 of the Wilson County Official Public Records; and being more particularly described as follows:

COMMENCING at a 2-inch iron pipe found marking the northern-most corner of said 328.047 acre tract; and marking the western-most corner of that certain 6.0 acre tract described in Instrument to Raymond L. Budge recorded in Volume 785, Page 711 of the Wilson County Official Public Records; and marking the eastern-most common corner of Tracts 4 and 5 of Ruble Ranch Subdivision, plat of which is recorded in Volume 1, Page 78 of the Wilson County Plat Records; and marking the northeastern-most corner of Marx Lane (60-feet wide private lane, Volume 521, Page 537 of the Wilson County Deed Records);

THENCE, along the easterly end of said Marx Lane tract the following two (2) courses and distances:

1. South 16°17'19" West, 90.06 feet to a 1-inch iron pipe found marking the northwestern-most common corner of the aforesaid 6.000 acre and 328.047 acre tracts;

2. South 14°16'40" West, 29.07 feet to a 1/2-inch iron rod found marking the southeast corner of said Marx Lane tract and the POINT OF BEGINNING of the herein described tract of land;

THENCE, South 75°59'40" East along the easterly extension of the southerly boundary of said Marx Lane tract at 30 feet passing the common boundary of the aforesaid 6.000 acre and 328.047 acre tracts; continuing for a total distance of 60.00 feet to a point for corner;

THENCE, South 07°45'11" East, 4202.24 feet to a point for corner;

THENCE, along an alignment running 70 feet from, and parallel with, the boundary of the aforementioned 328.047 acre tract, the following four (4) courses and distances:

1. South 59°33'42" West, 2206.92 feet to a point for corner;

2. North 14°11'50" East, 192.36 feet to an angle point;

3. North 13°57'49" East, 1804.96 feet to an angle point;

4. North 14°10'03" East, 1457.79 feet to a point for corner;

1-9-2013  *[initials]*

JKS Engineering – Proposed Marx Remainder Tract "A" – 100.000 acres
Job No. S0762-008-00 - January 9, 2014 - Page 1 of 2

Smart Engineering. Smart Solutions.™

www.jonescarter.com

Exhibit "2"


EXHIBIT "B"
Page 1 of 2
54.5

**JONES & CARTER, INC.**
ENGINEERS • PLANNERS • SURVEYORS
Texas Board of Professional Engineers Registration No. F-89

THENCE, North 75°49'57" West, 70.00 feet to a point for corner situated in the westerly boundary of the aforesaid 328.047 acre tract and easterly boundary of Tract 6 of aforementioned Ruble Ranch Subdivision;

THENCE, along the easterly boundary of Tracts 6 and 5 of said Ruble Ranch Subdivision the following two(2) courses and distances:

1. North 14°10'05" East, 186.83 feet along the easterly boundary of that certain 16.978 acre "Tract Two" described in instrument to Lawrence Fitzenhein, et ux, recorded in Volume 1628, Page 368 of the Wilson County Official Public Records to a 1/2-inch iron rod (with cap stamped "JONES & CARTER") set at the western-most corner of the aforesaid 5.000 acre tract.

2. North 13°53'07" East, 1692.61 feet along the easterly boundary of said 16.978 acre "Tract Two" and along the easterly boundary of 15.893 acre "Tract 3" and 11.126 acre "Tract 1" described in instrument to Douglas D. Watson, et ux, recorded in Volume 4672, Page 288 of the Wilson County Official Public Records to the POINT OF BEGINNING, containing 100.630 acres of land in Wilson County, Texas as shown on drawing filed under Job No. S0752-003-00 in the office of Jones & Carter, Inc., San Antonio, Texas.

Note: All bearings and distances referenced herein are Texas State Plane Coordinate System grid, South Central Zone (NAD'83) as established by Global Positioning System (GPS). The grid to surface scale factor is: 1.00010t.

JONES & CARTER, INC.

Michael A. Romans
Registered Professional Land Surveyor #4657
Signature Date: 1-9-2013



EXHIBIT
"B"
Page 2 of 2

546

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

## DEED OF TRUST

### Terms

**Date:** _____, 2014

**Grantor:** FDP, LP, a Texas Limited Partnership

**Grantor's Mailing Address:**

> FDP, LP
> 1204 Zanderton
> Jourdanton, TX 78026
> Wilson County

**Trustee:** KIRK DOCKERY

**Trustee's Mailing Address:**

> KIRK DOCKERY
> P. O. Box 459
> Floresville, TX 78114
> Wilson County

**Lender:** ROBERT MARX AND DEBBIE MARX, husband and wife

**Lender's Mailing Address:**

> ROBERT MARX
> DEBBIE MARX
> 620 Marx Lane
> La Vernia, TX 78121
> Wilson County

**Obligation**

> Note

> **Date:** _____, 2014

> **Original principal amount:** ONE MILLION SEVEN HUNDRED EIGHTY-SIX THOUSAND SIX HUNDRED SEVENTY-FIVE AND NO/100 ($1,786,675.00) DOLLARS

*DEED OF TRUST*                                                                 *Page 1 of 7*

**EXHIBIT C**

547

Borrower:     FDP, LP, a Texas Limited Partnership

Lender:       ROBERT MARX AND DEBBIE MARX, husband and
              wife

Maturity date: As provided in the note.

Terms of Payment:    As provided in the note.

**Property (including any improvements):**

417.335 acre (Surface area - Grid Area: 417.201 acres) tract of land situated in the
G. C & S.F.R.R Survey, Section 5, Abstract No. 442, the Benjamin White Survey,
Abstract No. 431; and the J.N. Stone Survey, Abstract No. 516 in Wilson County,
Texas, containing a portion of Tracts 1, 2 and 3 described in instrument to Mrs. Clara
Jaksik Marx, Sr., recorded in Volume 420, Page 209 of the Wilson County Deed
Records, containing a small portion of that certain 5.000 acre tract described in
instrument to Robert R. Marx recorded in Volume 673, Page 799 of the Wilson
County Official Public Records; containing a portion of that certain 326.047 acre
tract described in instrument to Robert R. Marx recorded in Volume 732, Page 377
of the Wilson County Official Public Records; and being more particularly described
by metes and bounds on the attached Exhibit "A."

**Prior Lien:**    None.

**Other Exceptions to Conveyance and Warranty:**

Liens described as part of the Consideration and any other liens described in the deed
to Grantor as being either assumed or subject to which title is taken; validly existing
easements, rights-of-way, and prescriptive rights, whether of record or not; all presently
recorded and validly existing instruments, other than conveyances of the surface fee estate,
that affect the Property; and taxes for 2014, but not subsequent assessments for that and prior
years due to change in land usage, ownership, or both.

For value received and to secure payment of the Obligation, Grantor conveys the
Property to Trustee in trust. Grantor warrants and agrees to defend the title to the Property,
subject to the Other Exceptions to Conveyance and Warranty. On payment of the Obligation
and all other amounts secured by this deed of trust, this deed of trust will have no further
effect, and Lender will release it at Grantor's expense.

### Clauses and Covenants

**A.    Grantor's Obligations**

Grantor agrees to-

1.    keep the Property in good repair and condition;

2.    pay all taxes and assessments on the Property before delinquency;

548

3. defend title to the Property subject to the Other Exceptions to Conveyance and Warranty and preserve the lien's priority as it is established in this deed of trust;

4. maintain all insurance coverages with respect to the Property, revenues generated by the Property, and operations on the Property that Lender reasonably requires ("Required Insurance Coverages"), issued by insurers and written on policy forms acceptable to Lender, and deliver evidence of the Required Insurance Coverages in a form acceptable to Lender at least ten days before the expiration of the Required Insurance Coverages;

5. obey all laws, ordinances, and restrictive covenants applicable to the Property;

6. keep any buildings occupied as required by the Required Insurance Coverages;

7. if the lien of this deed of trust is not a first lien, pay or cause to be paid all prior lien notes and abide by or cause to be abided by all prior lien instruments; and

8. notify Lender of any change of address.

B.    **Lender's Rights**

1. Lender or Lender's mortgage servicer may appoint in writing one or more substitute trustees, succeeding to all rights and responsibilities of Trustee.

2. If the proceeds of the Obligation are used to pay any debt secured by prior liens, Lender is subrogated to all the rights and liens of the holders of any debt so paid.

3. Lender may apply any proceeds received under the property insurance policies covering the Property either to reduce the Obligation or to repair or replace damaged or destroyed improvements covered by the policy. If the Property is Grantor's primary residence and Lender reasonably determines that repairs to the improvements are economically feasible, Lender will make the property insurance proceeds available to Grantor for repairs.

4. Notwithstanding the terms of the Note to the contrary, and unless applicable law prohibits, all payments received by Lender from Grantor with respect to the Obligation or this deed of trust may, at Lender's discretion, be applied first to amounts payable under this deed of trust and then to amounts due and payable to Lender with respect to the Obligation, to be applied to late charges, principal, or interest in the order Lender in its discretion determines.

5. If Grantor fails to perform any of Grantor's obligations, Lender may perform those obligations and be reimbursed by Grantor on demand for any amounts so paid, including attorney's fees, plus interest on those amounts from the dates of payment at the rate stated in the Note for matured, unpaid amounts. The amount to be reimbursed will be secured by this deed of trust.

6. If there is a default on the Obligation or if Grantor fails to perform any of Grantor's obligations and the default continues after any required notice of the default and the time allowed to cure, Lender may-

549

a.  declare the unpaid principal balance and earned interest on the Obligation immediately due;

b.  direct Trustee to foreclose this lien, in which case Lender or Lender's agent will cause notice of the foreclosure sale to be given as provided by the Texas Property Code as then in effect; and

c.  purchase the Property at any foreclosure sale by offering the highest bid and then have the bid credited on the Obligation.

7.  Lender may remedy any default without waiving it and may waive any default without waiving any prior or subsequent default.

## C.  Trustee's Rights and Duties

If directed by Lender to foreclose this lien, Trustee will-

1.  either personally or by agent give notice of the foreclosure sale as required by the Texas Property Code as then in effect;

2.  sell and convey all or part of the Property "AS IS" to the highest bidder for cash with a general warranty binding Grantor, subject to the Prior Lien and to the Other Exceptions to Conveyance and Warranty and without representation or warranty, express or implied, by Trustee;

3.  from the proceeds of the sale, pay, in this order-

a.  expenses of foreclosure, including a reasonable commission to Trustee;

b.  to Lender, the full amount of principal, interest, attorney's fees, and other charges due and unpaid;

c.  any amounts required by law to be paid before payment to Grantor; and

d.  to Grantor, any balance; and

4.  be indemnified, held harmless, and defended by Lender against all costs, expenses, and liabilities incurred by Trustee for acting in the execution or enforcement of the trust created by this deed of trust, which includes all court and other costs, including attorney's fees, incurred by Trustee in defense of any action or proceeding taken against Trustee in that capacity.

## D.  General Provisions

1.  If any of the Property is sold under this deed of trust, Grantor must immediately surrender possession to the purchaser. If Grantor fails to do so, Grantor will become a tenant at sufferance of the purchaser, subject to an action for forcible detainer.

2.  Recitals in any trustee's deed conveying the Property will be presumed to be true.

3.  Proceeding under this deed of trust, filing suit for foreclosure, or pursuing any other remedy will not constitute an election of remedies.

550

4.      This lien will remain superior to liens later created even if the time of payment of all or part of the Obligation is extended or part of the Property is released.

5.      If any portion of the Obligation cannot be lawfully secured by this deed of trust, payments will be applied first to discharge that portion.

6.      Grantor assigns to Lender all amounts payable to or received by Grantor from condemnation of all or part of the Property, from private sale in lieu of condemnation, and from damages caused by public works or construction on or near the Property. After deducting any expenses incurred, including attorney's fees and court and other costs, Lender will either release any remaining amounts to Grantor or apply such amounts to reduce the Obligation. Lender will not be liable for failure to collect or to exercise diligence in collecting any such amounts. Grantor will immediately give Lender notice of any actual or threatened proceedings for condemnation of all or part of the Property.

7.      Grantor assigns to Lender absolutely, not only as collateral, all present and future rent and other income and receipts from the Property. Grantor warrants the validity and enforceability of the assignment. Grantor may as Lender's licensee collect rent and other income and receipts as long as Grantor is not in default with respect to the Obligation or this deed of trust. Grantor will apply all rent and other income and receipts to payment of the Obligation and performance of this deed of trust, but if the rent and other income and receipts exceed the amount due with respect to the Obligation and deed of trust, Grantor may retain the excess. If Grantor defaults in payment of the Obligation or performance of this deed of trust, Lender may terminate Grantor's license to collect rent and other income and then as Grantor's agent may rent the Property and collect all rent and other income and receipts. Lender neither has nor assumes any obligations as lessor or landlord with respect to any occupant of the Property. Lender may exercise Lender's rights and remedies under this paragraph without taking possession of the Property. Lender will apply all rent and other income and receipts collected under this paragraph first to expenses incurred in exercising Lender's rights and remedies and then to Grantor's obligations with respect to the Obligation and this deed of trust in the order determined by Lender. Lender is not required to act under this paragraph, and acting under this paragraph does not waive any of Lender's other rights or remedies. If Grantor becomes a voluntary or involuntary debtor in bankruptcy, Lender's filing a proof of claim in bankruptcy will be deemed equivalent to the appointment of a receiver under Texas law.

8.      Interest on the debt secured by this deed of trust will not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the principal of the debt or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess will be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded. This provision overrides any conflicting provisions in this and all other instruments concerning the debt.

9.      In no event may this deed of trust secure payment of any debt that may not lawfully be secured by a lien on real estate or create a lien otherwise prohibited by law.

10.     When the context requires, singular nouns and pronouns include the plural.

551

11. The term *Note* includes all extensions, modifications, and renewals of the Note and all amounts secured by this deed of trust.

12. Grantor agrees to furnish on Lender's request evidence satisfactory to Lender that all taxes and assessments on the Property have been paid when due.

13. If the Property is transferred by foreclosure, the transferee will acquire title to all insurance policies on the Property, including all paid but unearned premiums.

14. If Grantor transfers any part of the Property without Lender's prior written consent, Lender may declare the Obligation immediately payable and invoke any remedies provided in this deed of trust for default. If the Property is residential real property containing fewer than five dwelling units or a residential manufactured home, this provision does not apply to (a) a subordinate lien or encumbrance that does not transfer rights of occupancy of the Property; (b) creation of a purchase-money security interest for household appliances; (c) transfer by devise, descent, or operation of law on the death of a co-Grantor; (d) grant of a leasehold interest of three years or less without an option to purchase; (e) transfer to a spouse or children of Grantor or between co-Grantors; (f) transfer to a relative of Grantor on Grantor's death; (g) a transfer resulting from a decree of a dissolution of marriage, a legal separation agreement, or an incidental property settlement agreement by which the spouse of Grantor becomes an owner of the Property; or (h) transfer to an inter vivos trust in which Grantor is and remains a beneficiary and occupant of the Property.

15. This deed of trust binds, benefits, and may be enforced by the successors in interest of all parties.

16. If Grantor and Borrower are not the same person, the term *Grantor* includes Borrower.

17. Grantor and each surety, endorser, and guarantor of the Obligation waive all demand for payment, presentation for payment, notice of intention to accelerate maturity, notice of acceleration of maturity, protest, and notice of protest, to the extent permitted by law.

18. Grantor agrees to pay reasonable attorney's fees, trustee's fees, and court and other costs of enforcing Lender's rights under this deed of trust if this deed of trust is placed in the hands of an attorney for enforcement.

19. If any provision of this deed of trust is determined to be invalid or unenforceable, the validity or enforceability of any other provision will not be affected.

20. The term *Lender* includes any mortgage servicer for Lender.

21. Grantor represents that this deed of trust and the Note are given for the following purposes:

The debt evidenced by the Note is in payment of the purchase price of the Property; the debt is secured both by this deed of trust and by a vendor's lien on the Property, which is expressly retained in a deed to Grantor of even date. This deed of trust does not waive the vendor's

552

lien, and the two liens and the rights created by this deed of trust are cumulative. Lender may elect to foreclose either of the liens without waiving the other or may foreclose both.

FDP, LP

BY:_____

_____, General Partner

Acknowledgment

STATE OF TEXAS     §

COUNTY OF _____ §

This instrument was acknowledged before me on _____, 2014 by _____, General Partner of FDP, LP, a Texas Limited Partnership, on behalf of said partnership.

_____
Notary Public, State of Texas

PREPARED IN THE OFFICE OF:
Paul Webb, PC
221 N. Houston Street
Wharton, Texas 77488

AFTER RECORDING RETURN TO:

_____
_____

553

**JONES & CARTER, Inc.**
**ENGINEERS • PLANNERS • SURVEYORS**

1050 Central Parkway N., Suite 100
San Antonio, Texas 78232-5050

TEL. 210-494-9811
FAX 210-494-8919

AUSTIN
HOUSTON
SAN ANTONIO
COLLEGE STATION

DALLAS
DURHAM
ROSENBERG
THE WOODLANDS

State Board of Professional Engineers Registration No. F-439

**METES AND BOUNDS
DESCRIPTION OF A
417.335 ACRE TRACT OF LAND**

A Metes and Bounds description of a 417.335 acre (Surface area — Grid Area: 447.201 acres) tract of land situated in the G.C. & S.F. RR Survey, Section 5, Abstract No.342; the Benjamin White Survey, Abstract No.431; and the J.N. Slofie Survey, Abstract No.516; in Wilson County, Texas; containing a portion of Tracts 1, 2 and 3 described in instrument to Mrs. Clara Jaksik-Marx, Sr. recorded in Volume 428, Page 209 of the Wilson County Deed Records; containing a small portion of that certain 5.000 acre tract described in instrument to Robert R. Marx recorded in Volume 678, Page 799 of the Wilson County Official Public Records; containing a portion of that certain 826.047 acre tract described in instrument to Robert R. Marx recorded in Volume 752, Page 377 of the Wilson County Official Public Records; and being more particularly described as follows:

BEGINNING at a 2-inch iron pipe found marking the northern-most corner of said 826.047 acre tract, and marking the western-most corner of that certain 6.0 acre tract described in instrument to Raymond L. Budge recorded in Volume 785, Page 711 of the Wilson County Official Public Records; and marking the eastern-most common corner of Tracts 4 and 5 of Ruble Ranch Subdivision, plat of which is recorded in Volume 1, Page 76 of the Wilson County Plat Records; and marking the northeastern-most corner of Marx Lane (60-feet wide private lane, Volume 621, Page 827 of the Wilson County Deed Records); said BEGINNING point having Texas State Plane Grid Coordinates:
North 13,851,249.89 feet, East 2,288,408.68 feet;

THENCE, along the boundary of said 6.0 acre tract the following two (2) courses and distances:

1. South 76°29'39" East, 243.79 feet to a 1/2-inch iron rod found for corner;

2. North 14°32'14" East, 1045.87 feet to a 1/2-inch iron rod found for corner in the southwesterly boundary of Lot 88 of Rosewood Subdivision, Unit 2, plat of which is recorded in Volume 6, Page 22 of the Wilson County Plat Records;

THENCE, South 76°11'35" East, 6551.79 feet along the southwesterly boundary of said Rosewood Subdivision, Unit 2 and Rosewood Subdivision, Unit 3 (Volume 8, Page 60, Wilson County Plat Records), and Rosewood Subdivision, Unit 5 (Volume 8, Page 70, Wilson County Plat Records) to a 1-inch iron pipe found marking the northern-most corner of that certain 552.072 acre tract described in instrument to Yates-Semmes Land and Cattle Co. recorded in Volume 710, Page 672 of the Wilson County Official Public Records;

THENCE, South 69°32'02" West, along the northwesterly boundary of said 552.072 acre tract, at 2059.80 feet passing a 1/2-inch iron rod found marking the eastern-most corner of the aforementioned 826.047 acre tract, continuing for a total distance of 6044.55 feet to a 1-inch iron pipe found marking the western-most corner of said 552.072 acre tract and northern-most corner of the remainder of that certain 600.003 acre tract described in instrument to Norma L. Jaksik recorded in Volume 698, Page 255 of the Wilson County Official Public Records;

THENCE, South 69°33'42" West, 2654.43 feet along the northwesterly boundary of said 600.003 acre tract to a tract to a rock found near a fence post situated in the southeasterly boundary of Woodlands Subdivision, plat of which is recorded in Volume 11, Page 31 of the Wilson County Plat Records;

**EXHIBIT "A"**
**Page 1 of 3**

1-23-2014

JK8 Engineering — Proposed Marx Out Tract "B" — 417.335 acres
Job No. S0782-000-00 — January 23, 2014 • Page 1 of 3

Smart Engineering. Smart Solutions.™                          www.jonescarter.com

554

**JONES & CARTER, Inc.**
ENGINEERS · PLANNERS · SURVEYORS
Texas Board of Professional Engineers Registration No. F-439

THENCE, along the easterly boundary of aforementioned Ruble Ranch Subdivision, the following three (3) courses and distances:

1. North 14°11'50" East, along the easterly boundary of said Woodlands Subdivision; at 60.89 feet passing the centerline of Woodlands Drive (70 feet wide); continuing for a total distance of 332.67 feet to a 1/2-inch iron rod found marking the northeast corner of said Woodlands Subdivision and the southeast corner of Copper Creek Estates, Unit 2, plat of which is recorded in Volume 10, Page 93 of the Wilson County Plat Records;

2. North 13°57'45" East, along the easterly boundary of said Copper Creek Estates, Unit 2 and along the easterly boundary of an "unplatted area" owned by Paul Cleveland (Vol. 1444, Pg. 362, WCOPR) per plat of Copper Creek Estates, Unit 3 recorded in Volume 10, Page 160 of the Wilson County Plat Records; at 864.5 feet passing the centerline of Copper Creek Drive (70 feet wide); continuing for a total distance of 1804.94 feet to a 2-inch pipe found marking the eastern-most common corner of Tracts 6 and 7 of aforesaid Ruble Ranch Subdivision;

3. North 14°10'03" East, 1,457.91 feet along the easterly boundary of an unplatted strip of land (approximately 15 feet wide, Paul Cleveland, et ux, Volume 1597, Page 108, WCOPR) adjoining the easterly boundary of Bridge Water Ranch Subdivision, plat of which is recorded in Volume 11, Page 14 of the Wilson County Plat Records, and along the easterly boundary of that certain 15.979 acre "Tract Two" described in instrument to Laynezas Erisenheim, et ux, recorded in Volume 1623, Page 859 of the Wilson County Official Public Records, to a point for corner;

THENCE, along the boundary of a proposed 100.000 acre remainder tract, the following seven (7) courses and distances:

1. South 75°49'57" East, 70.00 feet to a point for corner;

2. South 14°10'03" West, 1457.78 feet to a point for corner;

3. South 13°57'45" West, 1804.95 feet to a point for corner;

4. South 14°11'50" West, 162.33 feet to a point for corner;

5. North 58°33'42" East, 2208.14 feet to a point for corner;

6. North 07°46'31" West, 4201.87 feet to a point for corner;

7. North 75°29'35" West, 60.00 feet to a 1/2-inch iron rod found marking the eastern-most corner of "Tract 1" described in instrument to Douglas D. Walther, et ux, recorded in Volume 1872, Page 266 of the Wilson County Official Public Records, and marking the southern-most corner of the aforementioned Marx Lane tract;

THENCE, North 14°16'49" East, 29.97 feet along the easterly end of said Marx Lane tract to a 1-inch iron pipe found marking an angle point, same being the northern-most corner of the aforesaid 5.000 acre tract;

EXHIBIT
"A"
Page 2 of 3

1-23-2014

555

**JONES & CARTER, INC.**
ENGINEERS · PLANNERS · SURVEYORS
Texas Board of Professional Engineers Registration No. F-439

THENCE, North 16°17'16" East, 80.08 feet along the easterly end of said Mane Lane tract to the POINT OF BEGINNING, containing 417.335 acres of land in Wilson County, Texas as shown on drawing filed under Job No. S0752-008-00 in the office of Jones & Carter, Inc., San Antonio, Texas.

Note: All bearings and distances referenced herein are Texas State Plane Coordinate System grid, South Central Zone (NAD83) as established by Global Positioning System (GPS). The grid to surface scale factor is: 1.000181.

JONES & CARTER, INC.



Michael A. Romans
Registered Professional Land Surveyor #4857

Signature Date: 1-23-2014



EXHIBIT
"A"
Page 3 of 3

556

# FARM AND RANCH CONTRACT

1. **PARTIES:** The parties to this contract are <u>Robert & Debbie Marx</u>

   (Seller) and <u>FDP, LP.</u> (Buyer). Seller agrees to sell and convey to Buyer and Buyer agrees to buy from Seller the Property defined below.

2. **PROPERTY:** The land, improvements, accessories and crops are collectively referred to as the "Property".
   A. **LAND:** The land situated in the County of <u>Wilson</u>, Texas, described as follows: <u>Approximately 500 acres to be surveyed out of a tract of land containing 521.79 acres further described in exhibit "A".</u> or as described on attached exhibit, also known as <u>Marx Ranch, Lavernia, TX</u> (address/zip code), together with all rights, privileges, and appurtenances pertaining thereto, including but not limited to: water rights, claims, permits, strips and gores, easements, and cooperative or association memberships.
   B. **IMPROVEMENTS:**
      (1) **FARM and RANCH IMPROVEMENTS:** The following permanently installed and built-in items, if any: windmills, tanks, barns, pens, fences, gates, sheds, outbuildings, and corrals.
      (2) **RESIDENTIAL IMPROVEMENTS:** The house, garage, and all other fixtures and improvements attached to the above-described real property, including without limitation, the following permanently installed and built-in items, if any: all equipment and appliances, valances, screens, shutters, awnings, wall-to-wall carpeting, mirrors, ceiling fans, attic fans, mail boxes, television antennas and satellite dish system and equipment, mounts and brackets for televisions and speakers, heating and air-conditioning units, security and fire detection equipment, wiring, plumbing and lighting fixtures, chandeliers, water softener system, kitchen equipment, garage door openers, cleaning equipment, shrubbery, landscaping, outdoor cooking equipment, and all other property owned by Seller and attached to the above described real property.
   C. **ACCESSORIES:**
      (1) **FARM AND RANCH ACCESSORIES:** The following described related accessories: (check boxes of conveyed accessories) ☒ portable buildings ☐ hunting blinds ☐ game feeders ☐ livestock feeders and troughs ☒ irrigation equipment ☐ fuel tanks ☒ submersible pumps ☒ pressure tanks ☒ corrals ☒ gates ☒ chutes ☐ other: _____

      (2) **RESIDENTIAL ACCESSORIES:** The following described related accessories, if any: window air conditioning units, stove, fireplace screens, curtains and rods, blinds, window shades, draperies and rods, door keys, mailbox keys, above ground pool, swimming pool equipment and maintenance accessories, artificial fireplace logs, and controls for: (i) satellite dish systems, (ii) garages, (iii) entry gates, and (iv) other improvements and accessories.
   D. **CROPS:** Unless otherwise agreed in writing, Seller has the right to harvest all growing crops until delivery of possession of the Property.
   E. **EXCLUSIONS:** The following improvements, accessories, and crops will be retained by Seller and must be removed prior to delivery of possession: <u>None</u>

   F. **RESERVATIONS:** Any reservation for oil, gas, or other minerals is described on the attached TREC addendum. Seller reserves the following water, timber, or other interests: <u>None</u>

3. **SALES PRICE:**
   A. Cash portion of Sales Price payable by Buyer at closing ............... $ _____300,000.00_____
   B. Sum of all financing described below (excluding any loan funding fee or mortgage insurance premium) ................................. $ _____1,575,000.00_____
   C. Sales Price (Sum of A and B) ............................................. $ _____1,875,000.00_____
   D. The Sales Price ☒ will ☐ will not be adjusted based on the survey required by Paragraph 6C. If the Sales Price is adjusted, the Sales Price will be calculated on the basis of $ 3,750.00 per acre. If the Sales Price is adjusted by more than 10%, either party may terminate this contract by providing written notice to the other party within _____14_____ days after the terminating party receives the survey. If neither party terminates this contract or if the variance is 10% or less, the adjustment will be made to the amount in ☐ 3A ☐ 3B ☐ proportionately to 3A and 3B.

4. **FINANCING:** The portion of Sales Price not payable in cash will be paid as follows: (Check applicable boxes below)

TAR 1701   Initialed for identification by Buyer <u>LWF</u> and Seller <u>RM DM</u>   TREC NO. 25-8

Merk Real Estate 1845 Water St Kerrville, TX 78028          Phone: (830)257-5551   Fax:          Lavernia
Mark Merk          Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com

**EXHIBIT 2**

16

☐ A. **THIRD PARTY FINANCING:** One or more third party mortgage loans in the total amount of
$_____ (excluding any loan funding fee or mortgage insurance premium).
(1) Property Approval: If the Property does not satisfy the lenders' underwriting requirements for the loan(s) (including, but not limited to appraisal, insurability and lender required repairs), Buyer may terminate this contract by giving notice to Seller prior to closing and the earnest money will be refunded to Buyer.
(2) Credit Approval: (Check one box only)
    ☐ (a) This contract is subject to Buyer being approved for the financing described in the attached Third Party Financing Addendum for Credit Approval.
    ☐ (b) This contract is not subject to Buyer being approved for financing and does not involve FHA or VA financing.

☐ B. **ASSUMPTION:** The assumption of the unpaid principal balance of one or more promissory notes described in the attached TREC Loan Assumption Addendum.

☒ C. **SELLER FINANCING:** A promissory note from Buyer to Seller of $ _1,575,000.00_____, secured by vendor's and deed of trust liens, and containing the terms and conditions described in the attached TREC Seller Financing Addendum. If an owner policy of title insurance is furnished, Buyer shall furnish Seller with a mortgagee policy of title insurance.

5. **EARNEST MONEY:** Upon execution of this contract by all parties, Buyer shall deposit
$_10,000.00_____ as earnest money with _____*Bedgood Title*_____
as escrow agent, at _____300 E. Airline rd. Victoria, TX 77901_____
(address). Buyer shall deposit additional earnest money of $ _____ with escrow agent within _____ days after the effective date of this contract. If Buyer fails to deposit the earnest money as required by this contract, Buyer will be in default.

6. **TITLE POLICY AND SURVEY:**
A. **TITLE POLICY:** Seller shall furnish to Buyer at ☒ Seller's ☐ Buyer's expense an owner policy of title insurance (Title Policy) issued by: _____*Bedgood Title*_____
(Title Company) in the amount of the Sales Price, dated at or after closing, insuring Buyer against loss under the provisions of the Title Policy, subject to the promulgated exclusions (including existing building and zoning ordinances) and the following exceptions:
(1) The standard printed exception for standby fees, taxes and assessments.
(2) Liens created as part of the financing described in Paragraph 4.
(3) Reservations or exceptions otherwise permitted by this contract or as may be approved by Buyer in writing.
(4) The standard printed exception as to marital rights.
(5) The standard printed exception as to waters, tidelands, beaches, streams, and related matters.
(6) The standard printed exception as to discrepancies, conflicts, shortages in area or boundary lines, encroachments or protrusions, or overlapping improvements. Buyer, at Buyer's expense, may have the exception amended to read, "shortages in area".
B. **COMMITMENT:** Within 20 days after the Title Company receives a copy of this contract, Seller shall furnish to Buyer a commitment for title insurance (Commitment) and, at Buyer's expense, legible copies of restrictive covenants and documents evidencing exceptions in the Commitment (Exception Documents) other than the standard printed exceptions. Seller authorizes the Title Company to deliver the Commitment and Exception Documents to Buyer at Buyer's address shown in Paragraph 21. If the Commitment and Exception Documents are not delivered to Buyer within the specified time, the time for delivery will be automatically extended up to 15 days or the Closing Date, whichever is earlier.
C. **SURVEY:** The survey must be made by a registered professional land surveyor acceptable to the Title Company and Buyer's lender(s). (Check one box only):
    ☐ (1) Within _____ days after the effective date of this contract, Seller shall furnish to Buyer and Title Company Seller's existing survey of the Property and a Residential Real Property Affidavit promulgated by the Texas Department of Insurance (T-47 Affidavit). If Seller fails to furnish the existing survey or affidavit within the time prescribed, Buyer shall obtain a new survey at Seller's expense no later than 3 days prior to Closing Date. The existing survey ☐ will ☐ will not be recertified to a date subsequent to the effective date of this contract at the expense of ☐ Buyer ☐ Seller. If the existing survey is not approved by the Title Company or Buyer's lender (s), a new survey will be obtained at the expense of ☐ Buyer ☐ Seller no later than 3 days prior to Closing Date.
    ☐ (2) Within _____ days after the effective date of this contract, Buyer shall obtain a new survey at Buyer's expense. Buyer is deemed to receive the survey on the date of actual receipt or the date specified in this paragraph, whichever is earlier.
    ☒ (3) Within ___40___ days after the effective date of this contract, Seller, at Seller's expense shall furnish a new survey to Buyer.
    ☐ (4) No survey is required.
D. **OBJECTIONS:** Buyer may object in writing to (i) defects, exceptions, or encumbrances to title disclosed on the survey other than items 6A(1) through (5) above; or disclosed in the Commitment other than items 6A(1) through (6) above; (ii) any portion of the Property

TAR 1701   Initialed for identification by Buyer _LWF_____ and Seller _RM DH_____   TREC NO. 25-8
Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com   Lavernia

17

(Address of Property)

lying in a special flood hazard area (Zone V or A) as shown on the current Federal Emergency Management Agency map; or (iii) any exceptions which prohibit the following use or activity:

_____

_____

Buyer must object the earlier of (i) the Closing Date or (ii) ___14___ days after Buyer receives the Commitment, Exception Documents, and the survey. Buyer's failure to object within the time allowed will constitute a waiver of Buyer's right to object; except that the requirements in Schedule C of the Commitment are not waived. Provided Seller is not obligated to incur any expense, Seller shall cure the timely objections of Buyer or any third party lender within 15 days after Seller receives the objections and the Closing Date will be extended as necessary. If objections are not cured within such 15 day period, this contract will terminate and the earnest money will be refunded to Buyer unless Buyer waives the objections.

E. EXCEPTION DOCUMENTS: Prior to the execution of the contract, Seller has provided Buyer with copies of the Exception Documents listed below or on the attached exhibit. Matters reflected in the Exception Documents listed below or on the attached exhibit will be permitted exceptions in the Title Policy and will not be a basis for objection to title:

| Document | Date | Recording Reference |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

F. SURFACE LEASES: Prior to the execution of the contract, Seller has provided Buyer with copies of written leases and given notice of oral leases (Leases) listed below or on the attached exhibit. The following Leases will be permitted exceptions in the Title Policy and will not be a basis for objection to title: _____

_____

_____

G. TITLE NOTICES:
(1) ABSTRACT OR TITLE POLICY: Broker advises Buyer to have an abstract of title covering the Property examined by an attorney of Buyer's selection, or Buyer should be furnished with or obtain a Title Policy. If a Title Policy is furnished, the Commitment should be promptly reviewed by an attorney of Buyer's choice due to the time limitations on Buyer's right to object.

(2) STATUTORY TAX DISTRICTS: If the Property is situated in a utility or other statutorily created district providing water, sewer, drainage, or flood control facilities and services, Chapter 49, Texas Water Code, requires Seller to deliver and Buyer to sign the statutory notice relating to the tax rate, bonded indebtedness, or standby fee of the district prior to final execution of this contract.

(3) TIDE WATERS: If the Property abuts the tidally influenced waters of the state, §33.135, Texas Natural Resources Code, requires a notice regarding coastal area property to be included in the contract. An addendum containing the notice promulgated by TREC or required by the parties must be used.

(4) ANNEXATION: If the Property is located outside the limits of a municipality, Seller notifies Buyer under §5.011, Texas Property Code, that the Property may now or later be included in the extraterritorial jurisdiction of a municipality and may now or later be subject to annexation by the municipality. Each municipality maintains a map that depicts its boundaries and extraterritorial jurisdiction. To determine if the Property is located within a municipality's extraterritorial jurisdiction or is likely to be located within a municipality's extraterritorial jurisdiction, contact all municipalities located in the general proximity of the Property for further information.

(5) PROPERTY LOCATED IN A CERTIFICATED SERVICE AREA OF A UTILITY SERVICE PROVIDER: Notice required by §13.257, Water Code: The real property, described in Paragraph 2, that you are about to purchase may be located in a certificated water or sewer service area, which is authorized by law to provide water or sewer service to the properties in the certificated area. If your property is located in a certificated area there may be special costs or charges that you will be required to pay before you can receive water or sewer service. There may be a period required to construct lines or other facilities necessary to provide water or sewer service to your property. You are advised to

TAR 1701   Initialed for Identification by Buyer *LWE* and Seller *KM DM*   TREC NO. 25-8
Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com   Lavernia

18

determine if the property is in a certificated area and contact the utility service provider to determine the cost that you will be required to pay and the period, if any, that is required to provide water or sewer service to your property. The undersigned Buyer hereby acknowledges receipt of the foregoing notice at or before the execution of a binding contract for the purchase of the real property described in Paragraph 2 or at closing of purchase of the real property.

(6) **PUBLIC IMPROVEMENT DISTRICTS:** If the Property is in a public improvement district, §5.014, Property Code, requires Seller to notify Buyer as follows: As a purchaser of this parcel of real property you are obligated to pay an assessment to a municipality or county for an improvement project undertaken by a public improvement district under Chapter 372, Local Government Code. The assessment may be due annually or in periodic installments. More information concerning the amount of the assessment and the due dates of that assessment may be obtained from the municipality or county levying the assessment. The amount of the assessments is subject to change. Your failure to pay the assessments could result in a lien on and the foreclosure of your property.

(7) **TEXAS AGRICULTURAL DEVELOPMENT DISTRICT:** The Property ☐ is ☐ is not located in a Texas Agricultural Development District. For additional information contact the Texas Department of Agriculture.

**7. PROPERTY CONDITION:**

A. **ACCESS, INSPECTIONS AND UTILITIES:** Seller shall permit Buyer and Buyer's agents access to the Property at reasonable times. Buyer may have the Property inspected by inspectors selected by Buyer and licensed by TREC or otherwise permitted by law to make inspections. Seller at Seller's expense shall turn on existing utilities for inspections.
**NOTICE:** Buyer should determine the availability of utilities to the Property suitable to satisfy Buyer's needs.

B. **SELLER'S DISCLOSURE NOTICE PURSUANT TO §5.008, TEXAS PROPERTY CODE (Notice):** (Check one box only)
☐ (1) Buyer has received the Notice
☐ (2) Buyer has not received the Notice. Within _____ days after the effective date of this contract, Seller shall deliver the Notice to Buyer. If Buyer does not receive the Notice, Buyer may terminate this contract at any time prior to the closing and the earnest money will be refunded to Buyer. If Seller delivers the Notice, Buyer may terminate this contract for any reason within 7 days after Buyer receives the Notice or prior to the closing, whichever first occurs, and the earnest money will be refunded to Buyer.
☒ (3) The Texas Property Code does not require this Seller to furnish the Notice.

C. **SELLER'S DISCLOSURE OF LEAD-BASED PAINT AND LEAD-BASED PAINT HAZARDS** is required by Federal law for a residential dwelling constructed prior to 1978.

D. **ACCEPTANCE OF PROPERTY CONDITION:** (Check one box only)
☒ (1) Buyer accepts the Property in its present condition.
☐ (2) Buyer accepts the Property in its present condition provided Seller, at Seller's expense, shall complete the following specific repairs and treatments:_____
_____.(Do not insert general phrases, such as " subject to inspections," that do not identify specific repairs.)
**NOTICE TO BUYER AND SELLER:** Buyer's agreement to accept the Property in its present condition under Paragraph 7D(1) or (2) does not preclude Buyer from inspecting the Property under Paragraph 7A, from negotiating repairs or treatments in a subsequent amendment, or from terminating this contract during the Option Period, if any.

E. **COMPLETION OF REPAIRS:** Unless otherwise agreed in writing, Seller shall complete all agreed repairs prior to the Closing Date. All required permits must be obtained, and repairs must be performed by persons who are licensed or otherwise permitted by law to provide such repairs. At Buyer's election, any transferable warranties received by Seller with respect to the repairs will be transferred to Buyer at Buyer's expense. If Seller fails to complete any agreed repairs prior to the Closing Date, Buyer may do so and receive reimbursement from Seller at closing. The Closing Date will be extended up to 15 days, if necessary, to complete repairs.

F. **LENDER REQUIRED REPAIRS AND TREATMENTS:** Unless otherwise agreed in writing, neither party is obligated to pay for lender required repairs, which includes treatment for wood destroying insects. If the parties do not agree to pay for the lender required repairs or treatments, this contract will terminate and the earnest money will be refunded to Buyer. If the cost of lender required repairs and treatments exceeds 5% of the Sales Price, Buyer may terminate this contract and the earnest money will be refunded to Buyer.

G. **ENVIRONMENTAL MATTERS:** Buyer is advised that the presence of wetlands, toxic substances, including asbestos and wastes or other environmental hazards, or the presence of a threatened or endangered species or its habitat may affect Buyer's intended use of the Property. If Buyer is concerned about these matters, an addendum promulgated by TREC or required by the parties should be used.

H. **SELLER'S DISCLOSURES:** Except as otherwise disclosed in this contract, Seller has no knowledge of the following:
(1) any flooding of the Property which has had a material adverse effect on the use of the Property;

TAR 1701   Initialed for Identification by Buyer *L W F* _____ and Seller *R M   D M*    TREC NO. 25-8
Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com    Lavernia

19

    (2) any pending or threatened litigation, condemnation, or special assessment affecting the Property;

    (3) any environmental hazards or conditions materially affecting the Property;

    (4) any dumpsite, landfill, or underground tanks or containers now or previously located on the Property;

    (5) any wetlands, as defined by federal or state law or regulation, affecting the Property; or

    (6) any threatened or endangered species or their habitat affecting the Property.

  I. **RESIDENTIAL SERVICE CONTRACTS:** Buyer may purchase a residential service contract from a residential service company licensed by TREC. If Buyer purchases a residential service contract, Seller shall reimburse Buyer at closing for the cost of the residential service contract in an amount not exceeding $ _____. Buyer should review any residential service contract for the scope of coverage, exclusions and limitations. **The purchase of a residential service contract is optional. Similar coverage may be purchased from various companies authorized to do business in Texas.**

  J. **GOVERNMENT PROGRAMS:** The Property is subject to the government programs listed below or on the attached exhibit: __None__
Seller shall provide Buyer with copies of all governmental program agreements. Any allocation or proration of payment under governmental programs is made by separate agreement between the parties which will survive closing.

8. **BROKERS' FEES:** All obligations of the parties for payment of brokers' fees are contained in separate written agreements.

9. **CLOSING:**

  A. The closing of the sale will be on or before ___March 15th, 2012___ , _____ , or within 7 days after objections made under Paragraph 6D have been cured or waived, whichever date is later (Closing Date). If either party fails to close the sale by the Closing Date, the non-defaulting party may exercise the remedies contained in Paragraph 15.

  B. At closing:

    (1) Seller shall execute and deliver a general warranty deed conveying title to the Property to Buyer and showing no additional exceptions to those permitted in Paragraph 6, an assignment of Leases, and furnish tax statements or certificates showing no delinquent taxes on the Property.

    (2) Buyer shall pay the Sales Price in good funds acceptable to the escrow agent.

    (3) Seller and Buyer shall execute and deliver any notices, statements, certificates, affidavits, releases, loan documents and other documents reasonably required for the closing of the sale and the issuance of the Title Policy.

    (4) There will be no liens, assessments, or security interests against the Property which will not be satisfied out of the sales proceeds unless securing the payment of any loans assumed by Buyer and assumed loans will not be in default.

    (5) If the Property is subject to a lease, Seller shall (i) deliver to Buyer the lease(s) and the move-in condition form signed by the tenant, if any, and (ii) transfer security deposits (as defined under §92.102, Property Code), if any, to Buyer. In such an event, Buyer shall deliver to the tenant a signed statement acknowledging that the Buyer has received the security deposit and is responsible for the return of the security deposit, and specifying the exact dollar amount of the security deposit.

10. **POSSESSION:** Seller shall deliver to Buyer possession of the Property in its present or required condition, ordinary wear and tear excepted: ☒ upon closing and funding ☐ according to a temporary residential lease form promulgated by TREC or other written lease required by the parties. Any possession by Buyer prior to closing or by Seller after closing which is not authorized by a written lease will establish a tenancy at sufferance relationship between the parties. Consult your insurance agent prior to change of ownership and possession because insurance coverage may be limited or terminated. The absence of a written lease or appropriate insurance coverage may expose the parties to economic loss.

11. **SPECIAL PROVISIONS:** (Insert only factual statements and business details applicable to the sale. TREC rules prohibit licensees from adding factual statements or business details for which a contract addendum or other form has been promulgated by TREC for mandatory use.)

Buyer is a licensed real estate agent. Buyer and Seller agree to the following details to be worked out before closing: 1. Seller will survey out approximately 21 acres which will not convey with this sale. 2. Seller will sign a first right of refusal and option agreement for the 21 acres which will allow buyer to purchase the proeprty in the future. 3. Seller will retain an easement for access to the 21 acres. 4. Seller agrees to fence the 21 acres within 120 days after closing.



## 12. SETTLEMENT AND OTHER EXPENSES:

A. The following expenses must be paid at or prior to closing:

(1) Expenses payable by Seller (Seller's Expenses):

(a) Releases of existing liens, including prepayment penalties and recording fees; release of Seller's loan liability; tax statements or certificates; preparation of deed; one-half of escrow fee; and other expenses payable by Seller under this contract.

(b) Seller shall also pay an amount not to exceed $ _____ to be applied in the following order: Buyer's Expenses which Buyer is prohibited from paying by FHA, VA, Texas Veterans Land Board or other governmental loan programs, and then to other Buyer's Expenses as allowed by the lender.

(2) Expenses payable by Buyer (Buyer's Expenses) Appraisal fees; loan application fees; adjusted origination charges; credit reports; preparation of loan documents; interest on the notes from date of disbursement to one month prior to dates of first monthly payments; recording fees; copies of easements and restrictions; loan title policy with endorsements required by lender; loan-related inspection fees; photos; amortization schedules; one-half of escrow fee; all prepaid items, including required premiums for flood and hazard insurance, reserve deposits for insurance, ad valorem taxes and special governmental assessments; final compliance inspection; courier fee; repair inspection; underwriting fee; wire transfer fee; expenses incident to any loan, Private Mortgage Insurance Premium (PMI), VA Loan Funding Fee, or FHA Mortgage Insurance Premium (MIP) as required by the lender; and other expenses payable by Buyer under this contract.

B. If any expense exceeds an amount expressly stated in this contract for such expense to be paid by a party, that party may terminate this contract unless the other party agrees to pay such excess. Buyer may not pay charges and fees expressly prohibited by FHA, VA, Texas Veterans Land Board or other governmental loan program regulations.

## 13. PRORATIONS AND ROLLBACK TAXES:

A. PRORATIONS: Taxes for the current year, interest, maintenance fees, assessments, dues and rents will be prorated through the Closing Date. The tax proration may be calculated taking into consideration any change in exemptions that will affect the current year's taxes. If taxes for the current year vary from the amount prorated at closing, the parties shall adjust the prorations when tax statements for the current year are available. If taxes are not paid at or prior to closing, Buyer shall pay taxes for the current year. Rentals which are unknown at time of closing will be prorated between Buyer and Seller when they become known.

B. ROLLBACK TAXES: If this sale or Buyer's use of the Property after closing results in the assessment of additional taxes, penalties or interest (Assessments) for periods prior to closing, the Assessments will be the obligation of Buyer. If Seller's change in use of the Property prior to closing or denial of a special use valuation on the Property claimed by Seller results in Assessments for periods prior to closing, the Assessments will be the obligation of Seller. Obligations imposed by this paragraph will survive closing.

## 14. CASUALTY LOSS: 
If any part of the Property is damaged or destroyed by fire or other casualty after the effective date of this contract, Seller shall restore the Property to its previous condition as soon as reasonably possible, but in any event by the Closing Date. If Seller fails to do so due to factors beyond Seller's control, Buyer may (a) terminate this contract and the earnest money will be refunded to Buyer, (b) extend the time for performance up to 15 days and the Closing Date will be extended as necessary or (c) accept the Property in its damaged condition with an assignment of insurance proceeds and receive credit from Seller at closing in the amount of the deductible under the insurance policy. Seller's obligations under this paragraph are independent of any other obligations of Seller under this contract.

## 15. DEFAULT: 
If Buyer fails to comply with this contract, Buyer will be in default, and Seller may (a) enforce specific performance, seek such other relief as may be provided by law, or both, or (b) terminate this contract and receive the earnest money as liquidated damages, thereby releasing both parties from this contract. If, due to factors beyond Seller's control, Seller fails within the time allowed to make any non-casualty repairs or deliver the Commitment, or survey, if required of Seller, Buyer may (a) extend the time for performance up to 15 days and the Closing Date will be extended as necessary or (b) terminate this contract as the sole remedy and receive the earnest money. If Seller fails to comply with this contract for any other reason, Seller will be in default and Buyer may (a) enforce specific performance, seek such other relief as may be provided by law, or both, or (b) terminate this contract and receive the earnest money, thereby releasing both parties from this contract.

## 16. MEDIATION: 
It is the policy of the State of Texas to encourage resolution of disputes through alternative dispute resolution procedures such as mediation. Any dispute between Seller and Buyer related to this contract which is not resolved through informal discussion ☐ will ☐ will not be submitted to a mutually acceptable mediation service or provider. The parties to the mediation

TAR 1701   Initialed for Identification by Buyer *L LF*   and Seller *AM DM*   TREC NO. 25-8
Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com

Lavernia

21

shall bear the mediation costs equally. This paragraph does not preclude a party from seeking equitable relief from a court of competent jurisdiction.

**17. ATTORNEY'S FEES:** A Buyer, Seller, Listing Broker, Other Broker, or escrow agent who prevails in any legal proceeding related to this contract is entitled to recover reasonable attorney's fees and all costs of such proceeding.

**18. ESCROW:**
A. ESCROW: The escrow agent is not (i) a party to this contract and does not have liability for the performance or nonperformance of any party to this contract, (ii) liable for interest on the earnest money and (iii) liable for the loss of any earnest money caused by the failure of any financial institution in which the earnest money has been deposited unless the financial institution is acting as escrow agent.

B. EXPENSES: At closing, the earnest money must be applied first to any cash down payment, then to Buyer's Expenses and any excess refunded to Buyer. If no closing occurs, escrow agent may: (i) require a written release of liability of the escrow agent from all parties, (ii) require payment of unpaid expenses incurred on behalf of a party, and (iii) only deduct from the earnest money the amount of unpaid expenses incurred on behalf of the party receiving the earnest money.

C. DEMAND: Upon termination of this contract, either party or the escrow agent may send a release of earnest money to each party and the parties shall execute counterparts of the release and deliver same to the escrow agent. If either party fails to execute the release, either party may make a written demand to the escrow agent for the earnest money. If only one party makes written demand for the earnest money, escrow agent shall promptly provide a copy of the demand to the other party. If escrow agent does not receive written objection to the demand from the other party within 15 days, escrow agent may disburse the earnest money to the party making demand reduced by the amount of unpaid expenses incurred on behalf of the party receiving the earnest money and escrow agent may pay the same to the creditors. If escrow agent complies with the provisions of this paragraph, each party hereby releases escrow agent from all adverse claims related to the disbursal of the earnest money.

D. DAMAGES: Any party who wrongfully fails or refuses to sign a release acceptable to the escrow agent within 7 days of receipt of the request will be liable to the other party for liquidated damages in an amount equal to the sum of: (i) three times the amount of the earnest money; (ii) the earnest money; (iii) reasonable attorney's fees; and (iv) all costs of suit.

E. NOTICES: Escrow agent's notices will be effective when sent in compliance with Paragraph 21. Notice of objection to the demand will be deemed effective upon receipt by escrow agent.

**19. REPRESENTATIONS:** All covenants, representations and warranties in this contract survive closing. If any representation of Seller in this contract is untrue on the Closing Date, Seller will be in default. Unless expressly prohibited by written agreement, Seller may continue to show the Property and receive, negotiate and accept back up offers.

**20. FEDERAL TAX REQUIREMENTS:** If Seller is a "foreign person," as defined by applicable law, or if Seller fails to deliver an affidavit to Buyer that Seller is not a "foreign person," then Buyer shall withhold from the sales proceeds an amount sufficient to comply with applicable tax law and deliver the same to the Internal Revenue Service together with appropriate tax forms. Internal Revenue Service regulations require filing written reports if currency in excess of specified amounts is received in the transaction.

**21. NOTICES:** All notices from one party to the other must be in writing and are effective when mailed to, hand-delivered at, or transmitted by facsimile or electronic transmission as follows:

| To Buyer at: FOP, LP | To Seller at: |
|---|---|
| 1204 Zanderson | Robert Mark |
| Jourdanton, TX 78026 | 620 Marx Lane |
| | Lavernia TX |
| Telephone: (830) 570-3570 | Telephone: (210) 710-3856 |
| Facsimile: (830) 769-1001 | Facsimile: _____ |
| E-mail: larry@atascosawildlifesupply.com | E-mail: _____ |

**22. AGREEMENT OF PARTIES:** This contract contains the entire agreement of the parties and cannot be changed except by their written agreement. Addenda which are a part of this contract are (check all applicable boxes):

☐ Third Party Financing Addendum for Credit Approval

☒ Seller Financing Addendum

☐ Addendum for Property Subject to Mandatory Membership in a Property Owners Association

☐ Buyer's Temporary Residential Lease

☐ Loan Assumption Addendum

☐ Addendum for Sale of Other Property by Buyer

☐ Addendum for Reservation of Oil, Gas and Other Minerals

☐ Addendum for "Back-Up" Contract

☐ Addendum for Coastal Area Property

☐ Environmental Assessment, Threatened or Endangered Species and Wetlands Addendum

☐ Seller's Temporary Residential Lease

☐ Short Sale Addendum

☐ Addendum for Property Located Seaward of the Gulf Intracoastal Waterway

☐ Addendum for Seller's Disclosure of Information on Lead-based Paint and Lead-based Paint Hazards as Required by Federal Law

☐ Other (list): _____

**23. TERMINATION OPTION:** For nominal consideration, the receipt of which is hereby acknowledged by Seller, and Buyer's agreement to pay Seller $ _100.00_ (Option Fee) within 2 days after the effective date of this contract, Seller grants Buyer the unrestricted right to terminate this contract by giving notice of termination to Seller within _15_ days after the effective date of this contract (Option Period). If no dollar amount is stated as the Option Fee or if Buyer fails to pay the Option Fee to Seller within the time prescribed, this paragraph will not be a part of this contract and Buyer shall not have the unrestricted right to terminate this contract. If Buyer gives notice of termination within the time prescribed, the Option Fee will not be refunded; however, any earnest money will be refunded to Buyer. The Option Fee ☒ will ☐ will not be credited to the Sales Price at closing. Time is of the essence for this paragraph and strict compliance with the time for performance is required.

**24. CONSULT AN ATTORNEY:** TREC rules prohibit real estate licensees from giving legal advice. READ THIS CONTRACT CAREFULLY. If you do not understand the effect of this contract, consult an attorney BEFORE signing.

Buyer's Attorney is: _____

Telephone: _____

Facsimile: _____

E-mail: _____

Seller's Attorney is: _____

Telephone: _____

Facsimile: _____

E-mail: _____

EXECUTED the _27th_ day of _January_, _2012_ (EFFECTIVE DATE). (BROKER: FILL IN THE DATE OF FINAL ACCEPTANCE.)

_____
Buyer FDP, LP.

_____
Buyer

_____
Seller Robert Marx

_____
Seller Debbie Marx

The form of this contract has been approved by the Texas Real Estate Commission. TREC forms are intended for use only by trained real estate licensees. No representation is made as to the legal validity or adequacy of any provision in any specific transactions. It is not intended for complex transactions. Texas Real Estate Commission, P.O. Box 12188, Austin, TX 78711-2188, (512) 936-3000 (http://www.trec.texas.gov) TREC NO. 25-8. This form replaces TREC NO. 25-6.

TAR 1701      TREC NO. 25-8

## RATIFICATION OF FEE

Listing Broker has agreed to pay Other Broker _____ of the total Sales Price when Listing Broker's fee is received. Escrow Agent is authorized and directed to pay Other Broker from Listing Broker's fee at closing.

Other Broker:                                         Listing Broker:

By: _____        By: _____

## BROKER INFORMATION AND AGREEMENT FOR PAYMENT OF BROKERS' FEES

| Other Broker | License No. | Listing or Principal Broker | License No. |
|---|---|---|---|
| Licensed Supervisor of Associate | Telephone | Licensed Supervisor of Associate | Telephone |
| Associate | | Associate | |
| Address | | Address | |
| City  State  Zip | | City  State  Zip | |
| Telephone  Facsimile | | Telephone  Facsimile | |
| E-mail | | E-mail | |

represents ❑ Buyer only as Buyer's agent
❑ Seller as Listing Broker's subagent

represents ❑ Seller only
❑ Buyer only
❑ Seller and Buyer as an intermediary

Upon closing of the sale by Seller to Buyer of the Property described in the contract to which this fee agreement is attached: (a) ❑ Seller ❑ Buyer will pay Listing/Principal Broker ❑ a cash fee of $ _____ or ❑ _____ % of the total Sales Price; and (b) ❑ Seller ❑ Buyer will pay Other Broker ❑ a cash fee of $ _____ or ❑ _____ % of the total Sales Price. Seller/Buyer authorizes and directs Escrow Agent to pay the brokers from the proceeds at closing.

**Brokers' fees are negotiable. Brokers' fees or the sharing of fees between brokers are not fixed, controlled, recommended, suggested or maintained by the Texas Real Estate Commission.**

Seller _____        Buyer _____

Seller _____        Buyer _____

**Do not sign if there is a separate written agreement for payment of Brokers' fees.**

## OPTION FEE RECEIPT

Receipt of $ _____ (Option Fee) in the form of _____ is acknowledged.

Seller or Listing Broker _____        Date _____

## CONTRACT AND EARNEST MONEY RECEIPT

Receipt of ☑ Contract and ☑ $ _10,500.00_ Earnest Money in the form of _personal check_ is acknowledged.
Escrow Agent: _Bellmont Title Co._                  Date: _1-30-2012_
By: _Marilyn Martin_
_300 N. Wilme_                                       _Dacs@belmonttitle.com_
                                                    Email Address
Address _Victoria_  _TX_  _77901_                    Telephone: _361-573-1785_
City             State            Zip               Facsimile: _361-575-7581_

TAR 1701                                             TREC NO. 25-8
Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com
Lavernia

24





PROMULGATED BY THE TEXAS REAL ESTATE COMMISSION (TREC)     12-04-06

# SELLER FINANCING ADDENDUM
## TO CONTRACT CONCERNING THE PROPERTY AT

*620 Marx Lane* _____ Marx Ranch, Lavernia, TX _____

(Address of Property)

**A. CREDIT DOCUMENTATION.** To establish Buyer's creditworthiness, Buyer shall deliver to Seller within _____ days after the effective date of this contract, ☐ credit report ☐ verification of employment, including salary ☐ verification of funds on deposit in financial institutions ☐ current financial statement and ☐ _____
_____.
Buyer hereby authorizes any credit reporting agency to furnish copies of Buyer's credit reports to Seller at Buyer's sole expense.

**B. CREDIT APPROVAL.** If the credit documentation described in Paragraph A is not delivered within the specified time, Seller may terminate this contract by notice to Buyer within 7 days after expiration of the time for delivery, and the earnest money will be paid to Seller. If the credit documentation is timely delivered, and Seller determines in Seller's sole discretion that Buyer's credit is unacceptable, Seller may terminate this contract by notice to Buyer within 7 days after expiration of the time for delivery and the earnest money will be refunded to Buyer. If Seller does not terminate this contract, Seller will be deemed to have approved Buyer's creditworthiness.

**C. PROMISSORY NOTE.** The promissory note (Note) described in Paragraph 4 of this contract payable by Buyer to the order of Seller will bear interest at the rate of ___4.500___ % per annum and be payable at the place designated by Seller. Buyer may prepay the Note in whole or in part at any time without penalty. Any prepayments are to be applied to the payment of the installments of principal last maturing and interest will immediately cease on the prepaid principal. The Note will contain a provision for payment of a late fee of 5% of any installment not paid within 10 days of the due date. Matured unpaid amounts will bear interest at the rate of 1½% per month or at the highest lawful rate, whichever is less. The Note will be payable as follows:

☐ (1) In one payment due _____ after the date of the Note with interest payable ☐ at maturity ☐ monthly ☐ quarterly. (check one box only)

☒ (2) In monthly installments of $ _12,048.64_____ ☒ including interest ☐ plus interest (check one box only) beginning ____30 days____ after the date of the Note and continuing monthly thereafter for ____180____ months when the balance of the Note will be due and payable.

☐ (3) Interest only in monthly installments for the first _____ month(s) and thereafter in installments of $ _____ ☐ including interest ☐ plus interest (check one box only) beginning _____ after the date of the Note and continuing monthly thereafter for _____ months when the balance of the Note will be due and payable.

**D. DEED OF TRUST.** The deed of trust securing the Note will provide for the following:

(1) PROPERTY TRANSFERS: (check one box only)

☒ (a) Consent Not Required: The Property may be sold, conveyed or leased without the consent of Seller, provided any subsequent buyer assumes the Note.

☐ (b) Consent Required: If all or any part of the Property is sold, conveyed, leased for a period longer than 3 years, leased with an option to purchase, or otherwise sold (including any contract for deed), without Seller's prior written consent, which consent may be withheld in Seller's sole discretion, Seller may declare the balance of the Note

Initialed for identification by Buyer _____ and Seller _____     TREC NO. 26-5

Meek Real Estate 1845 Water St Kerrville, TX 78028
Phone: (830)257-8881     Fax:     Mark Meek     Lavernia
Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com

25

___*1020 Marx Lane*___     **Marx Ranch, Lavernia, TX**
*(Address of Property)*

to be immediately due and payable. The creation of a subordinate lien, any conveyance under threat or order of condemnation, any deed solely between buyers, or the passage of title by reason of the death of a buyer or by operation of law will not entitle Seller to exercise the remedies provided in this paragraph.

NOTE: *Under (a) or (b), Buyer's liability to pay the Note will continue unless Buyer obtains a release of liability from Seller.*

(2) TAX AND INSURANCE ESCROW: (check one box only)

☒ (a) Escrow Not Required: Buyer shall furnish Seller, before each year's ad valorem taxes become delinquent, evidence that all ad valorem taxes on the Property have been paid. Buyer shall annually furnish Seller evidence of paid-up casualty insurance naming Seller as a mortgagee loss payee.

☐ (b) Escrow Required: With each installment Buyer shall deposit in escrow with Seller a pro rata part of the estimated annual ad valorem taxes and casualty insurance premiums for the Property. Buyer shall pay any deficiency within 30 days after notice from Seller. Buyer's failure to pay the deficiency will be a default under the deed of trust. Buyer is not required to deposit any escrow payments for taxes and insurance that are deposited with a superior lienholder. The casualty insurance must name Seller as a mortgagee loss payee.

(3) PRIOR LIENS: Any default under any lien superior to the lien securing the Note will be a default under the deed of trust securing the Note.

_____     _____
Buyer                                          Seller
FDP, LP                                      Robert Marx

_____     _____
Buyer                                          Seller
                                                   Debbie Marx

The form of this contract has been approved by the Texas Real Estate Commission for use with similarly approved or promulgated contract forms. TREC forms are intended for use only by trained real estate licensees. No representation is made as to the legal validity or adequacy of any provision in any specific transactions. It is not intended for complex transactions. Texas Real Estate Commission, P.O. Box 12188, Austin, TX 78711-2188, 1-800-250-8732 or (512) 459-6544 (http://www.trec.state.tx.us) TREC No. 26-5. This form replaces TREC No. 26-4.

TREC NO. 26-5

26


Exhibit "A"

## FIELD NOTES FOR A 326.047 ACRE TRACT

BEING 326.047 acres of land more or less, being comprised of the J. N. Stone Survey, Abstract 516, the Benjamin White Survey, Abstract 431 and 117.047 acres out of the G. C. & S. F. R. R. Survey, Abstract 442, Wilson County, Texas and also being comprised of a 49 acre tract described as "Tract 1", a 160 acre tract described as "Tract 2" and 117.047 acres out of a 321 1/3 acre tract described as "Tract 3" all of which are recorded in Volume 420, Pages 209-212 of the Deed Records of Wilson County, Texas and being more particularly described as follows:

BEGINNING at a set stone found at a fence corner for the most southerly corner of this tract, said point also being the most southerly corner of the above referenced 49 acre tract described as "Tract 1" and the approximate most southerly corner of the J. N. Stone Survey, Abstract 516;

THENCE N 14°02'14" E, 3784.15 feet along an existing west fence line of this tract to an iron pipe found in same for a corner of this tract;

THENCE S 76°07'18" E, 359.49 feet to an iron pipe found for a corner of this tract;

THENCE N 04°46'32" W, 1031.20 feet and N 13°51'00" E, 915.85 feet to an iron pipe found for a corner of this tract;

THENCE N 76°00'46" W, 29.98 feet to a iron pipe found in an existing fence line for a corner of this tract;

THENCE N 16°13'49" E, 29.96 feet along said fence to an iron pin found at a fence corner for the northwest corner of this tract;

THENCE S 75°36'14" E along an existing fence and passing an iron pin found at a fence corner at 248.95 feet and continuing a total distance of 654.95 feet to a point for an interior corner of this tract;

THENCE S 14°23'46" W, 364.42 feet to a point for a corner of this tract;

THENCE S 76°13'37" E, 4625.74 feet to an iron pin set and S 29°57'15" E, 61.20 feet to an iron pin set at a fence corner for the northeast corner of this tract;

27

THENCE along the existing southeast fence line of this tract S 59°30'39" W, 3952.09 feet to an iron pipe found at a fence corner and S 58°30'52" W, 3566.00 feet to the PLACE OF BEGINNING and containing 326.047 acres of land more or less.

I hereby certify the above to be true and correct according to an actual survey made on the ground under my supervision this the 24th day of October, 1989.

J. M. Butz, Jr., R.P.S. 2024

STATE OF TEXAS
J. M. BUTZ, JR.
2024
REGISTERED
PUBLIC SURVEYOR

28



## FIELD NOTES FOR A 186.152 ACRE TRACT

BEING 186.152 acres of land more or less out of the G. C. & S. F. R. R. Survey, Abstract 442, Wilson County, Texas and also being out of a 321 1/3 acre tract of land described as "Tract 3" in Volume 420, Pages 209-212 of the Deed Records of Wilson County, Texas and being more particularly described as follows:

BEGINNING at an iron pin found at a fence corner in the north line of said 321 1/3 acre tract for the northwest corner of this tract and being S 76°16'03" E, 249.63 feet from the northwest corner of the above referenced 321 1/3 acre tract and the approximate northwest corner of the G. C. & S. F. R. R. Survey;

THENCE S 76°13'37" E, 6552.97 feet along an existing fence on said north line to an iron pipe found at a fence corner for the northeast corner of this tract;

THENCE S 59°29'51" W, 2089.55 feet along the southeast fence line of said 321 1/3 acre tract to an iron pin set at a fence corner for the southeast corner of this tract;

THENCE N 29°57'15" W, 61.20 feet to an iron pin set for an angle point in the south line of this tract;

THENCE N 76°13'37" W, 4625.74 feet along said south line to a point for a corner of this tract;

THENCE N 14°23'46" E, 364.42 feet to a point for an interior corner of this tract;

THENCE N 75°36'14" W, 406.00 feet to an iron pin found at a fence corner for the most westerly southwest corner of this tract;

THENCE N 14°29'44" E, 1045.78 feet along an existing fence to the PLACE OF BEGINNING and containing 186.152 acres of land more or less.

I hereby certify the above to be true and correct according to an actual survey made on the ground under my supervision this the 24th day of October, 1989.

J. M. Butz, Jr., R.P.S. 2024

STATE OF TEXAS
J. M. BUTZ, JR.
2024
REGISTERED PUBLIC SURVEYOR

538

All that certain tract or parcel of land containing 4.46 acres of land being taken out of the North portion of Tract No. 5, (containing 128 acres) of the Ruble Ranch Subdivision Recorded in Volume 1, Page 78, Plat records of Wilson County, Texas, being the same land conveyed to Bill McReynolds by assignment of contract in Veterans Land Board and contract of sale record in Volume 340, Page 494 deed records at Wilson County, Texas apart of the Susannah Larrison Survey No. 109, Abstract 196, and being more particularly described as follows;

BEGINNING at a 2 inch pipe found at the Northeast corner of said Tract No. 5 same being the Southeast corner of Tract No. 4 (containing 130 acres) located on the East boundary line of said Susannah Larrison Survey for the Northeast corner of this tract;

THENCE S. 13 deg. 51 min. W., 60.0 foot along the East boundary line of said Susannah Larrison to a 1/2 inch iron pin set for the Southeast corner of this tract;

THENCE N.76 deg. 09 min.W., 3241.30 feet to a 1/2 inch iron pin set in the center line of a 30 foot Road Easement located on the West boundary line of said Tract No. 5, for the Southwest corner of this tract;

THENCE N. 14 deg. 03 min. E., 60.00 foot along center line of said 30 foot Road Easement same being the West boundary line of said Tract No. 5 to a 2 inch pin found at the Southwest corner of said Tract No. 4, and being Northwest corner of Tract No. 5, for the Northwest corner of this tract;

THENCE S. 76 deg. 09 min. E., 3241.10 feet along the North boundary line of said Tract 5, to the PLACE OF BEGINNING containing 4.46 acres of land;

GRANTORS:

BM

LLM

GRANTEE:

ETM Sr.

ETM, Sr.

Exhibit "A"

30



**FDP, LP**
1204 ZANDERSON AVE
JOURDANTON, TX 78026

146

30-2426/1140
0

1/26/12 Date

Pay to the Order of ___ Bedgood Title ___ $10,000.00

Ten thousand dollars + 0/100 ___ Dollars

150 N. Loop 1604 East
San Antonio, TX 78232
(210) 496-6116

For ___ Marx ___

⑈114024260⑈0146 ⑈3005568⑈

---

**FDP, LP**
1204 ZANDERSON AVE
JOURDANTON, TX 78026

145

30-2426/1140
0

1/26/12 Date

Pay to the Order of ___ Robert + Debbie Mack ___ $100.00

One hundred dollars + 0/100 ___ Dollars

150 N. Loop 1604 East
San Antonio, TX 78232
(210) 496-6116

For ___ Term option ___

⑈114024260⑈0145 ⑈3005568⑈

31

NO. 12-03-0101-CVW

| | | |
|---|---|---|
| FDP, LP and LARRY FRIESENHAHN | § | IN THE DISTRICT COURT |
| | § | |
| VS. | § | 81st JUDICIAL DISTRICT |
| | § | |
| ROBERT MARX, DEBBIE MARX and | § | |
| DIEGO LOPEZ | § | WILSON COUNTY, TEXAS |

FILED FOR RECORD
WILSON COUNTY, TEXAS
2013 SEP -3 AM 11:09
DEBORAH BRYAN
DISTRICT CLERK
BY: _____ DEPUTY

## MEDIATED SETTLEMENT AGREEMENT

The parties hereto agree that this lawsuit and all related claims and controversies between them are hereby settled in accordance with the following terms:

1. The parties acknowledge that bona fide disputes and controversies exist between them, and they desire to compromise and settle all claims and causes of action of any kind whatsoever which the parties may have arising out of the transaction or occurrence which is the subject of this litigation. It is further understood and agreed that this is a compromise of a disputed claim, and nothing contained herein shall be construed as an admission of liability.

2. Each signatory warrants and represents that:

   a. such person has authority to bind the party or parties for whom such person acts.

   b. the claims, suits, rights, and/or interests which are the subject matter hereto are owned by the party asserting same, have not been assigned, transferred or sold, and are free of any encumbrance.

3. The parties will execute and file an Agreed Order dismissing all claims in the above-styled and numbered case with prejudice. Each party will bear its own costs.

4. The parties agree as follows:

   a. Plaintiffs purchase 421 more or less acres from Defendants for $5,000.00 per acre. Closing per existing EMK - October 1, 2013.

   b. Defendants retain his "homestead property" for period of no longer than 8 years after Closing.

   c. Homestead Property will be determined by the parties, based on home and fenced areas sufficient to maintain existing horse/cattle operation, but not to exceed 100 acres. If the parties cannot agree on what constitutes Homestead

**EXHIBIT 3**

182

Property, the mediator will act as arbitrator and make the determination. Defendants' use of the Homestead Property will not unreasonably restrict Plaintiffs' use of the property being purchased.

    d.    Plaintiffs shall have the exclusive option to purchase the Homestead Property, at the above stated price, for a period of 120 days from the earlier of:

        (i)    written notice from the Defendant,

        (ii)    the death of the last surviving Defendant,

        (iii)    or the expiration of 8 years from closing.

5.    Except for the agreements set forth herein, the parties hereby release, discharge, and forever hold the other harmless from any and all claims, counterclaims, demands, or suits, known or unknown, fixed or contingent, liquidated or unliquidated, whether or not asserted in the above case, as of this date, arising from or related to the events and transactions which are the subject matter of this cause. This mutual release runs to the benefit of all attorneys, agents, employees, officers, directors, shareholders, partners, heirs, assigns, and legal representatives of the parties hereto.

6.    Counsel for _the Marzes_ shall deliver drafts of any further documents to be executed in connection with this settlement to counsel for the other parties hereto within _14_ days from the date hereof. The parties and their counsel agree to cooperate with each other in the drafting and execution of such additional documents as are reasonably requested or required to implement the provisions and spirit of this Settlement Agreement, but notwithstanding such additional documents the parties confirm that this is a written settlement agreement as contemplated by Section 154.071 of the Texas Civil Practice and Remedies Code.

7.    This Settlement Agreement is made and performable in Wilson County, Texas, and shall be construed in accordance with the laws of the State of Texas.

8.    If one or more disputes arise with regard to the interpretation and/or performance of this Agreement or any of its provisions, including the form of further documents to be executed, the parties agree to further mediation in an attempt to resolve same with Thomas J. Smith, the Mediator, who facilitated this settlement.

9.    Although the mediator has provided a basic outline of this Settlement Agreement to the parties' counsel as a courtesy to facilitate the final resolution of this dispute, the parties and their counsel have thoroughly reviewed such outline and have, where necessary, modified it to conform to the requirements of their agreement. All signatories to this Settlement Agreement hereby release the Mediator from any and all responsibility arising from the drafting of this Settlement Agreement, and by signing this Settlement Agreement acknowledge that they, or their attorneys, have been advised by the mediator in writing that this Settlement Agreement should be independently reviewed by counsel before executing the Agreement.

183

10. The parties represent and warrant that: (i) they have carefully reviewed this Settlement Agreement; (ii) they have consulted with their attorneys concerning this Settlement Agreement; (iii) any questions that they have pertaining to this Settlement Agreement have been answered and fully explained by their attorneys; (iv) their decision to execute this Settlement Agreement was not based on any statement or representation, either written or oral, made by any person or entity other than those statements contained in this Settlement Agreement, and specifically was not based on any statement or representation made by any opposing party or its counsel; (v) this Settlement Agreement constitutes the entire agreement and understanding between the parties; (vi) they have entered into this Settlement Agreement of their own free will; and (vii) all prior and contemporaneous agreements, understandings, representations and statements, whether written or oral, are merged herein.

Agreed, this 27th day of August, 2013.

PLAINTIFFS:

FDP, LP

By: _____
Name: _____
Title: _____

_____
Larry Friesenhahn

DEFENDANTS:

_____
Robert Marx

_____
Debbie Marx

184

10.    The parties represent and warrant that: (i) they have carefully reviewed this Settlement Agreement; (ii) they have consulted with their attorneys concerning this Settlement Agreement; (iii) any questions that they have pertaining to this Settlement Agreement have been answered and fully explained by their attorneys; (iv) their decision to execute this Settlement Agreement was not based on any statement or representation, either written or oral, made by any person or entity other than those statements contained in this Settlement Agreement, and specifically was not based on any statement or representation made by any opposing party or its counsel; (v) this Settlement Agreement constitutes the entire agreement and understanding between the parties; (vi) they have entered into this Settlement Agreement of their own free will; and (vii) all prior and contemporaneous agreements, understandings, representations and statements, whether written or oral, are merged herein.

Agreed, this 27th day of August, 2013.

PLAINTIFFS:

FDP, LP

By:_____
Name:_____
Title:_____


_____
Larry Friesenhahn


DEFENDANTS:

_____        6/28/13
Robert Marx

_____        8/28/13
Debbie Marx

185

**APPROVED AS TO FORM:**

LAW OFFICES OF GILBERT T. ADAMS
1855 Calder Ave. at Third Street
P. O. Drawer 3688
Beaumont, Texas 77704-3688
(409) 835-3000
(409) 832-6162 (Fax)

By: _____
    Gilbert T. Adams, III
    State Bar No. 00790201

ATTORNEYS FOR PLAINTIFFS


THE LAW OFFICE OF GILBERT VARA, JR.
The Ariel House
8118 Datapoint Drive
San Antonio, Texas 78229-3218
(210) 614-6400
(210) 614-6401 (Fax)


By: _____
    Gilbert Vara, Jr.
    State Bar No. 20496250

ATTORNEYS FOR DEFENDANTS

C:\DATA\TJS\12300.1879\Mediated Settlement Agreement.wpd

186

APPROVED AS TO FORM:

LAW OFFICES OF GILBERT T. ADAMS
1855 Calder Ave. at Third Street
P. O. Drawer 3688
Beaumont, Texas 77704-3688
(409) 835-3000
(409) 832-6162 (Fax)


By:_____
    Gilbert T. Adams, III
    State Bar No. 00790201

ATTORNEYS FOR PLAINTIFFS


THE LAW OFFICE OF GILBERT VARA, JR.
The Ariel House
8118 Datapoint Drive
San Antonio, Texas 78229-3218
(210) 614-6400
(210) 614-6401 (Fax)


By:_____ 08/28/13
    Gilbert Vara, Jr.
    State Bar No. 20496250

ATTORNEYS FOR DEFENDANTS


C:\DATA\TJS\12300.16790\Redacted Settlement Agreement.wpd

187

## CAUSE NO. 12-03-0101-CVW

| | | |
|---|---|---|
| FDP, LP and LARRY FRIESENHAHN | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | WILSON COUNTY, TEXAS |
| | § | |
| ROBERT MARX, DEBBIE MARX, ET AL | § | 81ST JUDICIAL DISTRICT |

### ORDER GRANTING PLAINTIFFS' MOTION AND APPLICATION TO CONFIRM ARBITRATION AWARD and CONFIRMATION OF ARBITRATION AWARD

On this day, came on to be heard Plaintiffs' Motion and Application to Confirm Arbitration Award. The Court having read the Motion, including the opinion of Tommy Smith, the Arbitrator with attached Exhibits and other evidence attached thereto and any response made or filed by the Defendants, is of the opinion that said Motion and Application is in all things meritorious and should be granted.

The Court finds that the parties did arbitrate Paragraph 4.c. of the Mediated Settlement Agreement dated August 27, 2013 as agreed by the parties and Ordered by this Court on or about November 14, 2013. It is therefore

ORDERED, ADJUDGED and DECREED that Plaintiff's Motion and Application to Confirm Arbitration Award attached hereto as **Exhibit A** is hereby GRANTED and this Court hereby Accepts and Confirms the metes and bounds legal descriptions attached thereto, including **Exhibit 2** to **Exhibit A** that legally and accurately describes the metes and bounds description of the "Homestead Property" as that term is used and referenced in the Mediated Settlement Agreement of August 27, 2013 which describes the one-hundred acre tract which Plaintiffs shall have the exclusive option to purchase from Defendants or their legal beneficiaries based on the terms described in Paragraph 4.d. of the Mediated Settlement Agreement of August 27, 2013.

It is further ORDERED, ADJUDGED and DECREED that Defendants, **ROBERT MARX** and **DEBBIE MARX**, are jointly and severally liable for the costs of the Arbitrator's fee in the amount

1

135/516-526



EXHIBIT
4

353

of $1,800.00 – the amount of the invoice submitted by the Arbitrator - which this Court finds to be a reasonable and necessary fee, and are ordered to remit payment to the Arbitrator within twenty (20) days from the date of this Order;

It is further ORDERED, ADJUDGED and DECREED that Defendants, **ROBERT MARX** and **DEBBIE MARX**, are jointly and severally liable for the costs of the surveyor's fee in the amount of $11,539.43 – the amount of the invoice submitted by the surveyor - which this Court finds to be a reasonable and necessary fee and cost of arbitration, and are ordered to remit payment to the Plaintiffs within twenty (20) days from the date of this Order;

It is further ORDERED, ADJUDGED and DECREED that Defendants, **ROBERT MARX** and **DEBBIE MARX**, are jointly and severally liable to Plaintiffs for Plaintiffs' attorneys fees' in the amount of $17,202.50 and expenses in the amount of $486.00 which the Court finds to be reasonable and necessary expenses associated with the time and expenses necessarily expended in connection with the conduct of the arbitration and are ordered to remit payment to Plaintiffs within twenty (20) days from the date of this Order. The Court finds that $350.00 per hour is a reasonable attorneys' fees rate for the areas in which the attorney services were provided for those services provided. The Court further finds that it was reasonable and necessary for Plaintiff's attorney to expend 49.15 hours associated with the arbitration, including the in-person meeting, multiple conferences, working with the surveyor at the arbitrator's direction and presenting of this Motion.

It is further ORDERED, ADJUDGED and DECREED that the Award of the agreed upon Arbitrator is confirmed and accepted in full by this Court.

SIGNED on this the 12 day of May, 2014.

_____
JUDGE PRESIDING

Filed \1 2 Day of May 2014
10:55AM
Deborah Bryan
Clerk District Court Wilson County, Texas
By_____ Deputy

2

354

LAW OFFICES OF
# THOMAS J. SMITH

112 E. PECAN, SUITE 3050
SAN ANTONIO, TEXAS 78205-1512
EMAIL: smith@tjsmithlaw.com
WEBSITE: www.tjsmithlaw.com
TELEPHONE (210) 227-7565       TELECOPIER (210) 227-8645

April 14, 2014

<u>VIA EMAIL</u>

Mr. Gilbert T. Adams, III
Law Offices of Gilbert T. Adams
1855 Calder Ave. at Third Street
P.O. Drawer 3688
Beaumont, Texas 77704-3688

Mr. Kirk Dockery
Law Offices of Donaho & Dockery, P.C.
P.O. Box 459
Floresville, Texas 78114

> Re: Cause No. 12-03-0101-CVW; FDP, LP and Larry Friesenhahn ("Buyer") vs. Robert Marx and Debbie Marx ("Seller")

Dear Gilbert and Kirk:

This letter will constitute the ruling by the Arbitrator, pursuant to Paragraph 4.c. of the Mediated Settlement Agreement, dated August 27, 2013. This ruling is limited to a determination of the exact location of the 100 acre tract being retained by the Seller.

The Arbitrator has considered the submissions of counsel for both Buyer and Seller and makes the following rulings:

1.     The 100 acre tract retained by Seller is shown on Exhibit "1," attached hereto, and more particularly described by metes and bounds in Exhibit "2" attached hereto.

2.     The property being sold by Seller to the Buyer, shall consist of 417.335 acres as shown on Exhibit "1" and more particularly described by metes and bounds on Exhibit "3."

3.     All other terms and conditions in the Mediated Settlement Agreement shall remain the same, excepting only that the earnest money contract closing date shall be at the earliest possible date.

PLAINTIFF'S
EXHIBIT
385

4.      Costs of this arbitration, including the Arbitrator's fee, shall be charged to Seller. A statement is enclosed.

Gentlemen, I urge that you get this matter closed as soon as possible. The parties have been in a state of "limbo" for long enough.

Very truly yours,

Thomas J. Smith

C:\DATA\TJS\12800.1879\ATTY12 LTR.WPD

Enclosures



THIS IS NOT A LAND TITLE SURVEY

Exhibit "1"

357

**JONES & CARTER, INC.**
ENGINEERS · PLANNERS · SURVEYORS

1000 Central Parkway N., Suite 100
San Antonio, Texas 78232-5050

TEL 210 494 5511
FAX 210 494 5519

AUSTIN     DALLAS
HOUSTON     BRENHAM
SAN ANTONIO     ROSENBERG
COLLEGE STATION     THE WOODLANDS

*Texas Board of Professional Engineers Registration No. F-439*

## METES AND BOUNDS
## DESCRIPTION OF A
## 100.000 ACRE TRACT OF LAND

A Metes and Bounds description of a 100.000 acre (Surface area – Grid Area: 99.968 acres) tract of land situated in the Benjamin White Survey, Abstract No. 431 and the J.N. Stone Survey, Abstract No. 516; in Wilson County, Texas; containing a portion of Tracts 1 and 2 described in instrument to Mrs. Clara Jaksik Marx, Sr., recorded in Volume 420, Page 209 of the Wilson County Deed Records; containing a portion of that certain 5.000 acre tract described in instrument to Robert R. Marx recorded in Volume 673, Page 799 of the Wilson County Official Public Records; containing a portion of that certain 326.047 acre tract described in Instrument to Robert R. Marx recorded in Volume 732, Page 377 of the Wilson County Official Public Records; and being more particularly described as follows:

COMMENCING at a 2-inch iron pipe found marking the northern-most corner of said 326.047 acre tract; and marking the western-most corner of that certain 6.0 acre tract described in instrument to Raymond L. Budge recorded in Volume 785, Page 711 of the Wilson County Official Public Records; and marking the eastern-most common corner of Tracts 4 and 5 of Ruble Ranch Subdivision, plat of which is recorded in Volume 1, Page 78 of the Wilson County Plat Records; and marking the northeastern-most corner of Marx Lane (60-feet wide private lane, Volume 521, Page 537 of the Wilson County Deed Records);

THENCE, along the easterly end of said Marx Lane tract the following two(2) courses and distances:

1. South 16°17'19" West, 30.06 feet to a 1-inch iron pipe found marking the northwestern-most common corner of the aforesaid 5.000 acre and 326.047 acre tracts;

2. South 14°16'49" West, 29.97 feet to a 1/2-inch iron rod found marking the southeast corner of said Marx Lane tract and the POINT OF BEGINNING of the herein described tract of land;

THENCE, South 75°59'40" East, along the easterly extension of the southerly boundary of said Marx Lane tract, at 30 feet passing the common boundary of the aforesaid 5.000 acre and 326.047 acre tracts; continuing for a total distance of 60.00 feet to a point for corner;

THENCE, South 07°45'11" East, 4202.24 feet to a point for corner;

THENCE, along an alignment running 70 feet from, and parallel with, the boundary of the aforementioned 326.047 acre tract, the following four(4) courses and distances:

1. South 58°33'42" West, 2205.92 feet to a point for corner;

2. North 14°11'50" East, 162.33 feet to an angle point;

3. North 13°57'45" East, 1804.95 feet to an angle point;

4. North 14°10'03" East, 1457.79 feet to a point for corner;

1-9-2013

JKS Engineering – Proposed Marx Remainder Tract "A" - 100.000 acres
Job No. S0782-008-00 - January 9, 2014 - Page 1 of 2

Smart Engineering-Smart Solutions.™     www.jonescarter.com

Exhibit "2"

358

THENCE, North 75°49'57" West, 70.00 feet to a point for corner situated in the westerly boundary of the aforesaid 326.047 acre tract and easterly boundary of Tract 6 of aforementioned Ruble Ranch Subdivision;

THENCE, along the easterly boundary of Tracts 6 and 5 of said Ruble Ranch Subdivision the following two(2) courses and distances:

1. North 14°10'03" East, 186.83 feet along the easterly boundary of that certain 16.979 acre "Tract Two" described in instrument to Lawrence Friesenhahn, et ux, recorded in Volume 1623, Page 356 of the Wilson County Official Public Records; to a 1/2-inch iron rod (with cap stamped "JONES & CARTER") set at the western-most corner of the aforesaid 5.000 acre tract;

2. North 13°53'07" East, 1862.61 feet; along the easterly boundary of said 16.979 acre "Tract Two" and along the easterly boundary of 15.893 acre "Tract 3" and 11.129 acre "Tract 1" described in instrument to Douglas D. Watson, et ux, recorded in Volume 1672, Page 286 of the Wilson County Official Public Records; to the POINT OF BEGINNING, containing 100.000 acres of land in Wilson County, Texas as shown on drawing filed under Job No. S0752-008-00 in the office of Jones & Carter, Inc., San Antonio, Texas.

Note: All bearings and distances referenced herein are Texas State Plane Coordinate System grid, South Central Zone (NAD'83) as established by Global Positioning System (GPS). The grid to surface scale factor is: 1.000161.

JONES & CARTER, INC.

Michael A. Romans
Registered Professional Land Surveyor #4657
Signature Date: 1-9-2013

JKS Engineering – Proposed Marx Remainder Tract "A" - 100.000 acres
Job No. S0752-008-00 - January 8, 2014 - Page 2 of 2

359

**JONES & CARTER, Inc.**
**ENGINEERS • PLANNERS • SURVEYORS**

1000 Central Parkway N., Suite 100
San Antonio, Texas 78232-5050

TEL  210-494-5511
FAX  210-494-5519

AUSTIN                   DALLAS
HOUSTON                  BRENHAM
SAN ANTONIO              ROSENBERG
COLLEGE STATION          THE WOODLANDS

*Texas Board of Professional Engineers Registration No. F-439*

**METES AND BOUNDS
DESCRIPTION OF A
417.335 ACRE TRACT OF LAND**

A Metes and Bounds description of a 417.335 acre (Surface area – Grid Area: 417.201 acres) tract of land situated in the G.C. & S.F. RR Survey, Section 5, Abstract No.442; the Benjamin White Survey, Abstract No.431; and the J.N. Stone Survey, Abstract No.516; in Wilson County, Texas; containing a portion of Tracts 1, 2 and 3 described in instrument to Mrs. Clara Jaksik Marx, Sr. recorded in Volume 420, Page 209 of the Wilson County Deed Records; containing a small portion of that certain 5.000 acre tract described in instrument to Robert R. Marx recorded in Volume 679, Page 799 of the Wilson County Official Public Records; containing a portion of that certain 326.047 acre tract described in instrument to Robert R. Marx recorded in Volume 732, Page 377 of the Wilson County Official Public Records; and being more particularly described as follows:

BEGINNING at a 2-inch iron pipe found marking the northern-most corner of said 326.047 acre tract; and marking the western-most corner of that certain 6.0 acre tract described in instrument to Raymond L. Budge recorded in Volume 785, Page 711 of the Wilson County Official Public Records; and marking the eastern-most common corner of Tracts 4 and 5 of Ruble Ranch Subdivision, plat of which is recorded in Volume 1, Page 76 of the Wilson County Plat Records; and marking the northeastern-most corner of Marx Lane (60-feet wide private lane, Volume 521, Page 537 of the Wilson County Deed Records); said BEGINNING point having Texas State Plane Grid Coordinates:
North 13,651,249.09 feet, East 2,233,406.68 feet;

THENCE, along the boundary of said 6.0 acre tract the following two (2) courses and distances:

1.  South 76°29'36" East, 248.79 feet to a 1/2-inch iron rod found for corner;

2.  North 14°32'14" East, 1045.67 feet to a 1/2-inch iron rod found for corner in the southwesterly boundary of Lot 88 of Rosewood Subdivision, Unit 2, plat of which is recorded in Volume 9, Page 22 of the Wilson County Plat Records;

THENCE, South 76°11'36" East, 6551.79 feet along the southwesterly boundary of said Rosewood Subdivision, Unit 2 and Rosewood Subdivision, Unit 3 (Volume 9, Page 60, Wilson County Plat Records), and Rosewood Subdivision, Unit 6 (Volume 9, Page 70, Wilson County Plat Records) to a 1-inch iron pipe found marking the northern-most corner of that certain 632.072 acre tract described in instrument to Yates-Semmes Land and Cattle Co. recorded in Volume 710, Page 672 of the Wilson County Official Public Records;

THENCE, South 69°32'02" West, along the northwesterly boundary of said 632.072 acre tract, at 2069.30 feet passing a 1/2-inch iron rod found marking the eastern-most corner of the aforementioned 326.047 acre tract; continuing for a total distance of 6041.56 feet to a 1-inch iron pipe found marking the western-most corner of said 632.072 acre tract and northern-most corner of the remainder of that certain 600.003 acre tract described in instrument to Norma L. Jaksik recorded in Volume 696, Page 255 of the Wilson County Official Public Records;

THENCE, South 59°33'42" West, 3554.43 feet along the northwesterly boundary of said 600.003 acre tract to a tract to a rock found near a fence post situated in the southeasterly boundary of Woodlands Subdivision, plat of which is recorded in Volume 11, Page 31 of the Wilson County Plat Records;

1-23-2014

Exhibit "3"                                                    360

THENCE, along the easterly boundary of aforementioned Ruble Ranch Subdivision, the following three(3) courses and distances:

1. North 14°11'50" East, along the easterly boundary of said Woodlands Subdivision; at 60.60 feet passing the centerline of Woodlands Drive (70 feet wide); continuing for a total distance of 333.67 feet to a 1/2-inch iron rod found marking the northeast corner of said Woodlands Subdivision and the southeast corner of Copper Creek Estates, Unit 2, plat of which is recorded in Volume 10, Page 93 of the Wilson County Plat Records;

2. North 13°57'45" East; along the easterly boundary of said Copper Creek Estates, Unit 2 and along the easterly boundary of an "unplatted area" owned by Paul Cleveland (Vol.1444, Pg.362; WCOPR) per plat of Copper Creek Estates, Unit 3 recorded in Volume 10, Page 100 of the Wilson County Plat Records; at 854.5 feet passing the centerline of Copper Creek Drive (70 feet wide); continuing for a total distance of 1804.94 feet to a 2-inch pipe found marking the eastern-most common corner of Tracts 6 and 7 of aforesaid Ruble Ranch Subdivision;

3. North 14°10'03" East, 1457.91 feet; along the easterly boundary of an unplatted strip of land (approximately 15 feet wide, Paul Cleveland, et ux, Volume 1597, Page 108, WCOPR) adjoining the easterly boundary of Bridge Water Ranch Subdivision, plat of which is recorded in Volume 11, Page 14 of the Wilson County Plat Records, and along the easterly boundary of that certain 16.979 acre "Tract Two" described in instrument to Lawrence Friesenhahn, et ux, recorded in Volume 1623, Page 356 of the Wilson County Official Public Records, to a point for corner;

THENCE, along the boundary of a proposed 100.000 acre remainder tract; the following seven(7) courses and distances:

1. South 75°49'57" East, 70.00 feet to a point for corner;

2. South 14°10'03" West, 1457.79 feet to a point for corner;

3. South 13°57'45" West, 1804.95 feet to a point for corner;

4. South 14°11'50" West, 162.33 feet to a point for corner;

5. North 58°33'42" East, 2206.14 feet to a point for corner;

6. North 07°45'31" West, 4201.67 feet to a point for corner;

7. North 76°29'36" West, 60.00 feet to a 1/2-inch iron rod found marking the eastern-most corner of "Tract 1" described in instrument to Douglas D. Watson, et ux, recorded in Volume 1672, Page 266 of the Wilson County Official Public Records, and marking the southern-most corner of the aforementioned Marx Lane tract;

THENCE, North 14°16'49" East, 29.97 feet along the easterly end of said Marx Lane tract to a 1-inch iron pipe found marking an angle point; same being the northern-most corner of the aforesaid 5.000 acre tract;

1-23-2014

**JC** J O N E S & C A R T E R, Inc.
ENGINEERS · PLANNERS · SURVEYORS
*Texas Board of Professional Engineers Registration No. F-439*

THENCE, North 16°17'19" East, 30.06 feet along the easterly end of said Marx Lane tract to the POINT OF BEGINNING, containing 417.335 acres of land in Wilson County, Texas as shown on drawing filed under Job No. S0752-008-00 in the office of Jones & Carter, Inc., San Antonio, Texas.

Note:  All bearings and distances referenced herein are Texas State Plane Coordinate System grid, South Central Zone (NAD'83) as established by Global Positioning System (GPS). The grid to surface scale factor is: 1.000161.

JONES & CARTER, INC.



Michael A. Romans
Registered Professional Land Surveyor #4657

Signature Date: 1-23-2014

362

# Law Offices of Thomas J. Smith

112 East Pecan Street, Suite 3050
San Antonio, TX 78205-1512
Tax ID 74-2737757

Telephone (210) 227-7565                                                    Fax (210) 227-8645

April 14, 2014

Invoice submitted to:

Mr. Gilbert T. Adams, III
Law Offices of Gilbert T. Adams
1855 Calder Ave. at Third Street
Beaumont, TX 77704

Mr. Kirk Dockery
Law Offices of Donaho & Dockery, P.C.
P.O. Box 459
Floresville, Texas 78114

For arbitration services rendered in connection with the arbitration of FDP, LP and Larry
Friesenhahn vs. Robert Marx and Debbie Marx; File No. 12300.1879

Professional Services

|  | | Hrs/Rate | Amount |
|---|---|---|---|
| 4/14/2014 | All fees incurred by Arbitrator since January 16, 2014, including: Various communications with counsel, correspondence and emails with counsel and review of submissions and prior documents. | 6.00 300.00/hr | 1,800.00 |
| | **For professional services rendered** | 6.00 | **$1,800.00** |
| | Balance due | | $1,800.00 |